ELIZABETH C. SCOTT (*pro hac vice* forthcoming)
escott@ftc.gov
TAYLOR H. ARANA (*pro hac vice* forthcoming)
tarana@ftc.gov
CLAIRE E.W. STEWART (*pro hac vice* forthcoming)
cstewart@ftc.gov
FEDERAL TRADE COMMISSION
230 South Dearborn Street, Suite 3030
Chicago, IL 60604
Telephone: (312) 960-5609 (Scott)
Telephone: (312) 960-5639 (Arana)
Telephone: (312) 960-5615 (Stewart)

Local Counsel:
AARON M. SCHUE (CA BAR NO. 338760)
aschue@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

[Additional Attorneys for Plaintiffs Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION; ATTORNEY GENERAL OF COLORADO; OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS; THE PEOPLE OF THE STATE OF ILLINOIS; STATE OF NEBRASKA; STATE OF TENNESSEE; STATE OF UTAH; UTAH DIVISION OF CONSUMER | Case No. _____<br><br>Complaint for Permanent Injunction, Monetary Relief, Civil Penalties, And Other Relief |

PROTECTION; COMMONWEALTH
OF VIRGINIA

      Plaintiffs,

      v.

LIVE NATION ENTERTAINMENT,
INC.
and
TICKETMASTER, L.L.C.,

      Defendants.

Plaintiffs, the Federal Trade Commission ("FTC"); Attorney General of Colorado; Office of the Attorney General, State of Florida, Department of Legal Affairs; the People of the State of Illinois; the State of Nebraska; the State of Tennessee by and through its Attorney General and Reporter; the Attorney General of the State of Utah, and the Utah Division of Consumer Protection; and the Commonwealth of Virginia, by, through, and at the relation of its Attorney General (collectively, "Plaintiffs"), for their Complaint allege:

1.      Plaintiff the FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief, pursuant to Sections 5(m)(1)(A), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 57b, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c.

2.     Plaintiff, the Attorney General of Colorado, acting in his official law enforcement capacity, brings this action for Defendants' violations of the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 *et seq* and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Colorado seeks relief, including a permanent injunction, monetary relief, civil penalties, and other relief pursuant to the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-110 and 112 and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

3.     Plaintiff State of Florida brings this action for Defendants' violations of the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c.  For these violations, Florida seeks relief, including injunctive relief, equitable monetary relief, consumer restitution, the refund of monies paid, disgorgement of ill-gotten monies, civil penalties, attorney's fees, and other relief pursuant to Sections 501.207(1)(b), 501.207(3), 501.2075, and 501.2077, Florida Statutes, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

4.     Plaintiff State of Illinois brings this action for Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 ("Consumer Fraud Act"), the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Illinois seeks relief, including a permanent injunction, restitution, civil

penalties, and other relief pursuant to Section 7 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7, and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

5.      Plaintiff Nebraska brings this action for Defendants' violations of the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-301 *et. seq* and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Nebraska seeks relief, including a permanent injunction, restitution for Nebraska consumers, civil penalties, attorneys' fees, and costs and other relief pursuant to Neb. Rev. Stat. § 87-303.05 and 15 U.S.C. § 45c(c).

6.      Plaintiff State of Tennessee brings this action for Defendants' violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101. *et seq*. and the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Tennessee seeks relief, including a permanent injunction, restitution, civil penalties, attorneys' fees and costs, and other relief pursuant to Tenn. Code Ann. § 47-18-108 and 15 U.S.C. § 45c(c).

7.      Plaintiff State of Utah brings this action for Defendants' violations of the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Utah seeks a permanent injunction, compelled compliance with the law, and damages, restitution, or other compensation on behalf of Utah residents pursuant to the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

8. Plaintiff Utah Division of Consumer Protection brings this action for violations of the Utah Consumer Sales Practices Act, Utah Code § 13-11-1 *et seq*., under Utah Code §§ 13-2-5(3) and 13-11-17(1). For these violations, the Utah Division of Consumer Protection seeks permanent injunctive relief, disgorgement of ill-gotten monies, restitution of actual damages on behalf of impacted consumers, civil penalties, fines, and other equitable relief.

9. Plaintiff Commonwealth of Virginia brings this action for Defendants' violations of the Better Online Ticket Sales Act, 15 U.S.C. § 45c. For these violations, Virginia seeks relief, including a permanent injunction, damages, restitution, and other relief pursuant to the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

## SUMMARY OF THE CASE

10. Ticketmaster, L.L.C. ("Ticketmaster"), a wholly owned subsidiary of Live Nation Entertainment, Inc. ("Live Nation"), is the nation's largest ticketing company. It sells and offers to sell tickets for concerts, sports, and other live entertainment events on its website and a mobile application ("app"), making them available to consumers across the country on both the primary ("box office") and secondary ("resale") ticket markets. Ticketmaster dwarfs its competitors. The company controls roughly 80% or more of major concert venues' primary ticketing for concerts and a growing share of ticket resales in the secondary market. From

2019 to 2024 alone, consumers spent more than $82.6 billion purchasing tickets from Ticketmaster.

11.    The ticket prices and per-event ticket purchase limits on Defendants' website are primarily determined by the artists. In public, Defendants profess to prioritize "[g]etting tickets into the hands of fans, at prices set by the artist." Defendants also claim that ticket scalpers and "big resale sites" are to blame for resale tickets that Defendants sell for substantially more than the face value of the ticket. In private, however, Defendants have tacitly worked with those very same scalpers, allowing them to unlawfully purchase millions of dollars in tickets in the primary market, so that Defendants can extract more profit for themselves when reselling those tickets on the secondary market. Defendants' illegal conduct frustrates artists' desire to maintain affordable ticket prices that fit the needs of ordinary American families, costing ordinary fans millions of dollars every year. In public, Defendants maintain that their business model is at odds with brokers that routinely exceed ticket limits. In private, Defendants acknowledge that their business model and bottom line benefit from brokers preventing ordinary Americans from purchasing tickets to the shows they want to see at the prices artists set. For years, with the approval and participation of senior executives, Defendants have engaged in three illegal practices that injure artists, cause consumers to pay significantly more for event tickets, and benefit Defendants' bottom line.

12.    **First**, Defendants have displayed deceptively low ticket prices to consumers and charged much more. When consumers have searched for event tickets on Ticketmaster, Defendants have displayed a list price in the search results that does not reflect the actual cost to consumers at checkout. That list price is displayed for nearly the entire purchase process, but at checkout, Defendants have charged consumers a substantially higher price with no explanation for the increase. The higher price is because, on every ticket sale, Defendants have added substantial mandatory fees not included in the list price, which can raise the cost to the consumer by 30% or more.

13.    In Ticketmaster's own words, Defendants have taken a "bait and switch approach" to advertising ticket prices, employed specifically to create a "lift" in ticket sales. Defendants have reaped massive profits by misrepresenting the total price of tickets to consumers, who pay billions of dollars each year in mandatory fees not reflected in the list price. While listing tickets for sale at artificially low prices, Defendants have claimed publicly that they support "all-in pricing"—where, as they put it, "the first price the consumer sees is the price the consumer pays."[1] Yet, over the last decade, the first price the consumer has seen on Ticketmaster's

---

[1]    *See* Live Nation Entertainment and Ticketmaster North America's Public Comment on FTC Notice of Proposed Rule Making on Unfair or Deceptive Fees, 16 C.F.R. Part 464 (2024), https://www.regulations.gov/comment/FTC-2023-0064-3306 (last visited April 10, 2025).

platform has almost never been the price the consumer pays. As Ticketmaster's President told other Ticketmaster and Live Nation executives in 2022: "Until we have ALL IN pricing—this customer experience sucks, even if you change the name of the fees—the sticker shock at the end is the problem."

14. **Second**, Defendants deceptively represent that they impose strict ticket limits for individual events. Artists request and rely on these ticket limits to give ordinary fans the opportunity to purchase tickets to their events at affordable prices. But despite publicly blaming "scalpers and bots" for "prevent[ing] fans from getting tickets at the prices artists set," Defendants routinely allow ticket brokers to exceed ticket limits. Defendants have known for years that ticket brokers often buy as many as thousands of tickets for a single event, denying ordinary fans the opportunity to purchase them "at the prices artists set." Defendants' knowing participation in ticket brokers' unlawful conduct serves only to line Defendants' own pockets at the expense of fans and artists.

15. **Third**, Defendants have earned hundreds of millions of dollars in revenue by systematically violating the Better Online Ticket Sales Act, which prohibits selling or offering to sell tickets previously purchased in circumvention of measures used to enforce posted ticket-purchase limits or purchasing rules. Rather than enforce their ticket limits and purchasing rules against brokers, Defendants knowingly allow, and in fact even *encourage*, brokers to use multiple Ticketmaster

accounts to circumvent Ticketmaster's own security measures and access control systems. Defendants' tacit agreement to allow brokers to circumvent their ticket limits so that those same brokers can then list the unlawfully purchased tickets on Defendants' resale marketplace drives up the price of tickets and leaves ordinary fans unable to access the finite pool of tickets available at their face value. As a senior Ticketmaster executive admitted in an internal email that copied Live Nation leadership, the companies "turn a blind eye as a matter of policy" to brokers' violations of posted ticket limits.

16.     Defendants blame a technological "arms race" and ticket scalping for shutting fans out of artist-priced primary market tickets, but in reality, Defendants' own conduct gives purchasing consumers no choice but to resort to purchasing tickets at a steep markup in the resale market, where Defendants can collect another round of fees on the same tickets. Indeed, Defendants earn significant revenue from ticket resales. When reselling tickets brokers purchased from Ticketmaster, Defendants can "triple dip" on fees, collecting fees from: (1) brokers when they purchase the tickets on the primary market, (2) brokers, again, when Ticketmaster sells their tickets on Ticketmaster's secondary market, and, finally, (3) consumers who purchase tickets from Ticketmaster on its secondary market. Ticketmaster offers and sells millions of tickets in this way on its website and app, charging $3.7 billion in fees on resale tickets from 2019 through 2024.

17.    Defendants' unlawful conduct and tacit coordination with brokers injures fans, who have paid far more than the advertised ticket price for both box office and resale tickets, and who are forced to pay inflated resale prices for high-demand tickets that brokers illegally amassed from Defendants by circumventing measures used to enforce posted ticket-purchase limits and in violation of posted purchasing rules. Defendants' conduct also injures artists, who set ticket limits that they understand Defendants will implement, only to be thwarted by Defendants' choice to allow brokers to evade them.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

19.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), and (d), 1395(a), and 15 U.S.C. §§ 45c(c)(5)(A) and 53(b).

## PLAINTIFFS

20.    The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Better Online Ticket Sales Act, 15

U.S.C. § 45c, which makes it unlawful both to (1) circumvent "a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules," and to (2) "sell or offer to sell any ticket in interstate commerce" obtained through circumvention of the above-referenced controls, when the seller "participated directly in or had the ability to control" the circumvention, or "knew or should have known" the tickets were acquired through circumvention.

