ELIZABETH C. SCOTT (*pro hac vice*)
escott@ftc.gov
TAYLOR H. ARANA (*pro hac vice*)
tarana@ftc.gov
CLAIRE E.W. STEWART (*pro hac vice*)
cstewart@ftc.gov
FEDERAL TRADE COMMISSION
230 South Dearborn Street, Suite 3030
Chicago, IL 60604
Telephone: (312) 960-5609 (Scott)
Telephone: (312) 960-5639 (Arana)
Telephone: (312) 960-5615 (Stewart)

Local Counsel:
AARON M. SCHUE (CA BAR NO. 338760)
aschue@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER, L.L.C., <br><br> Defendants. | Case No. 2:25-CV-08884 <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

Table of Authorities ........................................................................................ iii

BACKGROUND ...............................................................................................1

    Bait-and-Switch Ticket Prices ...................................................................1

    Illusory Ticket Limits ................................................................................3

LEGAL STANDARDS .....................................................................................5

    I.    Rules 8(a) and 12(b)(6) ......................................................................5

    II.   Rule 9(b) Does Not Apply ..................................................................6

ARGUMENT ....................................................................................................7

    I.    Plaintiffs Plausibly Allege That Ticketmaster Violated Section 5 of the FTC Act and Parallel State Statutes ...............................................7

        A. Ticketmaster's False Low Ticket Prices Are Deceptive ................7

        B. Ticketmaster's Ticket Limit Claims Are Deceptive .....................11

        C. The State Deception and Unconscionability Claims Are Properly Pled Suffice For the Same Reasons .................................................12

        D. The FTC May Obtain Injunctive Relief for Ticketmaster's Deceptive Low Ticket Prices .........................................................13

        High Degree of Scienter, Frequency of Violative Acts, and Harm ....15

        Ample Ability to Commit Future Violations .....................................15

        No Recognition of Wrongful Nature of Conduct ...............................16

    II.   Plaintiffs Plausibly Allege Defendants' BOTS Act Violations ..........16

        A. Scalpers Circumvent Defendants' Technological Measures .........18

1.  Circumvent Means to Get Around ...........................................18

2.  The BOTS Act Does Not Limit Circumvention to Bypassing Without Authority .................................................................18

B.  Plaintiffs Allege the Technological Measures That Were Circumvented .....................................................................20

C.  Defendants Sell or Offer to Sell Illegally Purchased Event Tickets........................................................................22

1.  Defendants Sold or Offered to Sell Tickets Under the Plain Meaning of Those Terms ..........................................22

2.  The Structure and Purpose of the BOTS Act Confirms the Plain Meaning of Sell and Offer to Sell ...........................25

D.  Defendants Do Not Contest Their Ability to Control Illegal Ticket Purchases.......................................................................26

E.  Defendants Know or Should Know They Are Selling or Offering Illegally Purchased Tickets ...........................................27

III.   Defendants Violated the BOTS Act With Actual Knowledge or Knowledge Fairly Implied ................................................29

IV.   The BOTS Act Does Not Prohibit States From Alleging Violations Alongside the FTC ................................................30

V.   Conclusion..........................................................................31

Certificate of Compliance ...........................................................35

-ii-

# TABLE OF AUTHORITIES

## Cases

*Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858 (9th Cir. 2016) .............5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................5

*Childs v. S. D. Fam. Hous., LLC*, 150 F.4th 1151 (9th Cir. 2025) ...................18, 22

*CFPB v. Consumer Advoc. Ctr. Inc.*,

    2021 WL 6496789 (C.D. Cal. Dec. 7, 2021) ..................................................30

*CFPB v. Howard*, 2017 WL 10378953 (C.D. Cal. May 30, 2017) ........................17

*Close v. Sotheby's, Inc.*, 894 F.3d 1061 (9th Cir. 2018) ........................................25

*Est. of Graham v. Sotheby's, Inc.*, 178 F. Supp. 3d 974 (C.D. Cal. 2016) .............25

*Estrada v. Mendoza*, 275 P.3d 1024 (Utah Ct. App. 2012) .....................................13

*Fabozzi v. StubHub, Inc.*, 2012 WL 506330, (N.D. Cal. Feb. 15, 2012) ...............25

*Franklin-Chomas v. Internet Referral Servs., LLC*,

    2025 WL 2917158 (S.D. Cal. Oct. 14, 2025) ................................................24

*Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995) ...............................................10

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) .......................................16

*FTC v. Amazon.com, Inc.*, 71 F. Supp. 3d 1158 (W.D. Wash. 2014)...............13, 14

*FTC v. Amazon.com, Inc.*, 735 F.Supp.3d 1297 (W.D. Wash. 2024)......................29

*FTC v. Corpay, Inc.*, 2026 WL 35708 (11th Cir. Jan. 6, 2026)...............................9

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006) ...............................10

*FTC v. Del Sol, LLC*, 2005 WL 8157774 (C.D. Cal. May 23, 2005)........................8

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ......................9, 10

*FTC v. Doxo*, 2025 WL 887311 (W.D. Wash. Mar. 21, 2025) ................................9

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005)..........................6

*FTC v. Grand Canyon Educ., Inc.*, 745 F. Supp. 3d 803 (D. Ariz. 2024)................6

*FTC v. Hoyal & Assoc., Inc.*, 859 F. App'x. 117 (9th Cir. 2021) ..........................15

*FTC v. John Beck Amazing Profits, LLC*,

    865 F.Supp.2d 1052 (C.D. Cal. 2012).....................................................8, 11

*FTC v. Key Investment Group*, No. 25-cv-02716, (D. Md. Nov. 24, 2025)...........19

*FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104 (S.D. Cal. 2008)...................................12

*FTC v. Nudge, LLC*, 2022 WL 2132695 (D. Utah June 1 4, 2022) ........................12

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ...........................................7

*FTC v. QYK Brands LLC*, 2022 WL 1090257(C.D. Cal. Apr. 6, 2022) ...........14, 16

*FTC v. QYK Brands LLC*, 2024 WL 1526741 (9th Cir. Apr. 9, 2024)..............13, 15

*FTC v. Roomster Corp.*, 654 F. Supp. 3d 244 (S.D.N.Y. 2023)......................15, 16

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ....................................................7

*Hernandez v. Williams, Zinman & Parham PC*,

    829 F.3d 1068 (9th Cir. 2016) ..........................................................................26

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319 (1984) .........7, 8, 11

*In re Filderman Corp.*, 64 F.T.C. 427, 1964 WL 73194 (1964) .............................9

*In re Packaged Seafood Prods. Antitrust Litig.*,

    242 F. Supp. 3d 1033 (S.D. Cal. 2017)............................................................13

*In re Thompson Med. Co., Inc.,*

    104 F.T.C. 648, 1984 WL 565377 (1984)......................................................12

*iSpot.tv, Inc. v. Teyfukova*, 2023 WL 3602806 (C.D. Cal. May 22, 2023) .......19, 20

