**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**F I L E D**
CLERK, U.S. DISTRICT COURT

1/12/2026

CENTRAL DISTRICT OF CALIFORNIA
BY:          GSA          DEPUTY

---

**FEDERAL TRADE COMMISSION, et al.,**

Plaintiffs,

v.

**LIVE NATION ENTERTAINMENT, INC., et al.,**

Defendants.

Case No. 2:25-cv-08884

---

**BRIEF OF AMICUS CURIAE**

**JOSEPH ANTHONY REYNA**

**IN SUPPORT OF NEITHER PARTY**

**ADDRESSING SYSTEM-MEDIATED MARKET POWER, LICENSING-BASED**

**ACCESS, LABOR PIPELINES, CONSUMER SIGNALING, UPSTREAM**

**CONCENTRATION EFFECTS, AND RECORD PRESERVATION**

---

**IDENTITY AND INTEREST OF AMICUS CURIAE**

Amicus curiae **Joseph Anthony Reyna** submits this brief solely to assist the Court with an analytical framework for evaluating conduct and effects in **platform-mediated markets** where power is exercised through **system design**, **permissioned access**, **interface-driven price/choice environments**, and **labor-pipeline mechanisms** that can externalize costs and obscure causation.

Amicus is an independent researcher, nonprofit director, and public-interest litigant who has examined platform-mediated markets, digital pricing systems, labor allocation, and information asymmetries in regulated and quasi-regulated industries, including live entertainment, ticketing, and creative distribution.

Amicus takes no position on ultimate liability and files in support of neither party. This brief does not depend on resolving disputed facts. It offers a structured method for analyzing (i) how market power may operate through system architecture; (ii) how consumer understanding may be altered by cumulative signaling rather than isolated statements; (iii) how labor and risk may be externalized into informal pipelines; (iv) how upstream monetization constraints can increase dependence on downstream bottlenecks; and (v) why preservation obligations are outcome-determinative where key market facts exist only as transient digital states.

No party's counsel authored this brief in whole or in part, and no party or counsel contributed money intended to fund its preparation or submission.

---

**STATEMENT REGARDING MEET-AND-CONFER (C.D. CAL. L.R. 7-3)**

Pursuant to Local Rule 7-3, amicus initiated a good-faith meet-and-confer request with counsel for all parties more than seven days prior to filing. A response was received that did not resolve or oppose the contemplated filing. This brief is therefore submitted following a good-faith attempt to comply with Local Rule 7-3.

---

**PURPOSE AND USE OF THIS AMICUS BRIEF**

This brief is submitted to assist the Court with **how to analyze, not what to decide**. Platform-mediated markets present recurring analytical issues that arise at multiple procedural stages in this case, including market definition, foreclosure, consumer deception, discovery scope, and record preservation. These issues cannot always be resolved by reference to discrete contracts or static price terms.

Amicus offers a **neutral analytical framework** applicable regardless of which party ultimately prevails. Specifically, this brief is intended to aid the Court in evaluating:

(1) whether access conditioning and permissioned system design can constitute functional exclusion even where theoretical alternatives exist;

(2) whether consumer understanding in interface-driven transactions is best assessed through isolated representations or through the cumulative choice environment; and

(3) whether ordinary discovery and preservation practices are sufficient where material market facts exist only as transient, system-generated states.

3

This framework does not depend on accepting disputed factual assertions, weighing credibility, or expanding the set of parties or claims. It is offered to clarify how existing doctrine may be applied to markets mediated by code, interfaces, and automated decision systems.

---

## REQUESTED CLARIFICATIONS FOR THE COURT'S CONSIDERATION

Amicus respectfully submits that the Court's resolution of this case may benefit from addressing the following **clarifying questions**, independent of outcome and without prejudging liability:

1. **Functional Substitutability in Permissioned Systems**

   Whether, in markets governed by licensing-like access and technical integration, the existence of theoretical alternatives is sufficient to defeat market power claims when effective participation at scale requires coordinated compliance with a dominant intermediary's system.

2. **Meaningful Disclosure in Interface-Driven Transactions**

   Whether consumer deception analysis in digital or automated environments should consider the **total choice architecture**—including sequencing, defaults, urgency cues, and cumulative signaling—rather than evaluating individual disclosures in isolation.

3. **Preservation of Transient Digital Market States**

   Whether preservation obligations in platform-mediated markets should account for ephemeral system states—such as dynamic pricing configurations, queue logic, interface variants, and availability displays—that may be material to adjudicating claims but are

4

not fully reconstructible from static transaction records.