21.     Philip J. Weiser is the Attorney General for the State of Colorado. Attorney General Weiser brings this action in his official, law enforcement capacity. The Attorney General of Colorado is responsible for enforcing the Colorado Consumer Protection Act. Colo. Rev. Stat. § 6-1-103. The Colorado Consumer Protection Act prohibits individuals, in the course of their business, vocation, or occupation, from advertising goods, services, or property with the intent not to sell them as advertised, from making false or misleading statements concerning the price of goods, services or property, and from knowingly or recklessly committing an unfair business practice. Colo. Rev. Stat. §§ 6-1-105(1)(i), (l), (u), (rrr). The Colorado Consumer Protection Act also prohibits any person from using, or causing to be used, a software application that runs automated tasks over the internet that circumvents or disables any electronic queues, waiting periods, or other sales

volume limitation systems associated with an online event ticket sale. Colo. Rev. Stat. § 6-1-720(1)(b); Colo. Rev. Stat. § 6-1-105(1)(x). The Attorney General of Colorado is further empowered to enforce the federal Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

22.    James Uthmeier, the Florida Attorney General, is an enforcing authority of the Florida Deceptive and Unfair Trade Practices Act pursuant to Section 501.203(2), Florida Statutes, is afforded the authority to seek the full range of relief available under Florida Deceptive and Unfair Trade Practices Act, and has determined that this enforcement action serves the public interest. The Florida Attorney General enforces Section 501.204(1), Florida Statutes, which prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. The Florida Attorney General also has authority to enforce the Better Online Ticket Sales Act pursuant to 15 U.S.C. § 45c(c).

23.    The State of Illinois is one of the fifty sovereign states of the United States. Attorney General Kwame Raoul is the duly elected and qualified Attorney General, acting for the Plaintiff State of Illinois, and brings this action in his official capacity for and on behalf of the People of the State of Illinois, pursuant to the Provisions of the Consumer Fraud Act, 815 ILCS 505/7, and his common law authority as Attorney General to represent the People of the State of Illinois.  The Illinois Attorney General believes this action to be in the public interest of the

citizens of the State of Illinois and brings this lawsuit pursuant to Section 7(a) of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/7(a). The Illinois Attorney General also has authority to enforce the Better Online Ticket Sales Act pursuant to 15 U.S.C. § 45c(c).

24.     Michael T. Hilgers, Attorney General of the State of Nebraska is empowered by the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-303.05, 303.11 and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c) to bring an action in the name of Nebraska to enforce these laws and protect the public.

25.     Jonathan Skrmetti, Attorney General and Reporter of the State of Tennessee, is the chief legal officer of the State of Tennessee and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is also empowered by the Tennessee Consumer Protection Act, Tenn. Code Ann. §§47-18-101, et seq. and the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c) to bring an action in the name of Tennessee to enforce these laws and protect the public.

26.     The State of Utah is one of the fifty sovereign states of the United States.  Attorney General Derek Brown is the duly elected and qualified Attorney, acting for the Plaintiff State of Utah, and he is authorized to bring this action on

behalf of Utah residents to enforce the Better Online Ticket Sales Act, pursuant to 15 U.S.C. § 45c(c) and Utah Code § 67-5-1(1)(b).

27.    The Utah Division of Consumer Protection is a state agency within the Utah Department of Commerce that administers and enforces Utah consumer protection laws, including *inter alia* the Utah Consumer Sales Practices Act, Utah Code §§ 13-11-1 through -23, which prohibits deceptive and unconscionable acts and practices in connection with consumer transactions.  The Utah Division of Consumer Protection, while represented by the Utah Attorney General, is authorized to initiate and maintain this action by statute and does so under Utah Code § 13-11-17(1), through the undersigned counsel pursuant to Section 67-5-1(1)(b).

28.    Jason S. Miyares, the Attorney General of the Commonwealth of Virginia, is the chief legal officer of the Commonwealth of Virginia and may exercise such authority as the public interest requires and may file suits necessary for the enforcement of the law and public protection. The Attorney General is empowered by the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c) to bring an action in the name of Virginia to enforce the law and protect the public.

## **DEFENDANTS**

29.    Defendant Live Nation Entertainment, Inc. is incorporated in Delaware and headquartered in California with its principal place of business at 9348 Civic

Center Drive, Beverly Hills, CA 90210. Live Nation Entertainment, Inc. transacts, or has transacted, business in this District and throughout the United States.

30.    Defendant Ticketmaster, L.L.C. is a wholly owned subsidiary of Live Nation Entertainment, Inc. Ticketmaster is incorporated in Virginia and headquartered in California with its principal place of business located at 9348 Civic Center Drive, Beverly Hills, CA 90210. Ticketmaster transacts, or has transacted, business in this District and throughout the United States. Ticketmaster has two directors, both of whom are Live Nation Entertainment, Inc. executives.

## COMMON ENTERPRISE

31.    Defendants Live Nation Entertainment, Inc. and Ticketmaster, L.L.C. (collectively, "Defendants") have operated as a common enterprise while engaging in the deceptive and unfair acts and practices alleged below. Defendants have conducted the business practices described below through their interrelated companies that have common officers, headquarters, and business functions. Live Nation's President and CFO is the Live Nation executive responsible for Ticketmaster's operations.

## COMMERCE

32.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44; Section 501.203(8), Florida Statutes; and

Section 1 of the Illinois Consumer Fraud Act, 815 ILCS 505/1(f); and Tenn. Code Ann. § 47-18-103(24).

## DEFENDANTS' BUSINESS ACTIVITIES

33.    Ticketmaster describes itself as a "ticketing company that provides both ticket sales and ticket resale services." In its primary market (box office) ticketing business, which is "the sale of tickets to a buyer in the first instance," Ticketmaster contracts with venues to "enable them to manage and market shows, sell tickets, and validate tickets for entry." In its secondary market (resale) ticketing business, Ticketmaster sells tickets that third parties have previously purchased in the primary market and then listed for resale on Ticketmaster's platform. Ticketmaster is the merchant of record for all primary and resale tickets sold on its platform.

34.    Live Nation is the nation's largest live entertainment company, touching nearly every facet of the industry. Live Nation describes itself as "operat[ing] in more than 30 countries, selling tickets to consumers in both the primary and secondary market for live-event tickets." In addition to closely managing Ticketmaster's operations, Live Nation owns or controls hundreds of live entertainment venues nationwide, including live entertainment venues within the State of Florida, State of Illinois, and State of Tennessee, promotes thousands of live entertainment events each year, manages artists, and brokers sponsorships for its concerts and festivals. In 2024, Ticketmaster generated more than half of Live

Nation's adjusted operating income. Ticketmaster has substantially higher profit margins than Live Nation's concert and venue operations and is a key part of Live Nation's profitability.

35.    Consumers purchasing tickets from Defendants on either the primary or secondary markets access them via Ticketmaster's website or app.

36.    Defendants' ticket prices have several components. The "face value" of a ticket on the primary market is set by the performing artist and does not include fees. Next, Defendants add several mandatory fees to the cost of tickets purchased from the Ticketmaster website and app, both for primary and secondary market sales. These typically include service fees, facility fees, and order processing fees. Consumers cannot purchase tickets from Ticketmaster without paying the mandatory fees. According to internal Ticketmaster documents, the average percentage of fees charged on tickets ranges from 24% to 44% of the total price. From 2019 through 2024, consumers paid over $16.4 billion in mandatory fees on ticket purchases from Ticketmaster. Defendants each retain a significant portion of these fees—Ticketmaster as the ticketing company and Live Nation as a promoter and owner and operator of venues.

37.    Defendants earn additional revenue when tickets are sold again on the secondary market. In addition to the mandatory fees charged to buyers as described above, Defendants charge consumers who list tickets for resale on Ticketmaster a

set percentage, which Ticketmaster calls a "seller fee." The fees for brokers to list tickets are set by agreements between Ticketmaster and the brokers, and Ticketmaster often decreases fees for high-volume brokers, incentivizing them to list more tickets for Ticketmaster to resell on its platform. Defendants have collected $986 million in these resale fees from 2019 through 2024.

38.    Ticketmaster generates most of its revenue on its primary and secondary market ticket sales from these various mandatory fees charged to consumers and brokers. Altogether these fees earned Defendants over $11 billion from 2019 through 2024 alone.

39.    Defendants also have authority to increase the price of tickets on their secondary market, separate and apart from any fees. The consumer or broker listing the ticket for resale selects the initial price. Defendants can then unilaterally increase that price. When Defendants increase the price of a ticket, they keep the markup on each sale. Defendants collected over $187 million in markups they added to resale tickets from 2019 through 2024.

**Defendants Have Advertised Deceptive Ticket Prices**

40.    To view ticket prices for an event, consumers often search for the event on Ticketmaster's website or app. From Ticketmaster's website, consumers can select the event from the search results, and the website takes them to a page that shows the available tickets. For years, that experience has been the same or similar

to the example shown in **Figures 1-4**. In **Figure 1**, on the left, the page displays a seating chart for the whole arena, showing all the available sections and rows. On the right, Ticketmaster shows the list price for the available tickets and their corresponding section and row. Consumers can sort the results by "Lowest Price" or "Best Seats."

**Figure 1 – Ticket Search Results [Captured on March 19, 2024]**



41.    Ticketmaster's search-results page also lets consumers filter by ticket list price using a price-selection tool that allows consumers to choose a maximum and minimum per-ticket price, as depicted below in **Figure 2**. The consumer is then shown only the ticket options with list prices within that selected price range and can look at the seat options in various sections by clicking on the interactive seat map or by clicking on tickets in the list on the right-hand side of the page.

**Figure 2 – Ticketmaster Price Selection Tool [Captured on July 15, 2024]**



42.    After a consumer selects a ticket on the right-hand side of the page, Ticketmaster displays a page with a bright green button labeled "Next" at the bottom of the screen, as shown in **Figure 3**. Above it, Ticketmaster lists the "**SUBTOTAL**" in bold. The subtotal equals the previously displayed ticket list price (*see* **Figure 1**) multiplied by the number of tickets (e.g., for two tickets listed at $245, $490).

**Figure 3 – Ticket Selection Screen [Captured on March 19, 2024]**



43.     After a consumer clicks the green "Next" button, Ticketmaster displays another screen (**Figure 4**), which shows a clock at the top of the screen that counts down the limited time the consumer has to complete the purchase or lose the option to purchase the tickets. On the left, Ticketmaster requests consumers' payment information, provides information about how the tickets will be delivered, and offers ancillary services, including parking and hotel reservations. A bright green "Place Order" button is on the right-hand side. After a consumer enters their payment information, clicking "Place Order" completes the purchase.