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,

    416 F.3d 940 (9th Cir. 2005) ........................................................................5

*Mayer Brown LLP v. IRS*, 562 F.3d 1190 (D.C. Cir. 2009) ...................................18

*Moore v. Kayport Package Exp. Inc.*, 885 F.2d 531 (9th Cir. 1989) ...................6, 7

*People ex rel. Hartigan v. All Am. Aluminum & Constr. Co.*,

    524 N.E.2d 1067 (Ill. App. Ct. 1988) ............................................................13

*PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773 (Fla. 2003) ...............12, 13

*Porras v. StubHub, Inc.*, 2012 WL 3835073 (N.D. Cal. Sept. 4, 2012).................25

*Reinbrecht v. Walgreen Co.*, 742 N.W.2d 243 (Neb. App. Ct. 2007).....................13

*Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*,

    706 P.2d 1028 (Utah 1985) ..........................................................................13

*Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962 (9th Cir. 1975) .........................9

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,

    62 P.3d 142 (Colo. 2003)..............................................................................13

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,

    835 F. App'x 213 (9th Cir. 2020)........................................................25

*Trans World Accts., Inc. v. FTC.*, 594 F.2d 212 (9th Cir. 1979)............................7

*Tucker v. Sierra Builders*, 180 S.W.3d 109 (Tenn. Ct. App. 2005)........................12

*U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016)......................22

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003)............................7

**Statutes**

15 U.S.C. § 45 (Federal Trade Commission Act)..............................................*passim*

15 U.S.C. § 45c (Better Online Ticket Sales Act of 2016).............................*passim*

15 U.S.C. § 53 .......................................................................................17

15 U.S.C. § 57b(d) .................................................................................17

17 U.S.C. § 1201(a)(3)(A) .......................................................................19

28 U.S.C. § 2462 ...................................................................................17

Fla. Stat. Ann. § 501.204 (West 2025) ......................................................13

Utah Code Ann. § 13-11-2 .......................................................................12

**Rules**

Fed. R. Civ. P. 8(a)..................................................................................5

Fed. R. Civ. P. 9(b) ..............................................................................6, 7

Fed. R. Civ. P. 12(b)(6)............................................................................5

**Other Sources**

S. Rep. No. 114-391 (2016) ....................................................................30

Merriam–Webster, https://www.merriam-webster.com/dictionary........................22

Webster's II New College Dictionary 209 (3d. ed. 2005)........................................18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For years, Live Nation Entertainment, Inc. and Ticketmaster, L.L.C. ("Defendants") have deceived consumers with false low ticket prices and turned a blind eye to scalpers' unlawful ticket purchases, frustrating artists' efforts to get tickets to fans. Plaintiffs' 84-page complaint details violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a), the Better Online Ticket Sales Act ("BOTS Act"), 15 U.S.C. § 45c, and six state consumer protection statutes. In response, Defendants can only engage in doublespeak, distort the allegations, and ask the Court to ignore the plain language of the applicable statutes. Defendants' motion should be denied.

## BACKGROUND

Defendants sell tickets to concerts, sporting events, and other live entertainment. ECF-1 ¶¶10, 33, 34. Consumers spend billions of dollars annually purchasing primary (original) and secondary (resale) tickets from Defendants. *Id*. ¶¶10, 13. Defendants earn revenue from mandatory fees they charge consumers on ticket purchases. *Id*. ¶¶36–38.

### Bait-and-Switch Ticket Prices

Defendants' ticket purchase process for primary and secondary sales is the same. ECF-1 ¶48. Both types of tickets appear together on Ticketmaster's platform. *Id.* ¶35, Figure 1. Defendants display specific prices to consumers searching for tickets, and they allow consumers to select a specific price range to limit their search to their budget. *Id*. ¶¶40–49. Consumers spend time evaluating

ticket options and making purchasing decisions based on the displayed prices. *Id.* ¶54.



But Defendants have charged consumers billions of dollars in "surprise" mandatory fees on top of their advertised prices, increasing the cost to consumers by as much as 44%. ECF-1 ¶¶12, 36, 50, 58–59, 64. Consumers complained to Defendants that the last-minute price hikes were "insane," "hidden," and "unexpected," *id*. ¶52, and Ticketmaster's president acknowledged they left consumers with "sticker shock," *id*. ¶51. Each time Defendants considered displaying accurate prices, they nonetheless doubled down on "less transparency." *Id*. ¶¶55–61, 64.

**Illusory Ticket Limits**

Artists set ticket limits—caps on the number of tickets someone can purchase to an event—so that more fans can buy them. ECF-1 ¶¶65, 72. Defendants prominently post these limits when offering tickets for sale. *Id.* ¶67. Defendants' terms of use have prohibited users from "order[ing], or attempt[ing] to order, a number of tickets for an event that exceeds the stated limit for that event." *Id.* ¶68. And Defendants prohibit the use of multiple accounts or purchases to exceed ticket limits, and the use of fictitious information to create Ticketmaster accounts. *Id.* ¶¶67–69.

Defendants use technological measures to enforce their posted ticket limits, such as a quantity selector (often, a dropdown menu) on the purchase page that automatically prevents overlimit purchases in a single transaction. ECF-1 ¶70. Defendants' "TicketCounter" (previously, "Over the Ticket Limit") system "blocks multiple purchase attempts from the same IP address and analyzes patterns to identify multiple accounts acting in concert to evade purchase limits." *Id.* ¶71. Using TicketCounter, Defendants also run post-purchase analyses to "detect whether a single person or entity attempted to exceed purchase limits by using multiple Ticketmaster accounts or transactions." *Id.*

Defendants represent that they strictly impose ticket limits, ECF-1 ¶¶14, 67, well aware that while ordinary consumers abide by posted limits, professional

ticket brokers (also known as scalpers) routinely employ unlawful tactics to exceed limits and stockpile tickets. *Id*. ¶74-89. To evade Defendants' enforcement measures, scalpers create or buy hundreds or thousands of Ticketmaster accounts, often using fake identifying information or hidden IP addresses to get around Defendants' account verification systems. *Id*. This tactic is so common that Defendants refer to it in shorthand: the "mass buyer model." *Id*. ¶¶82, 105.

In aggregate, scalpers have purchased millions of tickets above posted limits for Defendants to resell. ECF-1 ¶¶65, 80. Individual scalpers have bypassed Defendants' enforcement measures to purchase thousands of over-limit tickets to high-demand events. *E.g.*, *id*. ¶105. Scalpers cannot purchase thousands of tickets to a single event without circumventing Defendants' countermeasures.