These clarifications would not resolve disputed facts or dictate remedies. They would, however, provide doctrinal guidance for evaluating conduct, evidence, and competitive effects in automated and system-mediated markets—both in this case and in future cases presenting similar structures.

---

## SUMMARY OF ARGUMENT

Traditional antitrust and consumer-protection analysis often assumes that market power is exercised through discrete contracts, observable price terms, or single-step misrepresentations. Platform-mediated markets—especially those combining ticketing, venue access, promotion, resale pathways, sponsorship, and data—often operate differently.

Market power can be exercised through system design and licensing-like access (permissioning, visibility rules, routing compatibility, conditional integration), making "theoretical alternatives" non-substitutable in practice.

Vertical integration can produce a stacked extraction system in which multiple revenue streams and value transfers attach to the same underlying event transaction—before, during, and after the event—while simultaneously suppressing rival formation and scaling.

Consumer deception may arise from cumulative interface effects (progressive disclosure, urgency cues, default add-ons, algorithmic scarcity), which may be technically accurate in isolation yet materially misleading in combination.

Labor and risk may be externalized into informal channels—ambassadors, affiliates, credential labor, "experience" roles—where compensation, consideration, and reporting may be opaque, converting labor cost suppression into revenue-equivalent advantage.

Upstream monetization constraints and algorithmic concentration in creative markets can increase dependence on downstream infrastructure (venues, routing, ticketing, sponsorship integration, and data). Digital dominance does not scale linearly into physical capacity; repeatable touring formats can remain economically optimal even at the top tier. This amplifies the competitive significance of downstream access control, particularly for mid-tier and emerging participants.

Record preservation is material because key "market facts" in a system-mediated transaction may exist only as ephemeral states (queue logic, interface variants, dynamic pricing configurations, availability displays). Preservation of raw transactional data may be insufficient if the experiential and contextual meaning is not preserved.

These observations do not resolve factual disputes. They frame what the Court must decide—particularly where precedent formed in automated markets will govern future markets.

---

**ARGUMENT**

## I. MARKET POWER MAY BE EXERCISED THROUGH SYSTEM DESIGN AND LICENSING-LIKE ACCESS

In platform-mediated markets, exclusion frequently operates not as an overt refusal to deal, but as permissioned access that functions like a commercial license. Access to venues, artists, routing compatibility, ticketing infrastructure, sponsorship integration, and consumer data may be nominally "available," yet practically conditioned on compliance with a dominant intermediary's system.

The Court's functional question is not whether theoretical alternatives exist, but whether effective participation at scale is administratively conditioned by a dominant platform's rules and technical integration. Where switching requires coordinated action across venues, artists, promoters, and consumers, "choice" can exist without functional substitutability.

## II. VERTICAL INTEGRATION CAN CREATE STACKED EXTRACTION AND FEEDBACK LOOPS

Where a firm coordinates promotion, venue access, ticketing, resale pathways, sponsorship, and data, it can capture economic value at multiple stages from the same transaction. The result is a self-reinforcing feedback loop: consumer demand yields revenue and data; data enhances pricing and leverage; leverage enhances venue and artist access; access reinforces ticketing and promotion control; and the cycle repeats.

7

This structure can produce durable power without a single decisive exclusionary act. Cumulative leverage across interconnected markets can be sufficient.

---

## III. LICENSING-BASED SYSTEMS CAN PREVENT DOWNSTREAM MARKET FORMATION AND SCALE

Market harm in platform ecosystems is not limited to price effects. Independent promoters, venues, and artists may operate locally yet fail to scale where access to routing, venues, ticketing infrastructure, sponsorship, or monetization is conditioned on compliance with a dominant system.

Non-formation of downstream markets can reflect structural barriers rather than lack of consumer demand. The Court may treat "missing markets" as a relevant competitive effect where permissioned access and interdependencies prevent viable scaling.

---

## IV. CONSUMER DECEPTION MAY ARISE FROM CUMULATIVE INTERFACE EFFECTS

In interface-driven transactions, the legally relevant "representation" may be the total choice environment, not a single sentence. Progressive fee disclosure, algorithmic scarcity cues, queue urgency, default add-ons, and routed resale pathways may each be defensible in isolation while materially shaping consumer belief as a combined system.

8

Where disclosure occurs only after cognitive commitment (time spent in queue, repeated clicks, loss-aversion cues), technical "accuracy" may not equal meaningful consumer understanding.

## V. RECURSIVE PRICING AND SCARCITY SIGNALS COMPLICATE CAUSATION

Automated markets generate and validate their own signals. Demand predictions may influence price; price influences demand; scarcity cues may be produced by throttled supply or system rules; availability representations may vary across users. These recursive loops complicate intent analysis because outcomes may be emergent system properties rather than discrete human decisions.