**Figure 4 – Ticket Delivery and Purchase Price Screen
[Captured on March 19, 2024]**



44.    Unbeknownst to many consumers searching for tickets, Defendants have charged much more than the list price to purchase a ticket. For example, in **Figure 4** above, although the list price was $245 per ticket (or $490 for two tickets), Ticketmaster ultimately charges $662.21—$172 (23%) more than the list price. Smaller and lighter text next to the total price indicates that this final cost includes

$60.96 in tax. But the page has not displayed the remaining $111.04 in mandatory fees (a $45.20 service fee on each ticket, a $6.00 facility charge on each ticket, and an order processing fee of $8.85).

45.     For years, by default, Defendants did not show consumers these mandatory fees in the list price in the original event search results, in the price selection tool, or on any other screen (*see* **Figures 1-3**). Nor did Defendants display the fees at checkout unless the consumer saw and clicked on the unlabeled dropdown caret next to the total charge.

46.     The only reference to fees during the purchase process has been on the screen that appeared *after* the consumer searched for and selected the seat based on the advertised list price, as shown above in **Figure 3**. In small print next to the list price, the phrase "+ Fees" appears. Even there, Ticketmaster does not state that it charges fees on every ticket—regardless of whether consumers purchase ancillary services—let alone identify the types or amounts of fees that will be added.

47.     The same has been true even when a consumer used the price-selection tool to limit search results to tickets within the consumer's budget. For example, if a consumer searched for tickets costing between $74-$95 (as shown above in **Figure 2**), and selected tickets listed for $94.50 each, the next screen would have shown a subtotal of $189 (double the per-ticket list price). But those same tickets

actually cost a total of $242.55—which is $53 more than the list price, and $26 more per ticket than the consumer's maximum budget.

48.     Ticketmaster's purchase process (as depicted in **Figures 1-4**) has been the same for primary and secondary market ticket sales. For tickets purchased and resold on Ticketmaster, the secondary market purchaser does not know who purchased the ticket from the primary market; the only entity named in connection with the resale is Ticketmaster. When Ticketmaster delivers resale tickets to a secondary-market purchaser, it voids the first ticket that it sold on the primary market and reissues a new ticket, with unique identifying information, to the secondary purchaser.

49.     Consumers who have purchased tickets on Ticketmaster's Android and iOS apps also have had a similar experience. On both platforms, Ticketmaster has advertised a lower list price but ultimately has charged consumers who complete their purchases significantly more.

### Defendants' Deceptive Ticket Pricing Has Harmed Consumers

50.     Consumers are routinely misled to believe that Defendants' listed prices are what they will pay or close to it, before tax. Indeed, many consumers have complained about Defendants' fees. For example, consumers have reported that they were surprised to learn that Defendants' mandatory fees substantially increased the price of the ticket. Even consumers who might expect that they will pay marginally

more than the list price, plus tax, do not expect that Defendants will charge 24 to 44% more than the advertised price. As Ticketmaster acknowledges in an internal presentation, "[w]hen fans are not complaining about the cost of fees they are complaining about the display of fees (bait and switch approach)."

51.     The true cost of tickets is important to consumers, as Defendants appear to recognize. As recently as 2023, Ticketmaster and Live Nation executives have stated, including to the United States Senate Judiciary Committee, that "fans should know the full cost of their tickets from the start. The various fees can be broken out and displayed as well, but the all-in price is the real price of admission, and that ought to be the first thing a fan sees."[2] Yet, for years, Defendants have chosen not to make the "full cost" the "first thing a fan sees," despite knowing from their own research that "most ticket buyers say the final cost of the tickets, including fees, is the most critical information to have UPFRONT in the purchase process." Ticketmaster's President, himself, has acknowledged that the company's tactics result in "sticker shock" when consumers finally see the actual price of their tickets.

52.     Defendants are well aware of consumers' preferences to see the total price upfront. Consumers have given them specific, negative feedback on the

---

[2] Senate Judiciary Hearing Jan. 24, 2023, Opening Statement of Joe Berchtold, President and Chief Financial Officer, Live Nation Entertainment, Inc. https://www.judiciary.senate.gov/imo/media/doc/Testimony%20-%20Berchtold%20-%202023-01-24.pdf (last visited June 6, 2025).

dramatic increase in price on the checkout page. Defendants have regularly commissioned or conducted surveys of consumers who used their platforms. Examples of consumers complaining about fees abound. In 2023, for example, one consumer said, "[f]ees are insane. Discourages me from attending events due to added and hidden costs." Another consumer said, "I don't understand why the FULL cost of the tickets can not [sic] just be displayed when viewing what tickets you want. Then I have to go to the cart just to see the absurd amount of fees you will charge me. Just put it on the main page!" In a different internal survey, another consumer noted "if you have to pay these extra fees, they should just be included in the listed ticket price so you don't have **unexpected charges at the end**. It's frustrating!!!"

53.     Even though Defendants have been well aware that consumers were being misled about the total price of tickets, they declined to change their sales tactics, choosing instead to maximize sales. Indeed, a 2015 Ticketmaster study confirmed that Ticketmaster sold tickets to consumers who would not have purchased them if they had known the true price of tickets upfront: "completely hiding the fee until checkout resulted in the highest conversion." As Defendants have known, a sizable difference between Defendants' list prices and what they charge matters to consumers and, if presented as an all-in-one price, would reduce sales. As

one consumer put it in 2023, mandatory fees are "like 40% of your ticket cost […] to me that would be a deterrent."

54.    Consumers have relied on Defendants' misleading pricing tactics to their detriment. For example, consumers have wasted substantial time comparing tickets and making purchase decisions based on the lower, advertised price. As an internal 2022 study reported, "[f]ans want to know the total cost of their ticket at the start to know if they can afford the ticket." Sometimes, this purchase process involves navigating several offers for optional add-on costs such as parking, insurance, and various VIP experiences, which consumers choose to accept or reject based on what they expect to pay for the ticket list price. Consumers also navigate this process under pressure from a purchase countdown clock that leaves them little time to review the material on the checkout page before making a purchase. And for highly sought-after events, where available tickets are snatched up at breakneck speed, consumers have risked losing the chance to buy any tickets at all if they chose not to complete the transaction after seeing the actual price.

### Defendants Have Obscured Total Ticket Prices to Boost Revenue

55.    Defendants' deceptive price display was no accident: The design resulted from years of internal testing designed by Defendants' employees that shows that Defendants' revenues increase when their price display is, in Ticketmaster's words, "less transparent." Internal documents show that, at least

since 2014, with input from Live Nation, Ticketmaster consistently chose to continue obscuring the true price of tickets after internal test results showed that accurate, transparent pricing would reduce sales.

56.     In one 2015 study, for example, Ticketmaster hypothesized that "the later we make the fee details transparent in the purchase funnel the more we can optimize ticket sales." To test this hypothesis, Ticketmaster hid the fees behind a "Price Details" link. As shown in **Figure 5**, the study expressly referred to this option as "less transparent."

**Figure 5 – Ticketmaster Tests "Less Transparent Fee Display"**



57.     When tested in actual transactions, the "less transparent" display resulted in higher sales, so Defendants adopted it and provided information about

mandatory fees only if consumers saw and clicked on the words "Price Details." Over time, Defendants made this even less prominent: For many years, Defendants continued to use a checkout page that replaced the "Price Details" link with an unlabeled dropdown caret. *See* **Figure 4**, *supra*.

58.    Defendants' executives and employees have communicated openly for a decade about how Defendants have hidden part of the ticket price in mandatory fees. For example, in an April 2015 email with the subject line "Surprise Fee!" a Ticketmaster employee indicated that some of the company's clients (e.g., artists, or sports teams) "are not in favor of hidden fees and prefer fee transparency." This email discussed yet another test to determine whether Defendants could make more money if they changed their default display from what Defendants deemed a "prominent" fee display, which showed the additional fees and total cost, to a "surprise" fee display, which did not, as shown below in **Figure 6**.

### Figure 6 – "Prominent" vs. "Surprise" Fee Display



59.    Two months later, a multinational entertainment company objected when Defendants used the less transparent "fees behind a link" display when selling tickets for the company's events (shown above in **Figure 5**, for example). The company questioned Ticketmaster about why it was not displaying the fee details more prominently. Internal discussions among Ticketmaster executives about how to respond to the objection centered around increasing conversion rates and revenue. One executive noted: "the less transparent the higher the conversion," concluding that "this means we're headed towards less transparency." Likewise, in September 2015, in response to an internal Ticketmaster study that reported consumers were complaining about "bait and switch" pricing, Ticketmaster decided that "the lift in ticket sales is more important than fan sentiment around fee display." Defendants even gave an employee an "MVP" award for designing the testing that proved the Defendants would make more money if they "optimiz[ed] the fee display" by making it "less transparent."

60.    In 2018, Defendants again considered changing their default display to reflect the full, accurate ticket price and ran tests to determine whether this switch would reduce the company's revenue. The test display showed a "fee toggle" at the beginning of the purchase process that Defendants described as giving fans "the choice of opting-in to see the per-ticket price with fees included on the [event detail page] and see the same price throughout the checkout process." Documents

describing the test claimed that the toggle would keep consumers from being "surprised" by "additional ticket fees during checkout." Defendants ended the test early when the ticket-purchase conversion rate dropped for consumers who used the toggle.

61.    In 2022, a Live Nation executive said she was "poking around" on Ticketmaster's site and "realize[d] our toggle is buried in filters." Defendants again tested the impact of displaying the fee toggle on the search results page in 2023, listing it above the seat options. This test showed significant increases in consumers' use of the fee toggle: 256.5% increased use on the website interface and 178.2% increased use on the app. Defendants concluded that "[i]ncreasing prominence of fee toggle had adverse impact on purchase behavior," and that consumers who used the fee toggle were less likely to "add-to-cart" or "continue to Checkout." In other words, when consumers had the option, they overwhelmingly chose to see the total cost of their tickets during the selection process and chose to buy fewer tickets. Defendants estimated that increased consumer use of the fee toggle would have resulted in a nearly $50 million loss of annual income. Defendants kept the fee toggle "buried in filters."

62.    That same year, a Live Nation marketing executive acknowledged internally that "[a]ll-in pricing benefits the consumer because they see the total all-in price of the ticket right upfront." She further noted that without all-in pricing, the

"[p]rice of a ticket when starting purchase process looks significantly lower than the final purchase price" and that "after all-in pricing," consumers "understand exactly how much [they] are going to spend when selecting tickets."

63.     Not until May 2025, deep into the FTC's investigation—and just before the effective date of the FTC's Rule on Unfair or Deceptive Fees,[3] which authorizes the FTC to seek civil penalties and other monetary relief against violators—did Defendants announce their intention to incorporate fees into listed ticket prices.