Defendants know about scalpers' unlawful ticket purchases. ECF-1 ¶104. A top executive admitted that "as a matter of policy," Defendants turn a "blind eye" to scalpers' conduct. *Id*. ¶¶15, 82, 90–91. In one internal document, Defendants identify the method of evasion (scalpers "violate[ed] fictitious account rules on [a] large scale") and the perpetrators (naming "the most questionable" scalpers and showing their massive ticket holdings). *Id*. ¶83. Another analysis estimated hundreds of millions of dollars in lost revenue if Defendants stopped scalpers from getting around their enforcement measures, illustrating Defendants' financial incentive to look the other way. *Id*. ¶97.

-4-

Rather than prevent scalpers from circumventing ticket limit enforcement measures and buying thousands of tickets to events with single-digit limits, however, Defendants help them. Defendants let scalpers use their TradeDesk platform, which allows scalpers to aggregate and manage large ticket inventories. *Id.* ¶84. Defendants then offer and sell those tickets on the resale market. *Eg., id.* ¶105. Defendants have earned billions of dollars on these tickets. *Id.* ¶16.

## LEGAL STANDARDS

### I.    Rules 8(a) and 12(b)(6)

On a Rule 12(b)(6) motion to dismiss, the Court must "accept the complaint's well-pleaded factual allegations as true, and construe all inferences in the plaintiff's favor." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016). Rule 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief," to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). A claim should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim entitling plaintiff to relief." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

## II.    Rule 9(b) Does Not Apply

Plaintiffs do not allege claims of fraud or mistake, so Rule 9(b) does not apply. To plead deception under Section 5 (and state consumer protection statutes), Plaintiffs need only allege that Defendants' representations contained a material claim or omission likely to mislead consumers acting reasonably under the circumstances. A Section 5 deception claim "simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b)," because it does not require proof of common law fraud's elements, such as specific reliance or specific injury. *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005). A BOTS Act claim does not even require a misrepresentation, let alone the other elements of common law fraud. While some district courts have applied 9(b) to FTC Act deception claims, many have not, and the Ninth Circuit has not ruled on this issue. *See FTC v. Grand Canyon Educ., Inc.*, 745 F. Supp. 3d 803, 837 (D. Ariz. 2024) (holding 9(b) does not apply and collecting cases holding same). As the Tenth Circuit put it, applying 9(b) to an FTC Act claim is "inconsistent with the purpose of the FTC Act and highly impractical." *Freecom*, 401 F.3d at 1203 n.7.

Even if Rule 9(b) applies—and it should not—the touchstone is whether a pleading "identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp.*

*Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). "[O]nly allegations . . . of fraudulent conduct must satisfy the heightened pleading requirements." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Knowledge may be alleged generally. Fed. R. Civ. P. 9(b).

## ARGUMENT

### I. Plaintiffs Plausibly Allege That Ticketmaster Violated Section 5 of the FTC Act and Parallel State Statutes

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). To establish a deceptive act or practice, the FTC must allege: (1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances and (3) is material. *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (citation omitted). "Proof of actual deception is unnecessary." *Trans World Accts., Inc. v. FTC.*, 594 F.2d 212, 214 (9th Cir. 1979). Express claims are presumed material, *Pantron I Corp.*, 33 F.3d at 1088, 1095–96 (9th Cir. 1994), as are claims about certain core characteristics of a product or service, such as price, *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 174, 1984 WL 565319, at *49 (1984). Plaintiffs plead facts that meet each element of deception.

### A. Ticketmaster's False Low Ticket Prices Are Deceptive

Since 2015, Defendants have represented to consumers that tickets are available at a specific price. "In cases of express claims," as here, "the

representation itself establishes the meaning." *Cliffdale*, 1984 WL 565319, at \*46. Defendants show consumers searching for tickets a list of available tickets at specific prices. ECF-1 ¶¶40, 45, 49; Figure 1. And when consumers use the price-selection slider on Defendants' search page, Defendants show results ostensibly limited to tickets priced within that range. *Id.* ¶41; Figure 2.

Defendants' stated prices have been false and misleading: neither the list prices nor the range of prices shown when consumers use the slider includes Defendants' hefty fees. *See FTC v. John Beck Amazing Profits, LLC*, 865 F.Supp.2d 1052, 1067 (C.D. Cal. 2012) (false claims are misleading under Section 5). Defendants have charged consumers as much as 44% more for tickets than advertised, through substantial mandatory fees Defendants add to every sale, amounting to $16.4 billion total. *See, e.g.,* ECF-1 ¶¶36.. When Defendants advertised false low prices, consumers were entitled to believe them. *See FTC v. Del Sol, LLC*, 2005 WL 8157774, at \*2 (C.D. Cal. May 23, 2005) (cleaned up) ("Consumer reliance on express claims is presumptively reasonable."). And here, Defendants intended to lure consumers with false low prices, ECF-1 ¶59, which makes consumers' belief that Defendants' advertised price was the true price presumptively reasonable. *Cliffdale*, 1984 WL 565319, at \*47 ("An interpretation will be presumed reasonable if it is the one the respondent intended to convey.").

-8-

Defendants do not pretend they did not make the alleged claims or that they were immaterial. Instead, Defendants profess not to understand how their claims could be false or misleading, because the true price of tickets is displayed at the last possible point in a transaction, as a countdown timer ticks to zero. ECF-55 at 28–29; ECF-1 ¶43. But the question is not whether Defendants include the total price at some point during the transaction. Courts have repeatedly held that representations are deceptive under Section 5 when they "induce[] the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975) ("Advertising capable of being interpreted in a misleading way should be construed against the advertiser."); *see, e.g., FTC v. Doxo*, 2025 WL 887311, *7 (W.D. Wash. Mar. 21, 2025) (denying motion to dismiss and citing same); *In re Filderman Corp.*, 64 F.T.C. 427, 1964 WL 73194, *19 (1964) (finding that respondents unlawfully advertised prices that were later inflated with mandatory service charges).

Nor does Defendants' ambiguous "+ Fees" tag help them. *See* ECF-1 ¶46. Vague or contradictory disclaimers cannot cure a false claim. *See, e.g., FTC v. Corpay, Inc.*, 2026 WL 35708, at *16 (11th Cir. Jan. 6, 2026) (disclaimers that are "small, ambiguous, or contradicted by the body of the ad" cannot correct misleading impression); *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 12 (1st

Cir. 2010) (disclaimers "are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression" (cleaned up)). Defendants state specific ticket prices, and as the complaint alleges, do not tell consumers that these prices exclude mandatory fees on every ticket, let alone that the total price may be as much as 44% more than advertised. ECF-1 ¶46. As complaints to Defendants from surprised consumers confirm, *id.* ¶50, to the extent "+ Fees" was meant to be a disclosure, it was ineffective. *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006) (proof of actual deception unnecessary but "highly probative to show that a practice is likely to mislead consumers acting reasonably").