The Court may consider whether legal standards that assume human-authored misrepresentations adequately capture system-generated market effects.

## VI. RISK, LABOR, AND INFORMATIONAL BURDENS MAY BE EXTERNALIZED ONTO INFORMAL PARTICIPANTS

System designers often do not bear the full cost of opacity or error. The burden is shifted onto consumers, artists, venues, promoters, and informal intermediaries (ambassadors, affiliates, credential labor) who absorb confusion and reputational damage.

When promotional or explanatory labor is induced through access, affiliation, or nominal incentives without transparent compensation or enforceable consideration, the system can convert informal labor pipelines into a mechanism of accountability avoidance. Courts

9

evaluating competitive conduct may consider who bears the cost of being wrong when system outputs mislead.

---

## VII. SUPERSTAR-SCALE INTEGRATION ILLUSTRATES SYSTEM EFFECTS AND INDUSTRY TEMPLATES

At the top of the market, fully integrated touring arrangements show the system at maximum scale—promotion, venue access, ticketing, sponsorship, routing, and data aligned through one intermediary. Those arrangements can become the implicit template for broader industry operations.

Smaller participants may be forced to conform to systems optimized for superstar tours even when inefficient or exclusionary at lower scale. The Court may consider whether such systems permit viable entry and growth for smaller operators, not merely whether entry is theoretically permitted.

---

## VIII. UPSTREAM MONETIZATION CONSTRAINTS, SUPERSTAR CONCENTRATION, AND DOWNSTREAM INFRASTRUCTURE DEPENDENCE

Platform-mediated creative markets exhibit a recurring structural feature: extreme concentration at the top coexists with widespread precarity below, even where aggregate demand is high. This pattern is a predictable outcome of systems optimized for predictability, risk minimization, and throughput rather than broad-based market formation.

10

At the recorded-music layer, digital distribution and streaming models tend to reward scale, momentum, and prior success. Algorithmic ranking, playlist placement, and promotional amplification favor incumbents because deviation increases volatility and churn risk. As a result, attention and revenue concentrate in a small number of globally dominant artists. This concentration does not require exclusivity or coordination; it can arise from rational, independent optimization by platforms and rights-holders seeking stability.

Importantly, digital dominance does not scale linearly into physical-world capacity. Live performance remains constrained by venue size, routing logistics, labor availability, and city-by-city saturation. Even globally popular artists may therefore be economically optimized for repeatable, lower-risk touring formats rather than continuous expansion. Persistence at the top, rather than perpetual growth, becomes a market equilibrium.

This dynamic has downstream consequences. When recorded-music monetization is insufficient to sustain a broad middle tier, touring becomes a primary pathway to economic viability. That shift heightens the competitive significance of access to live-event infrastructure—venues, routing compatibility, ticketing systems, sponsorship integration, and consumer data. Control over that infrastructure becomes a system-level choke point, not merely a complementary service.

These dynamics are relevant to antitrust and consumer-protection analysis not because any individual artist's success is improper, but because upstream concentration can amplify the foreclosure effects of downstream control where alternatives cannot scale independently.

**Clarification:** Amicus does not allege coordination or impropriety by upstream digital distributors, labels, or artists. This discussion is offered solely to illustrate how independent

optimization across distinct market layers can produce reinforcing concentration effects that heighten the competitive importance of downstream infrastructure access.

---

## IX. RECORD PRESERVATION IS MATERIAL WHERE MARKET FACTS ARE EPHEMERAL

Platform-mediated markets produce non-reconstructible states: dynamic pricing configurations, interface variants, queue logic, throttling, ranking outputs, and availability displays. These can differ across users and disappear quickly. Preservation of raw transaction logs alone may not preserve what consumers actually experienced.

Amicus does not allege spoliation. Amicus submits that the Court benefits from construing preservation obligations with the operational reality that key market facts may exist only as transient system states.

---

## X. THE RISK OF ACCIDENTAL PRECEDENT IN AUTOMATED MARKETS

If courts do not deliberately address how system-generated signals are evaluated, what constitutes meaningful disclosure in interface transactions, how licensing-based access affects market formation, and what preservation requires for ephemeral states, those questions may be decided implicitly through outcome. Implicit answers become precedent, shaping markets beyond the facts of any single case.