64.     In sum, despite public claims championing price transparency and internal recognition that consumers are misled by "bait and switch" tactics that result in "sticker shock," Defendants for years repeatedly chose to use displays that induced consumers to select tickets based on a lower advertised price than what Ticketmaster ultimately charges.

## Defendants Allow Brokers to Circumvent Posted Ticket Limits and Purchasing Rules

65.     Artists set, and Ticketmaster posts, per-event ticket purchase limits for many of the events on its platform. But since at least 2018, as Defendants well know, brokers have circumvented Ticketmaster's measures to enforce these limits at a staggering level, amassing and listing for resale millions of tickets to high-demand events. Defendants could stop these purchases but choose not to—and, in some

---

[3] 16 C.F.R. § 464, *et seq*, effective May 12, 2025.

respects, even contribute to brokers' ability to surpass ticket limits.

*Posted Event Ticket Limits*

66.     Ticket limits vary from event to event. For primary market sales for many high-demand events, artists determine the number of tickets that a consumer can buy and memorialize those limits in correspondence with Ticketmaster regarding marketing and ticketing guidelines. Artists typically cap purchases at anywhere from four to ten tickets for a single event. Defendants have claimed that they have "an active program to enforce ticket limits."

67.     For each event, Defendants have various measures to enforce the ticket limit built into the purchase process. Ticketmaster displays the ticket limit alongside other event information in the ticket browsing flow. As seen in the example below in **Figure 7**, in addition to stating that there is "an 8 ticket limit for this event" and that it is a "strict eight (8) ticket limit," the screen warns that "[m]ultiple purchases are forbidden." Ticketmaster further states that a violation of its ticket limit policy "may result in tickets (over the limit) being voided and refunded."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 7 – Example of Posted Ticket Purchase Limits**



68.    Ticketmaster's posted Terms of Use and Purchase Policy, along with other security measures and controls, also have prohibited users both from purchasing tickets in excess of posted per-event ticket limits, and from using multiple Ticketmaster user accounts to buy tickets in excess of those limits. Ticketmaster also requires users, before purchasing a ticket, to check a box on the final order page next to a statement that the user has agreed to the linked Terms of Use, also located in Ticketmaster's Help Center. The Terms of Use have prohibited users from "order[ing], or attempt[ing] to order, a number of tickets for an event that

exceeds the stated limit for that event" and from "circumventing any security measure, access control system, or other technological control or measure on the Site that is used to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules."

69.    The Purchase Policy, incorporated in the Terms of Use and located in Ticketmaster's Help Center, has stated:

> When purchasing tickets on our Site, you are limited to a specified number of tickets for each event (also known as a "ticket limit"). This ticket limit is posted during the purchase process and verified with every transaction. This policy is in effect to discourage unfair ticket buying practices. Each account must be linked to a unique individual, and must contain valid and verifiable information. **Multiple accounts may not be used to circumvent or exceed published ticket limits.** If you exceed the posted ticket limits, we reserve the right to cancel, without notice, any or all orders and tickets, in addition to prohibiting your ticket purchasing abilities…. This includes orders associated with the same name, e-mail address, billing address, credit card number, or other information. (Emphasis added.)

70.    Ticketmaster's website and app automatically prevent a single Ticketmaster accountholder from adding to their cart, or purchasing, more tickets than the posted limit in a single transaction. Ticketmaster uses a drop-down menu that allows the purchaser to select only up to the limit.

71.    Ticketmaster's array of security measures for enforcing event ticket limits also includes its TicketCounter system (previously called Over the Ticket

Limit or "OTL System"). Among other things, TicketCounter automatically blocks multiple purchase attempts from the same IP address and analyzes patterns to identify multiple accounts acting in concert to evade purchase limits. And, at the direction of artists and event promoters, Defendants will sometimes look at purchases after they were made to detect whether a single person or entity attempted to exceed purchase limits by using multiple Ticketmaster accounts or transactions. Nonetheless, Defendants do not as a matter of course cancel the tickets they identify as having been purchased by circumventing their enforcement measures, nor do they block the accounts that have repeatedly made such purchases.

72.    Artists impose ticket limits because they want their fans—not brokers—to buy their event tickets at face value. For high-demand events, those face value prices are often *only* available to consumers on the primary market. By contrast, once tickets have been purchased by brokers and listed for sale on the secondary market, artists have almost no control over how much their fans will pay for the tickets, if they can afford them at all.

73.    Tickets for high-demand events and for the most desirable seats are typically much more expensive on the secondary market than on the primary market, sometimes twice the original cost or more. For example, one broker purchased 772 tickets to a 2023 Coldplay concert for about $81,000. The same tickets were resold for over $170,000. The same broker also purchased 612 tickets to a single

2023 Chris Stapleton concert for about $47,000. The same tickets were resold for over $89,000. Consumers have paid hundreds of millions of dollars more for overlimit tickets offered for sale and resold by Defendants than the tickets cost on the primary market.

*Brokers Routinely Circumvent Ticket Limits*

74.    To evade Ticketmaster's enforcement measures, brokers routinely create hundreds or thousands of Ticketmaster accounts, often using fictitious names, email addresses, and other required information. Brokers also acquire Ticketmaster accounts from individual consumers by advertising online or even by placing flyers in public spaces offering to purchase Ticketmaster accounts. Brokers then hire employees or engage contractors to use these Ticketmaster accounts to purchase tickets in excess of posted limits over multiple transactions. This is a known tactic: internally, Defendants have discussed "the use of multiple accounts to circumvent TM systems." Indeed, from 2020 to 2024, one broker created, purchased, or otherwise obtained from third parties more than 13,000 Ticketmaster accounts.

75.    Though Live Nation publicly concedes that the practices of "buy[ing] and sell[ing] Ticketmaster accounts to brokers for no other reason than to help them obtain more tickets than anyone can consistent with posted ticket limits" are among the methods that, "when used for their intended purposes, violate the [Better Online Ticket Sales] Act," Defendants themselves have, for years, known about and aided

brokers who used multiple Ticketmaster accounts for these precise "intended purposes." For example, before the COVID-19 pandemic impacted live events, Ticketmaster forecast that in 2020, alone, more than five million of the concert tickets that it would offer for resale would be tickets purchased over ticket limits—this was more than 55% of the concert tickets it anticipated would be listed by brokers. In 2024, when Defendants considered enforcing their ban on multiple accounts against brokers, they contemplated "[p]roactively email[ing] brokers ahead of rollout to advise them to check they have access to the email(s) used on account(s)" and "to consider consolidating their tickets into a single account" so that the brokers holding tickets in multiple Ticketmaster accounts—in violation of Ticketmaster's enforcement measures—could still access their unlawfully purchased tickets.

76.    To bypass ticket limits by using multiple accounts, many brokers use software that allows one person to log into multiple accounts at once on the same computer without being detected by Defendants' automatic controls. This software generates proxy IP addresses so that it appears that each of the accounts is logged on from a different location, thereby evading Ticketmaster's automatic screening measures. Some brokers use an internet browser or browser extensions that are designed to provide the proxy IP addresses—another method Live Nation has publicly said violates the Better Online Ticket Sales Act. Still others use software to

operate technology called a "SIM box," or "SIM bank," to facilitate the receipt, and automate the retrieval of, account verification codes sent by Defendants to phone numbers associated with the brokers' fictitious ticket-purchasing accounts, evading Defendants' automated account verification measures, which Ticketmaster describes on its website as "an extra layer of protection against bots and other abuse."

*Selling and Offering to Sell Brokers' Unlawfully Obtained Tickets*
*Harms Consumers and Enriches Defendants*

77.    Growing revenue from the secondary ticket market is one of Defendants' principal business objectives. If Defendants sell a secondary market ticket that was purchased on their primary market, they collect three sets of fees on the same ticket: (1) the fees on the original purchase; (2) the fees charged to the person or broker listing the ticket for sale, which range from 13-15% of the resale price for consumers and 5-8% for brokers; and (3) the fees charged to the secondary market purchaser, which range from 17-23% of the resale price. Defendants have significantly increased their sale of secondary market concert tickets, from 3.8 million tickets in 2019 to over 20 million in 2024.

78.    In the aggregate, brokers list far more tickets for resale on Ticketmaster than consumers do. According to one Ticketmaster document, at one point in 2018, 55% of the tickets offered for resale by Ticketmaster were listed by brokers. Brokers make up an even higher share of Defendants' resale *concert* ticket sales. In the first quarter of 2022, 63% of the money consumers spent on Defendants' resale concert

tickets was on tickets listed by brokers. In the first quarter of 2023, it was 78%. Over those two quarters alone, consumers spent $504 million on resale concert tickets from Ticketmaster that were listed by brokers. By contrast, when a consumer who purchases a ticket on the primary market attends the event using that ticket, Defendants' revenue from that ticket is substantially less because Defendants cannot collect additional resale fees or markup the resale price.

79.    Selling and offering to sell tickets that brokers acquired by evading enforcement measures harms consumers, who are boxed out of the primary market and forced to pay substantially higher prices for the same tickets on the secondary market. In a Ticketmaster-commissioned May 2023 survey of consumers who attempted to purchase tickets on Ticketmaster's platform, for example, consumers reported being unable to purchase tickets on the primary market after waiting in the queue and instead being forced "to buy inflated resale tickets." One consumer noted that "all the bots get the tickets and then charge 10x the tickets."

### Defendants Know About and Enable Brokers' Overlimit Purchases

80.    Since at least 2018, Defendants have been aware that brokers use various tactics to evade their enforcement measures and exceed ticket limits. In public, Defendants advocate for greater Better Online Ticket Sales Act enforcement against resale ticketing platforms because, in Defendants' own words, the law acknowledges that secondary ticketing platforms "should [] know[]" when event

tickets are acquired unlawfully and are able to constantly look for "indications" of such unlawful purchases. In reality, Defendants sell or offer to sell millions of tickets that they know were purchased unlawfully and reap massive profits from those sales.

81.    Defendants admit that certain tools and practices are used to circumvent their enforcement measures in violation of the Better Online Ticket Sales Act. For example, Defendants have publicly acknowledged that proxy service tools that mask a user's true IP address and location are among a list of technologies that, among others, violate the Better Online Ticket Sales Act "when used for their intended purposes." Defendants also included multi-session browsers "specifically tailored to ticket scalping" in this list, noting one browser contained a review stating that it "mainly caters to ticket brokers" and "comes with several specialized features that help one bypass purchasing limits."

82.    In 2018, Defendants identified and analyzed a broker practice that it later termed the "mass buyer model," in which a broker pays hundreds to thousands of people to purchase tickets on the broker's behalf. Defendants also publicly acknowledge that scalpers use "burner accounts" to "scoop [tickets] up in seconds." A Ticketmaster engineer pointed out to a Ticketmaster executive that the company routinely chooses to turn a blind eye to broker circumvention of ticket limits: "we have a guy that hires 1000 college kids to each buy the ticket limit of 8, giving him 8000 tickets to resell. Then we have a guy who creates 1000 'fake' accounts and

uses each [to] buy the ticket limit of 8, giving him 8000 tickets to resell. We say the former is legit and call him a 'broker' while the latter is breaking the rules and is a 'scalper.' But from the fan perspective, we end up with one guy reselling 8000 tickets!"