Defendants cite no authority under the FTC Act for their position that reasonable consumers could not have been misled by their price claims, and the handful of cases analyzing private claims brought under different laws with different review standards and markedly different facts are inapposite. *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (allegedly deceptive promotions "expressly and repeatedly state[d]" material information and "qualifying language appears immediately next to the representations it qualifies" such that "no reasonable reader could ignore it").

### B.  Ticketmaster's Ticket Limit Claims Are Deceptive

Artists set ticket limits, which Defendants display in the ticket browsing flow. ECF-1 ¶¶66-67. Defendants represent to the public—artists and customers alike—that the limits are enforced. *Id*. ¶67, Figure 7 ("There is a strict eight (8) ticket limit for this event"; "Multiple purchases are forbidden …"; a violation may result in "voided and refunded" tickets). Artists understand that Defendants will implement these limits, which are memorialized when artists contract with Defendants to sell tickets for their events. *Id.* ¶17, 66.

Contrary to Defendants' representations to artists and customers, for many scalpers, the ticket limit is a fiction. Scalpers routinely create hundreds or thousands of accounts and acquire thousands of tickets in excess of per-event limits. *E.g.*, ECF-1 ¶¶73-74, 82-83, 87, 92, 105; Figure 8, Figure 9. Because Defendants' express representations about ticket limits for events are often false, they are likely to mislead reasonable consumers. *See, e.g., John Beck,* 865 F. Supp. 2d at 1066-67.

Defendants' ticket limit claims are material to both artists and customers. Since the claims are express, they are presumed material. *See, e.g., Cliffdale*, 1984 WL 565319, at *49. Especially at the pleading stage, Defendants cannot overcome that presumption with conjecture. The complaint also alleges that the claims were in fact material. Artists request and rely on ticket limits to give ordinary fans—not

-11-

scalpers—the opportunity to purchase affordable tickets to their events. ECF-1 ¶¶14, 65-66, 72. Defendants' lie to artists about a fundamental aspect of their business arrangement is enough to make materiality plausible. *Cf. In re Thompson Med. Co., Inc.,* 104 F.T.C. 648, 60, 1984 WL 565377 at *102 (1984) (representations about service's "central characteristics" are material). Ignoring harmed artists, Defendants contend only that ticket limits are immaterial to customers, who have no alternative but to purchase tickets from Defendants. ECF-55 at 30. Indeed, fans who lost out on primary market sales have paid hundreds of millions of dollars more for overlimit tickets that scalpers purchased. *Id*. ¶¶72-73, 79. Had they known the truth, they could have chosen differently, including choosing not to waste time attempting to buy tickets that scalpers are snapping up. *See id*. ¶54 (describing time spent searching for tickets); *see FTC v. Neovi, Inc.,* 598 F. Supp. 2d 1104, 1115 (S.D. Cal. 2008) (lost time is consumer harm under Section 5).

### C. The State Deception and Unconscionability Claims Are Properly Pled Suffice For the Same Reasons

The facts pleading the FTC's Section 5 claims also suffice for state Plaintiffs' deception claims, which require the same (or lesser) allegations as Section 5. *FTC v. Nudge, LLC*, 2022 WL 2132695, at *13 (D. Utah June 14, 2022) (quoting Utah Code section 13-11-2); *Tucker v. Sierra Builders*, 180 S.W.3d 109, 114–16 (Tenn. Ct. App. 2005); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d

773, 777 (Fla. 2003); Fla. Stat. Ann. §501.204 (West 2025); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147–48 (Colo. 2003); *Reinbrecht v. Walgreen Co.*, 742 N.W.2d 243, 249 (Neb. App. Ct. 2007); *People ex rel. Hartigan v. All Am. Aluminum & Constr. Co.*, 524 N.E.2d 1067, 1071 (Ill. App. Ct. 1988).

The same goes for Utah's unconscionability claim, which—notwithstanding Defendants' disagreement, ECF-55 at 32—properly alleges Defendants unfairly surprised and oppressed consumers with last-minute ticket-price increases and extreme markups through hidden fees and permitted scalper abuse. ECF-1 ¶¶50-51, 55-79; *see Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1042 (Utah 1985). Regardless, dismissal at this stage is inappropriate because substantive Utah law "establishes a policy of giving plaintiffs a reasonable opportunity to prove unconscionability," *Estrada v. Mendoza*, 275 P.3d 1024, 1028 (Utah Ct. App. 2012), "including permitting presentation of evidence if it appears an act even **may** be unconscionable," *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1087 (S.D. Cal. 2017) (emphasis in original).

## D. The FTC May Obtain Injunctive Relief for Ticketmaster's Deceptive Low Ticket Prices

Section 5 entitles the FTC to seek injunctive relief where, as here, it alleges that Defendants' illegal conduct is ongoing or likely to recur. *FTC v. QYK Brands LLC*, 2024 WL 1526741, at *3 (9th Cir. Apr. 9, 2024); *FTC v. Amazon.com, Inc.*,

71 F. Supp. 3d 1158, 1168 (W.D. Wash. 2014) ("Even if the unlawful practices have ceased, the Ninth Circuit has established that injunctive relief may still be appropriate."). Defendants' attempt to throttle the FTC's request for injunctive relief at the pleading stage mischaracterizes the complaint and the applicable legal standard.

Plaintiffs have not, as Defendants claim, "concede[d]" that Ticketmaster stopped its deceptive pricing practices in May 2025. ECF-55 at 28. The Complaint alleges that Defendants "announc[ed] their intention" to comply with the FTC's Fee Rule, which prohibits certain pricing practices in live-event ticketing and short-term lodging. ECF-1 ¶63. Whether and to what extent Defendants have stopped advertising false low ticket prices "is a question of fact not properly resolved on a motion to dismiss." *Amazon.com*, 71 F. Supp. 3d at 1168.

Even if it were proper on a 12(b)(6) motion to assume Defendants' violations ceased, the FTC alleges they are likely to recur. *See* ECF-1 ¶¶110, 172. To determine whether wrongdoing is likely to recur, courts consider "[1] the degree of scienter; [2] frequency of violative acts; [3] the defendant's ability to commit future violations; [4] the degree of harm consumers suffered; and [5] the defendant's recognition of his own culpability." *FTC v. QYK Brands LLC*, 2022 WL 1090257, at *10 (C.D. Cal. Apr. 6, 2022), *vacated in part on other grounds*. (quotations omitted). Contrary to Defendants' argument, the recurrence need not

-14-

be "imminent," so long as there is "a sufficient likelihood of future violations to warrant the imposition of an injunction." *QYK Brands*, 2024 WL 1526741, at *3. Defendants wholly fail to address the likelihood of recurrence factors, each of which supports the FTC's claim.