---

## XI. ECONOMIC MAP OF VALUE EXTRACTION AND REVENUE STREAMS IN THIS ECOSYSTEM

(STRUCTURED FOR JUDICIAL USE)

This case's competitive effects cannot be evaluated solely by reference to a single fee or contract because value can be captured across a stacked system. The categories below describe the revenue and economic value streams discussed in this submission as relevant to system-mediated power. The Court can treat this taxonomy as a checklist when assessing (i) market definition; (ii) foreclosure; (iii) consumer understanding; (iv) labor effects; and (v) remedies.

### I. CORE DIRECT REVENUE STREAMS (OBVIOUS BUT INCLUDED)

- Primary ticket sales

- Ticketing service fees

  - service fees

  - processing fees

  - order fees

  - delivery fees

- Facility fees

- Dynamic pricing / demand-based pricing

- VIP packages and premium upgrades

- Early access / presales / fast-lane access

## II. VENUE-BASED REVENUE (OWNERSHIP & OPERATIONS)

- Venue rental and booking fees

- Food and beverage sales

- Alcohol sales (high-margin)

- Parking revenue

- Transportation and access arrangements

- Venue naming rights

- On-site upgrades and add-ons

## III. PROMOTION & TOUR ECONOMICS

- Concert promotion margins

- Backend tour profits

- Artist revenue splits

- Guarantee structures with upside participation

- Tour financing / advances

- Routing control (logistics efficiency as profit)

- Event stacking and bundled scheduling efficiencies

## IV. ADD-ON & ANCILLARY PRODUCTS

- Ticket insurance

- Merchandise sales and merch revenue shares

- On-platform add-ons (parking passes, upgrades, bundles)

- Travel and hotel packages tied to events

## V. DATA & INFORMATION-BASED VALUE

- Consumer data monetization (direct and indirect)

- Pricing elasticity and demand forecasting

- Artist performance analytics

- Resale market intelligence

## VI. RESALE & SECONDARY MARKET VALUE

- Resale-related fee capture

- Inventory timing advantages affecting resale spreads

- Affiliated or influenced resale ecosystems

## VII. SPONSORSHIP & BRAND REVENUE

- Tour sponsorships

- Venue sponsorships

- Brand activations at events

- Long-term brand partnerships

## VIII. LABOR-RELATED ECONOMIC VALUE (CENTRAL TO THIS CHAT)

- Ambassador / promo labor misclassification

- Volunteer and credentialed labor substitution

- Intern and "experience-based" labor

- Non-cash compensation instead of wages

- Suppressed payroll taxes and benefits costs

- Reduced compliance and reporting costs

## IX. COST SUPPRESSION AS REVENUE-EQUIVALENT

- Avoided wages

- Avoided payroll taxes

- Avoided benefits and insurance costs

- Avoided unemployment insurance contributions

## X. FINANCIAL & PAYMENT MECHANICS

- Time value of money / consumer fund float

- Chargeback suppression and dispute friction

- Payment processing spread advantages

- Lower cost of capital due to scale

## XI. STRUCTURAL & STRATEGIC VALUE (NOT LINE-ITEM REVENUE)

- Vertical integration rents

- Exclusivity premiums

- Market foreclosure (competitors prevented from earning)

- Network effects across venues, artists, and fans

- Cross-subsidization between divisions

- Risk externalization to artists, venues, and consumers

- Option value on future tours and venues

- Regulatory latency (time as value)

- Narrative control / normalization of practices

- Litigation deterrence value

- Exit control over artists and venues

## XII. ACCOUNTING / STRUCTURAL EFFECTS (MENTIONED)

- Cost capitalization and amortization timing

- Intercompany and affiliate value flows

- Entity fragmentation effects

**Key takeaway:** We discussed more than 60 distinct ways Live Nation extracts revenue or economic value—many of which never appear as "revenue" on a financial statement but materially drive dominance, margins, and persistence.

---

## CONCLUSION

This matter concerns more than ticket prices or discrete contracts. It concerns how power, access, labor, consumer perception, and evidence operate in markets mediated by code, interfaces, and permissioned systems. Amicus respectfully submits that careful attention to system design, licensing-like access regimes, cumulative consumer signaling, recursive market effects, upstream concentration effects, labor-pipeline externalization, and preservation of transient records will assist the Court in evaluating the claims before it, regardless of outcome.

Respectfully submitted,

/s/ **Joseph Anthony Reyna** (JoeCat®)

Amicus Curiae

Austin, Texas 78731

WhiteHat@JoeCattt.com

January 6, 2026

**EXHIBIT INDEX AND NOTICE OF AVAILABLE MATERIALS**

*(Informational Only — No Exhibits Attached Unless Requested by the Court)*

Amicus Curiae provides this Exhibit Index solely to identify materials reviewed in developing the analytical framework presented in the accompanying amicus brief. **No exhibits are attached or offered for admission** unless and until requested by the Court. All listed materials are public records, public-records disclosures, FOIA responses, or federal court filings maintained by the identified custodians.