83.    Despite Defendants' recognition of these violations, thousands of Ticketmaster accounts are owned by a small handful of brokers who Defendants know or have reason to know routinely purchase tickets from Ticketmaster's primary market in excess of Ticketmaster's posted ticket limits. In 2018, for example, Defendants identified five brokers that "violat[ed] fictitious account rules on [a] large scale." As seen in the chart below in **Figure 8**, the five brokers listed controlled 6,345 Ticketmaster accounts and possessed 246,407 concert tickets to 2,594 events. A then-Ticketmaster vice president described these five brokers plus one other as "the most questionable in [his] mind" of the brokers who purchased and listed tickets on Ticketmaster's platform. For years, Defendants have continued to offer and sell tickets these very same brokers purchased by circumventing Ticketmaster's enforcement measures.

**Figure 8 – Ticketmaster Presentation Identifying Brokers That Violate Its Rules on a Large Scale**



**EVALUATING POTENTIAL ACTIONS**
FILTER CONCERT INVENTORY FROM BROKERS VIOLATING FICTITIOUS ACCOUNT RULES ON LARGE SCALE

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Serious negative economic impact if we we move to 8 ticket limit across the board | | | | | | | | | |
| Broker | # of TM.com Accounts | Total # of concert tickets in possession | % of Resale Concert Inventory | % of Primary Concert Inventory | Total # of events with tickets | Sell-Through | R12 GTV | Potential GTV Loss | Potential AOI Loss |
| Reps & Company | 1,074 | 102,968 | 4% | 0.6% | 1,202 | 29% | $9.6M | $3.9M | $482K |
| KP3 Endeavors | 597 | 56,388 | 2% | 0.3% | 1,123 | 26% | $14.1M | $1.5M | $192K |
| Lavaseats Corp | 83 | 43,935 | 2% | 0.3% | 1,133 | 16% | $3.5M | $866K | $108K |
| Key Investment Group | 3,188 | 33,088 | 1% | 0.2% | 483 | 12% | $2.6M | $671K | $84K |
| Smash Entertainment | 1,403 | 10,028 | >0% | 0.1% | 294 | 40% | $1.0M | $750K | $94K |
| Total | 6,345 | 246,407 | 10% | 1.4% | 2,594 | 24% | $30.7M | $7.7M | $959K |

*Broker Inventory as of 9.25.18 for productions 10.1.18 forward

37
*Privileged and Confidential*

ticketmaster

Ticketmaster confidential and proprietary. Do not distribute. For internal use only.

84.    Defendants even provide technological support for brokers who exceed ticket limits to list the tickets for resale by Ticketmaster. For example, Defendants offer ticket brokers a software platform called TradeDesk, which enables brokers to aggregate tickets purchased from multiple Ticketmaster accounts into a single interface for simpler resale management. Defendants make TradeDesk available only to high-volume brokers.

85.    TradeDesk's features make overlimit ticket purchases apparent to Defendants even before they sell or offer to sell them because TradeDesk aggregates, at the time of purchase, all the tickets purchased by each broker-controlled Ticketmaster account, and collects data about the number of tickets each account acquired for each event. For example, an October 2019 internal review looking at

"all listed tickets in [TradeDesk] across all associated accounts" and applying an estimated 8-ticket limit across all events identified dozens of brokers who "continued to hold positions greater than ticket limits" in ticket sales.

86.    The TradeDesk software aggregates tickets purchased on Ticketmaster's website or mobile app and has a dashboard that tracks sales metrics. Defendants also routinely monitor TradeDesk users' sales and reserve the right to discontinue accounts if they do not meet specified ticket sales thresholds. Moreover, Defendants pay brokers for their resale profits using a single invoice, aggregating the sales made from thousands of fictitious Ticketmaster accounts into a single payment to the broker who controls them. Ticketmaster also often denotes in its system which Ticketmaster accounts are controlled by brokers.

87.    A September 2018 Ticketmaster presentation reported that each TradeDesk account was associated with, on average, approximately 200 Ticketmaster accounts. These Ticketmaster accounts were not controlled by 200 unrelated individuals; rather, each TradeDesk account corresponded to a single broker using multiple Ticketmaster accounts to amass quantities that exceeded posted ticket limits. Ticketmaster executives reviewed and edited this presentation and ultimately declined to block these broker-controlled accounts despite their repeated violative purchases.

88.    Public reports detail Defendants' use of TradeDesk to help brokers

circumvent enforcement measures and exceed ticket limits. In 2018, for example, undercover journalists from the Toronto Star and the Canadian Broadcasting Corporation reported as much in an article titled, "We went undercover as ticket scalpers – and Ticketmaster offered to help us do business." When describing TradeDesk, one Ticketmaster sales executive told the reporters that he had "brokers that have literally a couple of hundred Ticketmaster accounts" aggregated in singular TradeDesk accounts. The reporters, posing as brokers, asked Ticketmaster whether brokers circumventing Ticketmaster's controls by using multiple accounts might be detected and investigated by Ticketmaster when they list tickets for resale. Ticketmaster's sales executive reassured the undercover reporters that Ticketmaster knew brokers buy tickets from multiple Ticketmaster accounts but would not crack down on accounts that exceed posted limits.

89.    Following artist and consumer outrage about the reporting, Live Nation's CEO directed the Defendants' public response, in which Defendants denied that they allowed brokers to circumvent ticket limits and claimed to be reviewing broker accounts to ensure compliance with ticket limits and Ticketmaster's terms of use. To this day, Ticketmaster claims that it "vets its reseller customer base looking for bad actors, violations of posted ticket limits, and other indications on inappropriate reseller behavior." But brokers' circumvention of Ticketmaster's enforcement measures with Defendants' knowledge, participation, or ability to

control continues unabated.

### Defendants Have the Ability to Stop Brokers' Circumvention of Artists' Ticket Limits

90.    Internal documents show that Defendants have technological and other means to prevent brokers from evading ticket limits, but often do not use them because doing so would decrease their revenue. As a Ticketmaster executive vice president explained to Ticketmaster's executive team and Live Nation's President and CFO in the wake of the undercover reporting on TradeDesk, as a "matter of policy" Defendants "turn[] a blind eye" to brokers' circumvention of their enforcement measures and follow a "don't ask don't tell" approach to brokers' blatantly violative conduct, allowing Defendants to then offer and sell those tickets on the secondary market.  Yet as recently as July 2025, Defendants told the public the opposite, insisting that Ticketmaster "does not turn a blind eye" to "patterns of behavior that indicate unlawful ticket purchases."

91.    In keeping with Defendants' turn-a-blind-eye policy, they have continued to offer and sell tickets from brokers who circumvent enforcement measures. For years, Defendants have tested various enhanced security measures that would identify and block brokers who skirt artists' ticket limits. Despite publicly acknowledging that many primary accounts "are actually controlled by ticket brokers" and that they are "increasingly able to [identify and weed out fake accounts]," Defendants have consistently declined to use these enforcement

measures to prevent brokers from exceeding ticket limits.

92.    In 2018, for example, Ticketmaster debated how proactive to be in restricting brokers from using "multiple accounts tied to a single Broker ID" to exceed ticket limits. Around the same time, Defendants considered whether to enforce ticket limits against the biggest violators. As seen below in **Figure 9**, Defendants analyzed the concentration of resale concert tickets among brokers. Eight of the "Large Brokers" they identified each controlled between 83 and 3,188 Ticketmaster accounts and between 24,721 and 102,968 concert tickets.

**Figure 9 – Ticketmaster Document Showing Brokers Controlling Thousands of Fictitious Ticketmaster Accounts and Tens of Thousands of Tickets**

| Largest | Broker | Type | # of Trade Desk Accounts | # of TM.com Accounts | Total # of concert tickets in possession | Total # of events with tickets | Concert GTV YTD by broker |
|---|---|---|---|---|---|---|---|
| 1. | Cloakify | Aggregator | 1 | 325 | 260,755 | 2,349 | $37.8M |
| 2. | *Stagefront* | Aggregator | 1 | 4,150 | 156,386 | 2,092 | $36M |
| 3. | DTI Management | Aggregator | 1 | 3,679 | 134,578 | 1,890 | $36.5M |
| 4. | Reps & Company | Large Broker | 1 | 1,074 | 102,968 | 1,202 | $14.8M |
| 5. | Ticket Galaxy | Large Broker | 1 | 629 | 73,869 | 1,208 | $12.2M |
| 6. | Ticket Boat | Large Broker | 1 | 845 | 73,449 | 2,375 | $10.5M |
| 7. | KP3 Endeavors | Large Broker | 1 | 597 | 56,388 | 1,123 | $11.4M |
| 8. | Lavaseats Corp | Large Broker | 1 | 83 | 43,935 | 1,133 | $4.4M |
| 9. | Perfect Tix | Large Broker | 1 | 231 | 41,383 | 1,115 | $7.5M |
| 10 | Top Star Tickets | Aggregator | 1 | 1,142 | 36,928 | 1,227 | $8.5M |
| 11 | Key Investment Group | Large Broker | 1 | 3,188 | 33,088 | 483 | $4.9M |
| 12 | Viwa | Large Broker | 1 | 728 | 24,721 | 308 | $3.8M |

93.    Defendants contemplated capping each of these brokers at eight resale ticket listings per event, but declined to do so because they concluded that such an action would have "[s]erious negative economic impact" to Defendants from the

reduction of Ticketmaster's profits from the secondary market.

94.    A year later, in September 2019, Defendants conducted an internal "Abuse Working Session" to discuss brokers' ticket limit violations and whether to take steps to stop them. The stated objective for the session was to reach agreement on the definition of "abuse," including differentiating between "good actors" and "bad actors" and "acceptable vs unacceptable behavior." A PowerPoint created by a Ticketmaster vice president for the session, which was revised and vetted by other Ticketmaster executives, states that "[e]veryone agrees that use of bots and false account information constitutes abuse."

95.    Despite that universal agreement, Defendants continued to permit brokers' "abuse," letting brokers create fictitious accounts and purchase above ticket limits. For example, in one October 2019 email exchange about overlimit purchases, a Ticketmaster employee remarked, "[y]ikes we are still not slowing [Broker A] down." Broker A is one of the large volume brokers Defendants had identified in an internal report a year earlier as "violating fictitious account rules on [a] large scale."

96.    Defendants then contemplated a new rule to limit purchases from the same IP address to "4x the event ticket limit," which would "limit [a broker's] mass purchases while still allowing for households or multi-use buildings to purchase for more than one account." Ticketmaster did not implement this rule.