**High Degree of Scienter, Frequency of Violative Acts, and Harm:** For ten years, Defendants have knowingly advertised false ticket prices, while repeatedly rejecting honest pricing (even awarding an employee for creating tests supporting less transparency) ECF-1 ¶¶55–64. *Cf. FTC v. Hoyal & Assoc., Inc.*, 859 F. App'x. 117, 120 (9th Cir. 2021) (affirming permanent injunction where defendants displayed "a 'willingness to flout the law' in a substantially similar manner over a decade"); *FTC v. Roomster Corp.*, 654 F. Supp. 3d 244, 258 (S.D.N.Y. 2023) ("the Complaint demonstrates a realistic likelihood of recurrence given Defendants' pattern of willful and deliberate behavior over the course of several years"). They have continued this conduct despite knowledge of consumer complaints and this investigation. ECF-1 ¶110. Defendants have charged consumers billions of dollars in fees not included in advertised ticket prices. *Id.* ¶¶36, 38.

**Ample Ability to Commit Future Violations:** As the largest players in the ticketing industry, Defendants have every opportunity to mislead consumers about prices again. Defendants' sole argument against recurrence is that the FTC's Rule

-15-

on Unfair and Deceptive Fees ("Fees Rule"), which also prohibits Defendants' Section 5 pricing violations, means Defendants will not violate Section 5 again. The premise is that the existence of laws precludes Defendants from violating them, but Defendants do not explain why this is the case when they have been violating the FTC Act for over a decade. *See* ECF-1 ¶¶63, 100. Moreover, even if the Fees Rule were forever effective against Defendants' deceptive ticket pricing, Defendants sell more than live-event tickets, ECF-1 ¶43, leaving Defendants free (in their view) to advertise false low prices of products or services not covered by the Rule (e.g., movie tickets that are not "live-event tickets"). *Roomster*, 654 Supp. 3d at 258 ("Recurring violations are hardly implausible where, as here, defendants retain control of the company and the capabilities allegedly used to violate the FTC Act."); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1202 (10th Cir. 2009) (same).

**No Recognition of Wrongful Nature of Conduct:** Far from acknowledging their wrongdoing, Defendants deny it. This factor weighs in favor of recurrence. 2022 *QYK Brands LLC*, WL 1090257, at *10 (injunction appropriate where defendants "dispute that any wrongdoing took place").

## II. Plaintiffs Plausibly Allege Defendants' BOTS Act Violations

Congress enacted the BOTS Act "to ensure equitable consumer access to tickets for any given event," BOTS Act of 2016, Pub. L. No. 114-274, pmbl., 130

Stat. 1401, not, as Defendants incredibly claim, to protect Ticketmaster. ECF-55 at 12. To that end, the BOTS Act prohibits two things. First, it prohibits circumventing measures used to enforce a ticket issuer's posted ticket limits and purchasing rules. 15 U.S.C. § 45c(a)(1)(A). Plaintiffs allege—and Defendants concede (ECF-55 at 15-16)—that scalpers do this to purchase tickets on Ticketmaster. Second, the statute prohibits selling or offering to sell improperly obtained tickets in certain circumstances, including where the seller had the ability to control the improper purchase or knew or should have known that the purchase was improper. 15 U.S.C. § 45c(a)(1)(B). Plaintiffs allege that Defendants sell improperly purchased tickets, and that they had the ability to control the violative conduct and knew or should have known the purchases were violative. That is all the statute requires. Defendants' effort to evade liability by imputing statutory requirements not in the text, complicating plain meanings, and mischaracterizing Plaintiffs' allegations fail.[1]

---

[1] Defendants' statute-of-limitations argument misfires three ways: the three-year limitations period applies only to the FTC's request for *redress* for BOTS Act violations (15 U.S.C. §57b(d)), not its request for injunctive relief under Section 13(b) of the FTC Act (15 U.S.C. § 53, no limitations period), civil penalties (28 U.S.C. § 2462, five-year limitations period), or any state plaintiff's BOTS Act claims (15 U.S.C. § 45c(c), no limitations period). In any case, as Defendants concede, the complaint alleges violations occurring within every applicable limitations period, so dismissal is inappropriate. *See CFPB v. Howard*, 2017 WL 10378953, at *7 (C.D. Cal. May 30, 2017) (declining to dismiss claim where, "[e]ven if some of the alleged conduct occurred outside the applicable statute of limitations period[, ]other alleged conduct occurred within the three-year statute of limitation that Defendants insist applies").

## A. Scalpers Circumvent Defendants' Technological Measures

### 1. Circumvent Means to Get Around

The Act makes it illegal "to circumvent a security measure, access control system, or other technological control or measure." 15 U.S.C. § 45c(a)(1)(A). "Circumvent" is not defined in the BOTS Act, so we use its plain meaning. *Childs v. S. D. Fam. Hous., LLC*, 150 F.4th 1151, 1159 (9th Cir. 2025). To "circumvent" something is to "get around" it. *See* ECF-55 at 23 ("'circumvent' means evading or avoiding"); *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1192 (D.C. Cir. 2009) ("circumvent" defined as "[t]o avoid by or as if by passing around" (citing Webster's II New College Dictionary 209 (3d. ed. 2005))).

"To evade Ticketmaster's enforcement measures," Plaintiffs allege, scalpers "routinely create hundreds or thousands Ticketmaster accounts, often using fictitious names, email addresses, and other required information." ECF-1 ¶74. Scalpers then employ a phalanx of workers or specialized software to "use these Ticketmaster accounts to purchase tickets in excess of posted limits over multiple transactions." *Id*. ¶¶74, 76. This allows scalpers to "get around" Defendants' ticket limits and the measures used to enforce them.

### 2. The BOTS Act Does Not Limit Circumvention to Bypassing Without Authority

Defendants seemingly agree that scalpers have amassed hundreds or thousands of Ticketmaster accounts to "bypass [Defendants'] screening and

-18-

verification measures." ECF-55 at 15. But, Defendants argue, Plaintiffs' allegation that Ticketmaster often "allow[ed]" this misconduct to occur means it is not circumvention. That does not follow. BOTS Act violations turn on the circumvention of measures used to enforce "*posted* event ticket purchasing limits" and "*posted* online ticket purchasing order rules," not whether the ticket issuer applied different, unposted limits to the violators.[2] *See* 15 U.S.C. § 45c(a)(1)(A) (emphases added).

Nothing in the BOTS Act's text suggests that avoiding or getting around ticket limit enforcement measures is not circumvention if it's sometimes secretly allowed.[3] When Congress wants to restrict circumvention to unauthorized conduct, it does so in plain, unambiguous text—as it did in the Digital Millenium Copyright Act ("DMCA"), which Defendants misguidedly rely on. The DMCA defines "to circumvent a technological measure" as "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, *without the authority of the copyright owner*." 17 U.S.C. § 1201(a)(3)(A) (emphasis added). Accordingly, in *iSpot.tv, Inc. v.*

---

[2] This comports with the BOTS Act's purpose, to ensure equitable access to tickets, not to make ticket sellers the arbiters of their own and others' compliance.