Amicus will submit any listed material, with an accompanying declaration as to source and custody, **upon request of the Court**.

---

**A. Washington State Attorney General — Public Records (PRR-2025-0179)**

**Exhibit A-1** — Exhibit_R_WA_AG_Complaints_PRR-2025-0179.pdf
Washington Attorney General Consumer Protection complaint materials disclosed pursuant to RCW 42.56.

**Exhibit A-2** — 000018.csv
Consumer Protection Division complaint dataset (core extract).

**Exhibit A-3** — 000022.csv
Duplicate export of complaint dataset (format variance).

**Exhibit A-4** — 000031.csv

Duplicate export of complaint dataset (format variance).

**Exhibit A-5** — 000043.csv

Duplicate export of complaint dataset (format variance).

**Exhibit A-6** — ANT000002.xlsx

Redacted internal workbook disclosed by WA AGO (records-practice and custodial documentation).

**Exhibit A-7** — 1000042.xlsx

Administrative disclosure artifact demonstrating routine state recordkeeping practices.

---

## B. Washington State Attorney General — Production Bundles

**Exhibit B-1** — B1_PC_25-179.pdf

**Exhibit B-2** — B2-PC-25-179.pdf

**Exhibit B-3** — B3-PC-25-179.pdf

**Exhibit B-4** — B4-PC-25-179.pdf

**Exhibit B-5** — B5-PC_25-179.pdf

**Exhibit B-6** — B6-PC_25-179.pdf

**Exhibit B-7** — B7-PC_25-179.pdf

**Exhibit B-8** — B8-PC_25-179.pdf

**Exhibit B-9** — B9-PC_25-179.pdf

**Exhibit B-10** — B10-PC_25-179.pdf

Washington Attorney General disclosure bundles produced under PRR-2025-0179.

---

## C. New York Attorney General Materials

**Exhibit C-1** — NY AG G000303-050425.pdf

New York Attorney General disclosure materials relevant to consumer protection and antitrust context.

---

## D. Federal FOIA Records

**Exhibit D-1** — FOIA 47-2025 UMG : Copyright Office.pdf

FOIA response materials from the U.S. Copyright Office.

---

## E. Market Access and Promotion Structure Materials

**Exhibit E-1** — Structural Barriers in Music Promotion_ Financial Thresholds, Access Disparities, and Disclosure Concerns.pdf

Materials addressing financial thresholds, access disparities, and disclosure issues in music promotion.

**Exhibit E-2** — Dreamville Records and Coast 2 Coast DJ's.pdf

Materials addressing promotional practices and access representations in artist development contexts.

**F. Federal Court Filings (Southern District of New York)**

**Exhibit F-1 —**

Reyna_v_Graham_25-cv-6777_Notice_of_Concentrated_Fiduciary_Control_Judicial_Clarificati on_Preservation_Exhibits_and_Supplemental_Exhibits_Declaration_and_Certificate_of_Service _2026-01-06.pdf

Filed notice and declaration concerning preservation and availability of exhibits in a related federal proceeding.

**NOTICE OF AVAILABILITY**

Amicus has intentionally not attached the above materials to avoid expanding the record or burdening the Court. Should the Court wish to review any listed item, amicus respectfully requests leave to submit the requested materials or corresponding public-records or FOIA responses.

**Respectfully submitted,**

**/s/ Joseph Anthony Reyna (JoeCat®)**

Amicus Curiae

Austin, TX, 78731

WhiteHat@JoeCattt.com

**CERTIFICATE OF SERVICE**

I hereby certify that on **January 6, 2026,** I caused the foregoing **Motion for Leave to File Brief of Amicus Curiae**, together with the proposed amicus curiae brief and proposed order, to be served as follows:

- **By U.S. Mail** on the Clerk of Court, United States District Court for the Central District of California; and
- **By electronic mail** on counsel of record for Plaintiffs and Defendants at the email addresses reflected on the Court's docket.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on **January 6, 2026**.

-------------------------------------------------------------------------------

**/s/ Joseph Anthony Reyna (JoeCat®)**

Amicus Curiae

Austin, TX, 78731

WhiteHat@JoeCattt.com



Clerk of Court
United States District Court
Central District of California
255 E. Temple Street, Suite 940
Los Angeles, CA 90012



Dreams Over Dollars
5900 Balcones Dr. #16077
Austin, Texas 78731

Re: FTC et al. v. Live Nation Entertainment, Inc., et al.,
Case No. 2:25-cv-08884