97.    In early 2020, Defendants considered the "potential financial impact"

of limiting brokers to 4, 8, or 16 tickets per concert. This analysis revealed that if Defendants stopped brokers' circumvention of their controls, the inventory of concert resale tickets from brokers would decrease by 55%, or over five million tickets per year. The accompanying "significant" financial impact to Defendants would reduce annual resale ticket revenue by nearly $220 million and cost them over $26 million in annual operating income. Defendants did not impose these limits.

98.     Defendants also tested a "new method for clustering accounts that tie back to the same account holder for the purpose of enforcing ticket limits," acknowledging "brokers have found ways to evade" the company's enforcement measures. To evaluate the results of the test, Defendants said they would look at metrics including the "[d]istribution of [resale] postings among known brokers." Internal Ticketmaster emails about the new clustering system reveal that Defendants decided to overrule the system to maintain a steady flow of tickets to brokers that could then be resold on Defendants' platform.

99.     In 2021, Defendants identified a third tool to prevent brokers from bypassing posted ticket limits, but once again, it was "too effective" at reducing broker purchases, and Defendants backed away from it. The tool employed third-party identity verification to help identify fictitious Ticketmaster accounts and prevent them from purchasing tickets. Soon brokers complained in online ticket broker forums (which were monitored by Ticketmaster employees) that their

attempts to purchase tickets were being blocked. Ticketmaster executives then raised alarms internally over brokers' complaints.

100.   A Ticketmaster employee explained to executives that the tool had been launched "to stop 'shell accounts' using fake emails from making purchases. A pattern that both fraudsters AND brokers use to violate [ticket] limits." The employee further explained that the Ticketmaster policy "says no multiple accounts, info must be real, and no bots. Brokers have been used to running the show for years here and it's becoming an issue this year with abuse running rampant." Nonetheless, the employee relayed that the account verification system was "turned … down for now since it was too effective." This dampening meant that "the brokers can go wild again and get most of their extra purchases through while we sort out what [Ticketmaster executives] would like to do." In the years since that email was sent, Ticketmaster has continued to let brokers exceed ticket purchase limits.

101.   In 2023, an internal Ticketmaster and Live Nation document detailing potential steps to make sure Ticketmaster accounts belonged to actual people also discussed the need to address the use of multiple accounts to circumvent Defendants' enforcement measures. But Defendants continue to let brokers circumvent the measures and violate ticket limits.

102.   In sum, for years, Defendants have been fully aware that brokers circumvent the measures they put in place to enforce ticket limits, and they have

repeatedly declined to implement methods to prevent brokers from amassing large numbers of tickets and listing them for sale by Ticketmaster. Defendants know exactly who those brokers are, how they are circumventing the measures, and to what degree. To facilitate brokers' circumvention of ticket limits, Defendants have reduced, discontinued, or declined to implement the use of tools that could effectively enforce ticket limits against brokers, intentionally giving brokers increased access to more tickets so that Ticketmaster can then resell them and collect additional fees from consumers.

## Defendants Knowingly Sell and Offer to Sell Tickets Obtained in Violation of the Better Online Ticket Sales Act

103.   Since at least 2018, Defendants have offered to sell and sold millions of secondary market tickets acquired by brokers who circumvented their enforcement measures. As detailed above, Defendants have well understood that these tickets were purchased in violation of these measures yet offered them for sale and resold them anyway. At one point, Defendants estimated that refraining from selling tickets that were purchased by brokers in excess of ticket limits would result in hundreds of millions of dollars in lost resale ticket sales.

104.   Many of the ticket purchasing violations have been by brokers that routinely and flagrantly circumvented Defendants' controls and exceeded ticket limits, and which Defendants identified or could have identified as doing so based on their own data. When brokers use their TradeDesk accounts, Defendants can see

the tickets purchased and sold on Ticketmaster's platform for each of the hundreds or thousands of Ticketmaster accounts linked to the TradeDesk account. In an internal analysis, Defendants acknowledged the consequences of using TradeDesk data to enforce ticket limits, finding that "strict enforcement of [over the limit] policy with TradeDesk data would crush broker inventory and [gross transactional value] levels" and ultimately reduce Defendants' revenue dramatically.

105.    Defendants' decision not to enforce the limit against brokers is reflected in brokers' ongoing unlawful conduct. One broker Defendants identified in internal 2018 documents as "violating the fictitious account rule on [a] large scale" and in 2019 as using the "mass buyer model," continued its violative conduct on Ticketmaster's platform into 2023 and 2024, while it continued to maintain a TradeDesk account. It purchased over 9,000 tickets on Ticketmaster to one night of Beyonce's Renaissance tour, and Ticketmaster sold over 2,500 of those tickets on the resale market. It then used 1,075 Ticketmaster accounts to purchase 8,518 tickets on Ticketmaster to a single Travis Scott concert in 2024, and Ticketmaster offered and sold 1,149 of these tickets on the resale market. The ticket purchasing limit at the point of sale for both of these events was 8. Broker B, another broker Defendants identified in the 2018 internal analysis, still has a TradeDesk account and controls 920 Ticketmaster accounts that it uses to make Ticketmaster primary market ticket purchases. A 2022 audit of the ticket inventory held by Broker C—another broker

identified by Ticketmaster in its 2018 analysis—estimated that over 50% of its inventory was tickets purchased above ticket limits using multiple accounts to circumvent Ticketmaster's enforcement measures.

106.   Defendants approved each of these brokers for TradeDesk accounts and have monitored their inventory on Ticketmaster to ensure they reach sales goals set by Ticketmaster, so that the brokers can maintain their TradeDesk access and discounted fee structures. Each broker's TradeDesk accounts are linked to hundreds or thousands of Ticketmaster accounts and their associated tickets purchased on Ticketmaster's platform.

107.   Defendants' choice to knowingly sell tickets that they allowed or enabled brokers to acquire by circumventing ticket limit enforcement measures harms consumers. As Live Nation's President and Chief Financial Officer Joe Berchtold stated to Congress in 2023 in response to questions about whether efforts to minimize scalping "trumps the welfare of consumers and preferences of the free market":

> We disagree strongly with [that] suggestion …. [T]here is absolutely nothing about scalping that promotes consumer welfare or a free market. Scalpers do not remedy a market imperfection, as they like to argue. They raise prices to consumers, transferring in return tickets that were meant to be less costly.

108.   Since, as Defendants acknowledge, ticket prices on the secondary market often far exceed those on the primary market, hundreds of thousands of

consumers have either paid significantly more on the secondary market or have been unable to purchase tickets at all because they could not afford the higher secondary market prices. As Live Nation stated publicly in July 2025:

> [I]t doesn't take a Ph.D. in economics to figure out that neither producers nor consumers are better off when a $300 ticket sells for $3,000 and the artist doesn't get a penny of the scalper's $2,700 profit. That is a world in which scalpers and resale sites are incentivized to get tickets by any means possible, and both artists and consumers are cheated.

109.   Despite knowing that both the brokers' conduct and Defendants' own conduct violate the Better Online Ticket Sales Act, Defendants have for years persisted in these practices, tacitly coordinating with the brokers and profiting handsomely, to the detriment of consumers and artists alike. These violations are ongoing.

\* \* \*

110.   Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things, Defendants engaged in unlawful conduct willfully, knowingly, repeatedly, and unabated for many years despite knowledge of consumer complaints and this investigation, earned significant revenue from this conduct, actively impaired the progress of the FTC's investigation by failing to timely comply with a Civil Investigative Demand, changed the terms

of use, policies and practices related to the subject matter of this complaint after learning of the prospect of this litigation, and remain in the ticketing business and maintain the means, ability, and incentive to resume their unlawful conduct.

## **VIOLATIONS OF THE FTC ACT**

111.   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce" and "unfair methods of competition."

112.   Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### **COUNT I**
### **Deceptive Claims Regarding Ticket Prices**
### **(by Plaintiff FTC)**

113.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available:

        a.     at or around a specific price; or

        b.     within a specific price range.

114.   In numerous instances, Defendants' representations as set forth above have been false or misleading.

115.   Therefore, Defendants' representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### Deceptive Claims Regarding Artists' Ticket Limits
### (by Plaintiff FTC)

116.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

117.   In numerous instances, Defendants' representations as set forth above have been false or misleading.

118.   Therefore, Defendants' representations constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE BETTER ONLINE TICKET SALES ACT

119.   Under Section (a)(1)(A) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a)(1)(A), it is unlawful for any person to "circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules." Under section (a)(1)(B) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a)(1)(B), it is unlawful "to sell or offer to sell any event ticket in interstate commerce obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either (i) participated directly in or had the ability to control the

conduct in violation of subparagraph (A); or (ii) knew or should have known that the event ticket was acquired in violation of subparagraph (A)."

120.    The Better Online Ticket Sales Act defines an "event" to mean "any concert, theatrical performance, sporting event, show, or similarly scheduled activity, taking place in a venue with a seating or attendance capacity exceeding 200 persons that—(A) is open to the general public; and (B) is promoted, advertised, or marketed in interstate commerce or for which event tickets are generally sold or distributed in interstate commerce." The Better Online Ticket Sales Act defines a "ticket issuer" to mean, in part, "any person who makes event tickets available, directly or indirectly, to the general public[.]"

121.    A violation of the Better Online Ticket Sales Act is "a violation of a rule defining an unfair or a deceptive act or practice under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))." 15 U.S.C. § 45c(b)(1). Thus, pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Better Online Ticket Sales Act is an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

122.    For each violation of the Better Online Ticket Sales Act, Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes the Court to grant relief as it finds necessary to redress injury to consumers, including monetary relief, rescission or reformation of contracts, the refund of money or return of property, and public

notification respecting the rule violation or the unfair or deceptive act or practice.

123.   Under Section (c)(1) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c)(1), the attorney general of a State may bring a civil action in an appropriate district court to enforce the Act, if the attorney general has reason to believe the State's residents have been adversely affected by the engagement of any person subject to subsection (a) in a practice that violates such subsection. Pursuant to Section (c)(1) of the Better Online Ticket Sales Act, the State may seek such relief to: enjoin further violations of the Better Online Ticket Sales Act, compel compliance with the Act, and obtain damages, restitution, or other compensation on behalf of its residents.

**COUNT III**
**Violations of the Better Online Ticket Sales Act**
**(by Plaintiffs FTC and the States of Colorado, Florida,**
**Illinois, Nebraska, Tennessee, and Utah, and**
**the Commonwealth of Virginia)**

124.   Ticketmaster is a ticket issuer that has implemented security measures, access control systems, or other technological controls or measures on its website or online service that Defendants have used to enforce posted event ticket limits or to maintain the integrity of posted online ticket purchasing order rules. In numerous instances, various persons have circumvented these measures, and in numerous instances, Defendants sell or offer to sell in interstate commerce event tickets purchased in circumvention of these measures. In numerous such instances,

Defendants (i) participate directly in or have the ability to control the conduct in violation of Section (a)(1)(A) of the Better Online Ticket Sales Act, or (ii) know or should know that these event tickets were purchased in violation of Section (a)(1)(A) of the Better Online Ticket Sales Act.