[3] Like Defendants here, the scalper defendants in *FTC v. Key Investment Group*, No. 25-cv-02716, ECF No. 33 (D. Md. Nov. 24, 2025) moved to dismiss BOTS Act claims on the grounds that Ticketmaster allowed the misconduct. Both motions to dismiss will be fully briefed at approximately the same time.

*Teyfukova*, 2023 WL 3602806 (C.D. Cal. May 22, 2023) (Frimpong, J.), this Court dismissed the plaintiff's DMCA claim because the complaint "only allege[d] that [defendant] individually used the credentials in the technological manner by which she was authorized to do" and therefore did not satisfy the definition of circumvent in the statute. *Id.* at *5. In contrast to the DMCA, the BOTS Act does not define "circumvent," much less define it to recognize only bypassing "without … authority." In any event, Plaintiffs here allege that scalpers "often us[e] fictitious names, email addresses, and other required information" to create accounts and evade Ticketmaster's enforcement measures, which would be enough even to allege unauthorized circumvention. ECF-1 ¶74.

### B. Plaintiffs Allege the Technological Measures That Were Circumvented

Plaintiffs' complaint details the technological measures Defendants use to enforce their ticket limits and purchase ordering rules. These measures range from the purchase cap hardcoded into Defendants' purchase process to Defendants' TicketCounter system, which blocks serial purchase attempts from the same IP address to stop "multiple accounts acting in concert to evade ticket limits." ECF-1 ¶¶70-71. Defendants insist the complaint does not connect the millions of overlimit ticket purchases to any circumvented technological control. This misreads the complaint. For each event, the quantity selector (i.e., dropdown menu allowing consumers to choose 1-8 tickets to purchase) on Defendants' purchase page was

capped at the ticket limit. Scalpers *could not* exceed the ticket limit without getting around that selector. Plaintiffs allege that scalpers use hundreds of accounts to purchase thousands of tickets above the limit, each time bypassing the ticket quantity selector that Defendants used to enforce ticket limits at the point of sale. *Id*. ¶105. This alone is enough to plead a technological control.

But there is more: account verification measures, ECF-1 ¶76, the purchase-flow checkbox requiring purchasers to agree to abide by the ticket limit, *id.* ¶68, Defendants' TicketCounter system that blocks serial purchases from the same IP address, and the post-purchase digital analyses Defendants use to "detect whether a single person or entity attempted to exceed purchase limits by using multiple Ticketmaster accounts or transactions," presumably to block them from continuing, *id.* ¶71. Plaintiffs allege that scalpers created hundreds or thousands of accounts (often using fictitious information to escape detection) and used software to mask their IP addresses and SIM boxes to automate account verification processes, *id.* ¶¶74, 76, to get around these measures and unlawfully purchase millions of tickets. The complaint gives specific examples of scalpers who have evaded Defendants' enforcement measures and acquired thousands of tickets to events with single-digit ticket limits. *E.g.*, *id*. ¶105. This more than satisfies any pleading standard.[4]

---

[4] Despite Defendants' insistence that Plaintiffs itemize each specific violative ticket to plead a BOTS Act claim, even Rule 9(b)—which does not apply to BOTS Act claims—"does not require

### C. Defendants Sell or Offer to Sell Illegally Purchased Event Tickets

#### 1. Defendants Sold and Offered to Sell Tickets Under the Plain Meaning of Those Terms

The complaint is replete with allegations that Defendants "sell" or "offer to sell" event tickets that have been unlawfully obtained. ECF-1 ¶¶10, 103. Since "sell" and "offer to sell" are not defined in the statute, courts give them their ordinary meaning. *Childs*, 150 F.4th at 1159. As Defendants recognize, "sell" means to "give or hand over (something) in exchange for money." ECF-55 at 18-19; *see Sell*, Merriam-Webster Dictionary (sell means "to give up (property) to another for something of value (such as money)" or "to influence or induce a purchase"); *sell*, Merriam–Webster, https://www.merriam-webster.com/dictionary/sell (last visited 1/16/2026). An "offer to sell" is defined as "the manifestation of willingness to enter into a bargain." ECF-55 at 19; Restatement (2d) of Contracts § 24 (1981).

Ticketmaster exists to exchange tickets for money. ECF-1 ¶¶33-34 (Live Nation describing itself as "selling tickets to consumers in *both the primary and secondary market* for live-event tickets" (emphasis added)). Consumers looking for tickets view and purchase primary and secondary tickets on Defendants' site in

---

absolute particularity or a recital of the evidence," and a complaint "need not 'describe in detail a single specific transaction' . . . used to carry out the fraud." *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (citation omitted).

the same place, using the same purchase process. *Id.* ¶¶48-49. In exchange for payment to Ticketmaster, Defendants—not the event organizer, the venue, a broker, or anyone else—send consumers the digital or physical Ticketmaster-branded ticket stub. *Id.* ¶¶40, 48. Consumers who purchase a resale ticket transact only with Ticketmaster, which is the merchant of record for the transaction and the only entity named in connection with the resale. *Id.* ¶¶33, 48. Defendants do not disclose the name of the third party who originally purchased the ticket or listed it on Ticketmaster's platform. *Id.* ¶48. Defendants can and do unilaterally adjust ticket prices on resales and keep the markup on each sale. *Id.* ¶39.

The parties appear to agree on the dictionary definition of "sell" and "offer to sell," but Defendants seek to add a requirement: that a person must "own or possess" and convey "the rights" associated with a ticket to sell it. ECF-55 at 18-19. In ordinary terms, though, whether a person "gives something in exchange for money" does not hinge on a technical analysis of ownership and property rights.[5] Defendants do not point to a single dictionary definition requiring such an inquiry. Even if they could, it would not support dismissal. As the complaint alleges, when

---

[5] The object of "sell or offer to sell" in the BOTS Act is an "event ticket," which the Act defines broadly as "any physical, electronic, or other form of a certificate, document, voucher, token, or other evidence indicating" the purchaser has a right or license to enter an event—*not the right or license itself*, as Defendants claim. 15 U.S.C. § 45c(a)(1)(B); Pub. L. No. 114-274, § 3(3), 130 Stat. at 1403. The digital or physical ticket Defendants deliver to consumers following their purchase is the "evidence indicating" they have the right to attend the event. ECF-1¶48.