125. Defendants' practices as set forth above are violations of Section (a)(1)(B) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a)(1)(B), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Colorado, Florida, Illinois, Nebraska, Tennessee, Utah, and Virginia join this count pursuant to Section (c) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(c).

## VIOLATIONS OF COLORADO STATE LAW

### COUNT IV
### Violations of Colorado Consumer Protection Act
### (By Plaintiff Attorney General of Colorado)

9. Plaintiff Colorado re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

10. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have violated the Colorado Consumer Protection Act by:

    a. advertising tickets with the intent not to sell them as advertised. Colo. Rev. Stat. § 6-1-105(1)(i);

b.       making false or misleading statements concerning the price of tickets, including by advertising tickets without including the full amount that the consumer must pay in order to purchase the ticket. Colo. Rev. Stat. § 6-1-105(1)(l);

c.       failing to disclose material information concerning the total price of tickets, which Defendants knew at the time they advertised tickets for sale, in order to induce consumers to enter into a transaction. Colo. Rev. Stat. § 6-1-105(1)(u); and

d.       knowingly or recklessly engaging in an unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent acts by failing to enforce ticket limits and other measures intended to prevent ticket brokers from buying excess tickets and causing consumers to pay higher prices. Colo. Rev. Stat. § 6-1-105(1)(rrr).

109.    When Defendants performed the deceptive trade practices described in the preceding paragraph, they did so in the course of their business, vocation, or occupation.

110.    Live Nation Entertainment, Inc. and Ticketmaster, L.L.C., violated the Colorado Consumer Protection Act, and they did so pursuing a joint or common interest. Colo. Rev. Stat. § 6-1-102(6).

## **VIOLATIONS OF FLORIDA STATE LAW**

### **THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**

112.   Section 501.204(1), Florida Statutes, declares that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

113.   Section 501.203(8), Florida Statutes, defines "trade or commerce" as the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise; of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity."

114.   The provisions of Florida Deceptive and Unfair Trade Practices Act shall be "construed liberally" to promote and "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

115.   Section 501.203(3), Florida Statutes, establishes that a violation of the Florida Deceptive and Unfair Trade Practices Act may be based upon any of the following: (a) any rules promulgated pursuant to the FTC Act; (b) the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts;

or (c) any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

116.   The Florida Legislature also expressly provided that when interpreting the Florida Deceptive and Unfair Trade Practices Act, "great weight shall be given to the interpretations of the [FTC] and the federal courts . . ." § 501.204(2), Fla. Stat.

117.   A person that willfully engages in a deceptive or unfair act or practice is liable for a civil penalty of Ten Thousand Dollars ($10,000.00) for each such violation, pursuant to Section 501.2075, Florida Statutes, and Fifteen Thousand Dollars ($15,000.00) for each violation victimizing a senior citizen or a person who has a disability. Willful violations occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

118.   The enforcing authority is entitled to reasonable attorney's fees and costs in any litigation where civil penalties are assessed. § 501.2075, Fla. Stat.

## COUNT V
### Florida Deceptive and Unfair Trade Practices Act Violations
### (By Plaintiff State of Florida)

119.   Plaintiff Florida re-alleges and incorporates each and every allegation set forth in the preceding paragraphs. In the course of Defendants' trade or commerce, Defendants have committed acts and practices that violate the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes.

Furthermore, pursuant to Section 501.203(3), Florida Statutes, violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), also constitute violations of Florida Deceptive and Unfair Trade Practices Act.

120.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available: (a) at or around a specific price; or (b) within a specific price range.

121.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

122.   In numerous instances, Defendants' representations as set forth above have been false or misleading. Defendants' false or misleading representations have affected the people of the State of Florida.

123.   Therefore, Defendants' representations constitute deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act and of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which therefore also violate the

Florida Deceptive and Unfair Trade Practices Act.

## **VIOLATIONS OF ILLINOIS STATE LAW**

### **The Illinois Consumer Fraud Act**

124.   Section 2 of the Illinois Consumer Fraud and Deceptive Business

Practices Act provides the following:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use or employment of
> any deception fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission
> of any material fact, with intent that others rely upon the
> concealment, suppression or omission of such material fact, or
> the use or employment of any practice described in Section 2 of
> the 'Uniform Deceptive Trade Practices Act', approved August,
> 5, 1965 [815 ILCS 510/2], in the conduct of any trade or
> commerce are hereby declared unlawful whether any person has
> in fact been misled, deceived or damaged thereby. In construing
> this section consideration shall be given to the interpretations of
> the Federal Trade Commission and the federal courts relating to
> Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

Section 7 of the Illinois Consumer Fraud Act provides:

> (a)      Whenever the Attorney General has reason to believe
> that any person is using, has used, or is about to use any
> method, act or practice declared by the Act to be unlawful, and
> that proceedings would be in the public interest, he may bring
> an action in the name of the State against such person to
> restrain by preliminary or permanent injunction the use of such
> method, act or practice. The Court, in its discretion, may
> exercise all powers necessary, including but not limited to:
> injunction, revocation, forfeiture or suspension of any license,
> charger, franchise, certificate or other evidence of authority of

any person to do business in this State; appointment of a receiver, dissolution of domestic corporations or association suspension or termination of the right of foreign corporation or associations to do business in this State; and restitution.

(b)    In addition to the remedies provided herein, the Attorney General may request and this Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act. In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

(c)    In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS 505/7.

126.    Section 10 of the Illinois Consumer Fraud Act provides, "In any action brought under the provisions of this Act, the Attorney General is entitled to recover costs for the use of this State." 815 ILCS 505/10.

**COUNT VI**
**Violations of the Illinois Consumer Fraud Act**
**(by Plaintiff State of Illinois)**

127.    Plaintiff Illinois re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

128.    Defendants, in the course of trade or commerce, have in numerous instances engaged in conduct which constitutes unfair and deceptive acts or

practices declared unlawful under section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by:

    A.    Misrepresenting, directly or indirectly, expressly or by implication, through advertisements, marketing, or promotion for sale with the intent that consumers rely on the misrepresentation that tickets are available at or around a specific price, or within a specific price range when that is not true;

    B.    Failing to disclose or adequately disclose to consumers that additional fees apply to live events, thereby suppressing or omitting a material fact with the intent that consumers rely upon that suppression or omission;

    C.    Failing to disclose or adequately disclose to Illinois consumers the amount of all applicable fees for live events, thereby suppressing or omitting a material fact with the intent that consumers rely upon that suppression or omission;

    D.    Misrepresenting directly or indirectly, expressly or by implication with the intent consumers rely on the misrepresentation, the true cost of live tickets to Illinois consumers; and

    E.    Misrepresenting directly or indirectly, expressly or by implication with intent consumers rely on the misrepresentation, the

maximum number of tickets that can be purchased for an event on behalf of the same person or entity.

## **VIOLATIONS OF NEBRASKA STATE LAW**

129.   Plaintiff Nebraska re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

130.   The Nebraska Uniform Deceptive Trade Practices Act specifies multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices. Neb. Rev. Stat. § 87-302.

131.   Under Neb. Rev. Stat. § 303.05:

(1) Whenever the Attorney General has cause to believe that a person has engaged in or is engaging in any deceptive trade practice or unconscionable act listed in section 87-302 . . .  the Attorney General may apply for and obtain, in an action in any district court of this state, a temporary restraining order, or injunction, or both, pursuant to the rules of civil procedure, prohibiting such person from continuing such practices, or engaging therein, or doing any act in furtherance thereof. The court may make such orders or judgments as may be necessary to prevent the use or employment by such person of any such deceptive trade practice, or which may be necessary to restore to any other person any money or real or personal property which may have been acquired by means of any such practice.

132.   Under Neb. Rev. Stat. § 303.11:

(1) Any person who violates section 87-302 . . . or who

willfully violates the terms of an injunction or declaratory judgment of a district court or the terms of a written assurance of voluntary compliance entered into pursuant to the Uniform Deceptive Trade Practices Act shall be subject to a civil penalty of not more than two thousand dollars for each violation. The Attorney General, acting in the name of the state, may seek recovery of such civil penalties in a civil action.

## COUNT VII
**Violations of the Nebraska Uniform Deceptive Trade Practices Act**
**(By Plaintiff State of Nebraska)**

133.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available:

        a.     without additional fees;

        b.     at or around a specific price; and/or

        c.     within a specific price range.

134.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

135.   In numerous instances, Defendants' representations have been false or misleading.

136.   Therefore, Defendants' false or misleading representations constitute

deceptive acts or practices in the course of business in violation of the Nebraska Uniform Deceptive Trade Practices Act. *See* Neb. Rev. Stat. § 87-302(2), (3), (5), (6), (10), (11), and (12).

137.   Defendants engaged in the above deceptive acts and practices willfully, knowing them to be deceptive.

138.   Defendants' false or misleading representations have affected the people of the State of Nebraska.

139.   Each deceptive act or practice as alleged herein constitutes a separate violation of the Nebraska Uniform Deceptive Trade Practices Act.

### VIOLATIONS OF TENNESSEE STATE LAW

**COUNT VIII**
**Unfair or Deceptive Acts of Practices Under**
**Tennessee Consumer Protection Act**
**(By Plaintiff State of Tennessee)**

140.   Plaintiff Tennessee re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

141.   The Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, *et seq.* prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104.

142.   The Tennessee Consumer Protection Act "shall be interpreted and construed consistently with the interpretations given by the Federal Trade Commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade

Commission Act, codified in 15 U.S.C. § 45(a)(1)." Tenn. Code Ann. § 47-18-115.

143.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

144.   In numerous instances, Defendants' representations as set forth above have been false or misleading.

145.   Therefore, Defendants' representations, as described above, also constitute a deceptive act or practice in violation of Tenn. Code Ann. § 47-18-104(a) and (b)(27).

## VIOLATIONS OF UTAH STATE LAW

146.   The Utah Consumer Sales Practices Act prohibits suppliers from committing "deceptive" acts or practices in connection with a consumer transaction, whether the act occurs before, during, or after the transaction.  Utah Code § 13-11-4(1).

147.   The Utah Consumer Sales Practices Act further prohibits suppliers from committing "unconscionable" acts or practices in connection with a consumer transaction, whether the act occurs before, during, or after the transaction. *Id.* § 13-11-5(1).

148.   Defendants engage in "consumer transaction[s]" by marketing and/or

selling to "person[s]" products and services that are primarily for personal, family, or household purposes, or for purposes that relate to a business opportunity. *Id.* § 13-11-3(2).