Ticketmaster delivers resale tickets to a secondary-market purchaser, it voids the first ticket that it sold on the primary market and reissues a new ticket, with unique identifying information, to the secondary purchaser. ECF-1 ¶48. Defendants cannot seriously contend that they never possess tickets they create and reissue.[6]

Not long before this action was filed, Defendants believed that ticket resale platforms sold or offered to sell tickets within the meaning of those terms under the BOTS Act, going so far as to publicly encourage the FTC to enforce 2(a)(1)(B) (the "sell or offer to sell" provision) against "other resale platforms" that sell tickets while "turn[ing] a blind eye to patterns of behavior that indicate unlawful ticket harvesting." ECF-1 ¶¶75, 80, 90.[7] Now, Defendants argue that resale platforms cannot be sellers, citing an array of nonbinding decisions under different laws and different facts. *See* ECF-55 at 20. Other courts have reached the opposite conclusion. *See, e.g., Franklin-Chomas v. Internet Referral Servs., LLC*, 2025 WL 2917158, at *9 (S.D. Cal. Oct. 14, 2025) (secondary ticket marketplace plausibly a ticket seller where consumers paid, and received tickets from, marketplace directly), *appeal filed*, No. 25-6832 (9th Cir.). None of the decisions Defendants

---

[6] Defendants reach outside the complaint for their terms and conditions, where they attempt to disclaim liability for ticket resales by deeming other parties responsible. But as Plaintiffs explain in their separately-filed opposition to Defendants' Request For Judicial Notice and Incorporation By Reference, Defendants cannot treat these terms as establishing facts on a motion to dismiss, especially here, where well-pled allegations in the complaint undermine Defendants' position.

[7] Live Nation's July 7, 2025, public comment, referenced in the complaint, is located at https://www.regulations.gov/comment/ATR-2025-0002-3566.

cite considered whether a company "sell[s] or offer[s] to sell an event ticket" as those terms are used in the BOTS Act.[8]  *E.g.*, *Est. of Graham v. Sotheby's, Inc.*, 178 F. Supp. 3d 974, 998 (C.D. Cal. 2016) (concluding it was "common knowledge" that eBay, where transactions were carried out directly between buyers and third-party sellers, was not a seller of goods); *Porras v. StubHub, Inc.*, 2012 WL 3835073, at *3 (N.D. Cal. Sept. 4, 2012) (relying on allegation that then-resale-only website advertised "on Stubhub, you're buying tickets from other fans" and "buy tickets from other fans"); *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 835 F. App'x 213, 216 (9th Cir. 2020) (noting, among other factors, that Amazon listed third party as seller on website and receipt).[9] As detailed above, *supra*, p. 2, Plaintiffs allege the opposite here. ECF-1 ¶48.

## 2. The Structure and Purpose of the BOTS Act Confirms the Plain Meaning of Sell and Offer to Sell

The BOTS Act proscribes two different types of conduct in subparagraphs (A) and (B)—the circumvention in the initial purchase and the sale or offer to sell those tickets, respectively. Defendants' proposed reading, however, would limit

---

[8] Many of these decisions also involved laws that imposed liability on sellers regardless of whether they had knowledge of or the ability to control purchases. At least two cases do not stand for the proposition Defendants cite them for. *See Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1068 n.6 (9th Cir. 2018) (declining to reach eBay's argument that it was not a seller); *Fabozzi v. StubHub, Inc.*, 2012 WL 506330, at *1 n.1 (N.D. Cal. Feb. 15, 2012) (addressing whether Stubhub sold tickets in dicta where plaintiffs had alleged the seller was unknown).

[9] The FTC is not suggesting that any of these decisions was correctly decided, or that the specific defendants in these cases would not qualify as "sellers" under the BOTS Act or any other law.

liability under subparagraph (B) in most instances to the same actor engaged in circumvention under subparagraph (A), neutering the "participation," "ability to control," and "knew or should have known" requirements. 15 U.S.C. § 45c(a)(1)(B). A ticket purchaser by definition "participate[s]" in their own purchase, knows about it, and has the ability to control it. If the only party who could be held liable under Subparagraph (B) were the lawless purchaser, Congress would not have added (B)(i) and (ii). *See Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1077 (9th Cir. 2016) (declining to endorse statutory interpretation based on precedent that "[w]e cannot interpret federal statutes to negate their own stated purposes") (internal citations omitted).

### D. Defendants Do Not Contest Their Ability To Control Illegal Ticket Purchases

Defendants' ability to control broker purchases of tickets in circumvention of Defendants' measures to enforce posted ticket limits—alone—supports a claim against Defendants for reselling those tickets. 15 U.S.C. § 45c(a)(1)(B)(i)-(ii) (using disjunctive "or"). Since at least 2018, Defendants have been able to identify specific scalpers who violate per-event ticket limits, their burner accounts, and the hundreds or thousands of tickets they purchased to an event by evading ticket limit controls. ECF-1 ¶¶65, 71, 83, 85, 87, 92. Defendants could, but generally do not, cancel excess purchases that scalpers make using burner accounts to evade the security measures that Defendants have indisputably imposed. *Id.* ¶71; *see also*

*supra* Part II.B. Instead, they enable scalpers to efficiently aggregate tickets obtained from multiple accounts. *Id*. ¶¶84-87. And each time Defendants identify a new measure that effectively curtails scalpers' circumvention, they have either declined to implement or chosen to disband it, allowing scalpers to "go wild again" and Defendants to maintain their bottom line. *Id.* ¶¶100, 91-102.[10]

Defendants do not contest Plaintiffs' allegations that Defendants are able to stop scalpers from evading ticket limit enforcement measures to acquire tickets. If the Court finds Plaintiffs adequately pled that Defendants sold or offered to sell tickets acquired in violation of 15 U.S.C. § 45c(a)(1)(A), then, it should deny Defendants' motion to dismiss Count III.

### E. Defendants Know or Should Know They Are Selling or Offering Illegally Purchased Tickets

Defendants sold millions of resale tickets that they "knew or should have known" were purchased by scalpers who "use[d] multiple accounts to circumvent TM systems" or otherwise circumvented their controls. ECF-1 ¶¶65, 74, 81, 82. Since at least 2018, Defendants have known that scalpers have used what Defendants call a "mass buyer model" to evade Defendants' enforcement measures and exceed ticket limits. *Id*. ¶82. Defendants also know who those scalpers are; internal communications reveal Defendants discussing specific scalpers who

---

[10] These facts also go to Defendants' *participation* in the underlying transactions, a separate basis for liability under the BOTS Act.

"violat[ed] fictitious account rules on [a] large scale." *Id*. ¶¶83, 85. Defendants and scalpers use Defendants' TradeDesk software, which makes overlimit ticket purchases apparent to Defendants before they resell them because it aggregates, at the time of purchase, all tickets purchased by a single broker across multiple accounts. *Id.* ¶¶85, 104. This states a BOTS Act violation based on Defendants' knowledge that they sold unlawfully purchased tickets.