149.   Defendants are a "supplier" because they regularly solicit, engage in, or enforce consumer transactions regardless of whether they deal directly with consumers. *Id.* § 13-11-3(5).

150.   As set forth below, Defendants have violated the Utah Consumer Sales Practices Act by engaging in the acts and practices alleged herein.

## COUNT IX
**Violations of the Utah Consumer Sales Practices Act for Deceptive and Unconscionable Conduct Regarding Ticket Prices**
**(by Plaintiff Utah Division of Consumer Protection)**

151.   Plaintiff Utah Division of Consumer Protection re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

152.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants have represented, directly or indirectly, expressly or by implication, that tickets are available:

    a.    at or around a specific price; or

    b.    within a specific price range.

153.   In numerous instances, Defendants' representations as set forth above have been false or misleading.

154.   In numerous instances, Defendants knew or had reason to know that

these representations would induce consumers into contracts with oppressive and unfair terms that the consumers would not have otherwise accepted.

155.    Therefore, Defendants' representations and actions constitute deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Utah Code §§ 13-11-4.

156.    Further, Defendants' representations and actions constitute unconscionable acts or practices in violation of Section 13-11-5.

### COUNT X
**Violations of the Utah Consumer Sales Practices Act for Deceptive and Unconscionable Conduct Regarding Artists' Ticket Limits (by Plaintiff Utah Division of Consumer Protection)**

157.    Plaintiff Utah Division of Consumer Protection re-alleges and incorporates each and every allegation set forth in the preceding paragraphs.

158.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of tickets, Defendants misrepresent, directly or indirectly, expressly or by implication, the maximum number of tickets that can be purchased for an event by or on behalf of the same person or entity.

159.    In numerous instances, Defendants' representations as set forth above have been false or misleading.

160.    In numerous instances, Defendants knew or had reason to know that these representations would induce consumers into contracts with oppressive and unfair terms that the consumers would not have otherwise accepted.

161.  Therefore, Defendants' representations and actions constitute deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Utah Code § 13-11-4.

162.  Further, Defendant's representations and actions constitute unconscionable acts or practices in violation of Section 13-11-5.

## CIVIL PENALTIES

163.  Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award civil penalties for each violation of the Better Online Ticket Sales Act, 15 U.S.C. § 45c.

164.  Defendants violated the Better Online Ticket Sales Act, 15 U.S.C. § 45c, with actual knowledge or knowledge fairly implied on the basis of objective circumstances, as required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

165.  The Colorado Consumer Protection Act authorizes this Court to award civil penalties in the amount of up to $20,000 per violation or $50,000 for violations committed against an elderly person. Colo. Rev. Stat. § 6-1-112

166.  Section 501.2075, Florida Statutes, authorizes this Court to award civil penalties against a person that willfully engages in a deceptive or unfair act or practice in the amount of $10,000 for each violation and Section 501.2077, Florida Statutes, authorizes this Court to award civil penalties in the amount of $15,000.00

for each violation victimizing a senior citizen or a person who has a disability. Willful violations occur when the person knew or should have known that the conduct in question was deceptive or unfair or prohibited by rule, pursuant to Section 501.2075, Florida Statutes.

167.    Subsection 815 ILCS 505/7(b) of the Illinois Consumer Fraud Act authorizes this Court to award civil penalties for each deceptive and unfair practice done in violation of the Consumer Fraud Act and an additional penalty of $50,000 for each violation the Court finds that Defendants committed with the intent to defraud.

168.    Subsection 815 ILCS 505/7(c) of the Illinois Consumer Fraud Act authorizes this Court to award an additional civil penalty of $10,000 for each violation of the Illinois Consumer Fraud Act found to have been committed against a senior citizen.

169.    Neb. Rev. Stat. § 87-303.11(1) authorizes this Court to award civil penalties for each violation of the Nebraska Uniform Deceptive Trade Practices Act.

170.    Tenn. Code Ann. § 47-18-108(b)(3) authorizes this Court to award a civil penalty of not more than $1,000 for each violation of the Tennessee Consumer Protection Act.

171.    The Utah Consumer Sales Practices Act authorizes this Court to award a fine to the Utah Division of Consumer Protection for Defendants' violation of the

Utah Consumer Sales Practices Act. Utah Code § 13-11-17(1)(e). There is no cap on the amount of fine this Court can award, but it must instead be assessed after considering the factors set forth under Utah Code § 13-11-17(6).

## CONSUMER INJURY

172.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Better Online Ticket Sales Act, the Colorado Consumer Protection Act, the Florida Deceptive and Unfair Trade Practices Act, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Nebraska Uniform Deceptive Trade Practices Act, the Tennessee Consumer Protection Act, and the Utah Consumer Sales Practices Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the Better Online Ticket Sales Act, the Colorado Consumer Protection Act, the Florida Deceptive and Unfair Trade Practices Act, the Illinois Consumer Fraud Act, the Illinois Uniform Deceptive Trade Practices Act, the Nebraska Uniform Deceptive Trade Practices Act, the Tennessee Consumer Protection Act, and the Utah Consumer Sales Practices Act;

B.      Award monetary and other relief within the Court's power to grant;

C.      Impose civil penalties for each violation of the Better Online Ticket Sales Act in accordance with Section 2(b) of that Act, 15 U.S.C. § 45c(b), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A);

D.      Award Plaintiff States civil penalties, fines, and/or forfeitures for each violation of their respective state laws, attorneys' fees, and expenses as provided under state law;

E.      Award Plaintiffs the cost of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper; and

F.      Award any additional relief as the Court determines to be just and proper.

Dated: September 17, 2025                    Respectfully submitted,


**FOR THE FEDERAL TRADE COMMISSION:**

/s/*Elizabeth C. Scott*
Elizabeth C. Scott (*pro hac vice forthcoming*)
escott@ftc.gov
Taylor H. Arana (*pro hac vice forthcoming*)
tarana@ftc.gov
Claire E. W. Stewart (*pro hac vice forthcoming*)
cstewart@ftc.gov
FEDERAL TRADE COMMISSION
230 South Dearborn Street, Suite 3030
Chicago, IL 60604
Telephone:   312-960-5609 (Scott)
             312-960-5639 (Arana)
             312-960-5615 (Stewart)
Fax:         312-960-5600

Local Counsel:
Aaron M. Schue (CA Bar No. 338760)
aschue@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300
Fax: (310) 824-4380


*Attorneys for the Federal Trade Commission*

**FOR THE ATTORNEY GENERAL OF COLORADO:**

PHILIP J. WEISER
Attorney General
State of Colorado

/s/*Brady J. Grassmeyer*
Brady J. Grassmeyer (*pro hac vice* forthcoming)
Brady.Grassmeyer@coag.gov
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6263


*Attorney for the State of Colorado*

**FOR THE OFFICE OF THE ATTORNEY GENERAL,**
**STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS:**

JAMES UTHMEIER
Attorney General


/s/ *Donna Cecilia Valin*
Donna Valin, Special Counsel, Assistant Attorney General (*pro hac vice*
forthcoming)
Donna.valin@myfloridalegal.com
Consumer Protection Division
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Fax: (407) 245-0365

Victoria Ann Butler, Dir. of Consumer Protection Litigation (*pro hac vice*
forthcoming)
Victoria.butler@myfloridalegal.com
3507 E. Frontage Road, Suite 325
Tampa, FL 32607
Telephone: (813) 287-7950

Henry Q. Johnson, Senior Assistant Attorney General (*pro hac vice* forthcoming)
Henry.Johnson@myfloridalegal.com
Multistate and Privacy Bureau
110 SE 6th Street
Fort Lauderdale, FL 33301
Telephone: (954) 712-4600

*Attorneys for the State of Florida*

**FOR THE PEOPLE OF THE STATE OF ILLINOIS:**

KWAME RAOUL

Attorney General

/s/ *Alexandra A. Golota*

ALEXANDRA A. GOLOTA (*pro hac vice* forthcoming)

alexandra.golota@ilag.gov

WILTON A. PERSON (*pro hac vice* forthcoming)

Wilton.Person@ilag.gov

 Office of the Illinois Attorney General

Consumer Fraud Bureau

115 S. LaSalle Street, 26th Floor

Chicago, Illinois 60603

Telephone:    (872) 272-0794 (Golota)

                        (224) 252-6458 (Person)

*Attorneys for the State of Illinois*

**FOR THE STATE OF NEBRASKA:**

/s/ *Benjamin J. Swanson*
Benjamin J. Swanson (*pro hac vice* forthcoming)
benjamin.swanson@nebraska.gov
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68508
Telephone: (402) 471-7759

*Attorney for the State of Nebraska*

1
2

**FOR THE STATE OF TENNESSEE:**

3
4

JONATHAN SKRMETTI
Attorney General and Reporter

5
6

/s/ *Kelley L. Groover*
KELLEY GROOVER, Sr. Assistant Attorney General/Managing Attorney (*pro hac vice* forthcoming)

7
8

Kelley.Groover@ag.tn.gov
KRISTINE KNOWLES, Assistant Attorney General (*pro hac vice* forthcoming)

9

Kristine.Knowles@ag.tn.gov
OFFICE OF THE TENNESSEE ATTORNEY GENERAL

10

Public Protection Section
Consumer Protection Division

11

UBS Tower, 20th Floor
315 Deaderick Street

12
13

Nashville, Tennessee 37243
Telephone: (615) 741-1671

14

Fax: (615) 532-2910

15
16

*Attorneys for the State of Tennessee*

17

18

19

20

21

22

23

24

25

26

27

28

**FOR THE STATE OF UTAH and the**
**UTAH DIVISION OF CONSUMER PROTECTION:**

DEREK BROWN
Utah Attorney General

Douglas Crapo
Deputy Attorney General

*/s/ Marilee L. Miller*
Marilee L. Miller (Utah bar pending, *pro hac vice* forthcoming)
Director, Public Protection and Fraud Division
marileemiller@agutah.gov
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, UT 84114
Telephone: (801) 366-0310

*/s/ Stevenson Smith*
Stevenson Smith (*pro hac vice* forthcoming*)*, Assistant Attorney General
scsmith@agutah.gov
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, UT 84114
Telephone: (801) 366-0310

*Attorneys for the State of Utah*

**FOR THE COMMONWEALTH OF VIRGINIA, *ex rel.* JASON S. MIYARES, ATTORNEY GENERAL:**

JASON S. MIYARES
Attorney General of Virginia

*/s/ Chandler P. Crenshaw*
CHANDLER P. CRENSHAW (*pro hac vice* forthcoming)
Assistant Attorney General and Unit Manager
CCrenshaw@oag.state.va.us
Assistant Attorney General and Unit Manager
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone:   (804) 786-2071
Fax:           (804) 786-0122

*Attorney for Plaintiff Commonwealth of Virginia*