In public, Defendants acknowledge that secondary ticket platforms "should [] know[]" when event tickets are acquired unlawfully and can look for "indications" of these purchases. ECF-1 ¶80. In their motion to dismiss, however, Defendants grouse that the complaint does not plausibly allege Defendants knew or should have known about specific underlying ticket purchases. ECF-55 at 24-25. This is wrong under any pleading standard.[11] Plaintiffs plausibly plead Defendants' actual awareness of circumvention in general and in connection with specific scalpers. *See*, *e.g.*, ECF-1 ¶105. And Plaintiffs plausibly plead ample indicators that should have put Defendants on notice that the tickets they listed and resold on their platform were purchased in violation of their ticket limit enforcement measures. *E.g., id.* ¶¶85, 104, 105. Defendants' cited authority under other laws does not support their argument. Not one involves pleading standards. All relate to

---

[11] Even if Rule 9(b) were to apply to a BOTS Act claim—and it should not—"[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

post-discovery, merits-stage motions for summary judgment or trial findings. ECF-55 at 24-25. Moreover, plaintiffs in those cases were found to have presented significantly less evidence of specific knowledge in support of summary judgment or at trial than the Complaint alleges even now, at the pleading stage.

### III.    Defendants Violated the BOTS Act With Actual Knowledge or Knowledge Fairly Implied

Civil penalties are available for BOTS Act violations committed "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such [actions are] unfair or deceptive and [are] prohibited." 15 U.S.C. § 45(m)(1)(A). Plaintiffs plead that Defendants actually knew that ticketing platforms like Defendants' face liability under the BOTS Act. ECF-1 ¶80. And because "'the text' of the law itself'" makes clear that Defendants' conduct was unlawful, knowledge is "fairly implied." *See* ECF-55 at 25; ECF-1 ¶81 (Defendants have admitted that scalpers' use of proxy service tools, burner accounts, and multi-session browsers to circumvent Defendants' security measures violates the BOTS Act). The Commission has properly pled a claim for civil penalties. *See, e.g.*, *FTC v. Amazon.com, Inc.*, 735 F.Supp.3d 1297, 1333 (W.D. Wash. 2024) (that a "reasonable person under the circumstances would have known of the existence of the provision" constitutes "constructive knowledge").

**IV.    The BOTS Act Does Not Prohibit States From Alleging Violations Alongside the FTC**

States, through their attorneys general, are authorized to enforce the BOTS Act. 15 U.S.C. § 45c(c)(1). Defendants argue that the state Plaintiffs were barred from joining the FTC's BOTS Act claims from the start, because the statute prohibits states from bringing separate claims against Defendants "during the pendency" of FTC claims. 15 U.S.C. § 45c(c)(4); ECF-55 at 26. But this limitation only prevents states from initiating separate BOTS Act claims once the FTC has filed suit; it does not prohibit the FTC and state from acting jointly. *CFPB v. Consumer Advoc. Ctr. Inc.*, 2021 WL 6496789, at *3 (C.D. Cal. Dec. 7, 2021) ("Because the present action was brought *jointly* by the CFPB and the States, no CFPB action was *pending* at the time the CFPB and the States brought the present action."). *See also* S. Rep. No. 114-391, at 5 (2016) (BOTS Act intended to "prevent a State's attorney general, in an effort to preempt action by the FTC, from bringing a civil action under this section *if the FTC has already instituted* [an action] against the same defendant" (emphasis added)).

**V. CONCLUSION**

For the reasons stated above, the Court should deny Defendants' Motion to Dismiss.

Dated:  January 20, 2026

Respectfully Submitted,

By:  */s/Elizabeth C. Scott*
ELIZABETH C. SCOTT (*pro hac vice*)
escott@ftc.gov
TAYLOR H. ARANA (*pro hac vice*)
tarana@ftc.gov
CLAIRE E.W. STEWART (*pro hac vice*)
cstewart@ftc.gov
FEDERAL TRADE COMMISSION
230 South Dearborn Street, Suite 3030
Chicago, IL 60604
Telephone: (312) 960-5609 (Scott)
Telephone: (312) 960-5639 (Arana)
Telephone: (312) 960-5615 (Stewart)

AARON M. SCHUE (CA BAR NO. 338760)
aschue@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300

*Counsel for Plaintiff*
*Federal Trade Commission*

/s/*Brady J. Grassmeyer*
Brady J. Grassmeyer (*pro hac vice*)
Brady.Grassmeyer@coag.gov
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6263

*Attorney for the Colorado Attorney General*


 /s/ *Donna Cecilia Valin*
Donna Valin, Special Counsel, Assistant Attorney General (*pro hac vice*)
Donna.valin@myfloridalegal.com
Consumer Protection Division
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Fax: (407) 245-0365

*Attorney for the State of Florida*

/s/ *Alexandra A. Golota*
ALEXANDRA A. GOLOTA (*pro hac vice*)
alexandra.golota@ilag.gov
WILTON A. PERSON (*pro hac vice*)
Wilton.Person@ilag.gov
 Office of the Illinois Attorney General
Consumer Fraud Bureau
115 S. LaSalle Street, 26th Floor
Chicago, Illinois 60603
Telephone:   (872) 272-0794 (Golota)
                      (224) 252-6458 (Person)

*Attorneys for the State of Illinois*

/s/ *Benjamin J. Swanson*
Benjamin J. Swanson (*pro hac vice*)
benjamin.swanson@nebraska.gov
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68508
Telephone: (402) 471-7759

*Attorney for the State of Nebraska*

/s/ *Kelley L. Groover*
KELLEY GROOVER, Sr. Assistant Attorney General/Managing Attorney (*pro hac vice*)
Kelley.Groover@ag.tn.gov

KRISTINE KNOWLES, Assistant Attorney General (*pro hac vice*)
Kristine.Knowles@ag.tn.gov
OFFICE OF THE TENNESSEE ATTORNEY GENERAL
Public Protection Section
Consumer Protection Division
UBS Tower, 20th Floor
315 Deaderick Street
Nashville, Tennessee 37243
Telephone: (615) 741-1671
Fax: (615) 532-2910

*Attorneys for the State of Tennessee*

/s/ *Stevenson Smith*
Stevenson Smith (*pro hac vice*), Assistant Attorney General
scsmith@agutah.gov
Utah Attorney General's Office
160 East 300 South, Fifth Floor
Salt Lake City, UT 84114
Telephone: (801) 366-0310
*Attorneys for the State of Utah and the Utah Division of Consumer Protection*

/s/ *Chandler P. Crenshaw*
CHANDLER P. CRENSHAW (*pro hac vice*)
Assistant Attorney General and Unit Manager
CCrenshaw@oag.state.va.us
Assistant Attorney General and Unit Manager
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Telephone:   (804) 786-2071
Fax:            (804) 786-0122

*Attorney for Plaintiff Commonwealth of Virginia*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff Federal Trade Commission certifies that this brief contains 6,995 words, which complies with the word limit of L.R. 11-6.1.


<u>/s/Elizabeth C. Scott</u>
ELIZABETH C. SCOTT
Attorney for Plaintiff
Federal Trade Commission