# Exhibit 1

**LOCAL COUNSEL**

James M. Donovan (Cal. No. 64756)
  *jmdonovan@thedonovanoffices.com*
Michael J. Glenn (Cal. No. 89654)
  *mglenn@thedonovanoffices.com*

915 Wilshire Boulevard, Suite 1610
Los Angeles, CA 90017
Telephone: (213) 629-4861

**TORRIDON LAW PLLC**

Michael A. Fragoso*
  *mfragoso@torridonlaw.com*
T. Zachary Horton*
  *tzhorton@torridonlaw.com*
Peter Lee Hamilton*
  *phamilton@torridonlaw.com*

801 Seventeenth Street NW, Suite 1100
Washington, DC 20006
Telephone: (202) 249-6900

*Pro hac vice forthcoming*

Attorneys for Amici Curiae
SENATORS MARSHA BLACKBURN, RICHARD BLUMENTHAL, JOHN CORNYN, JOSH HAWLEY, JOHN KENNEDY, BEN RAY LUJÁN, AND BERNIE MORENO

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br><br>**LIVE NATION ENTERTAINMENT, INC.**, *et al.*,<br><br>                    Defendants. | Case No. 2:25-cv-08884-MEMF-MAA<br><br>**[PROPOSED] BRIEF OF AMICI CURIAE SENATOR MARSHA BLACKBURN, ET AL. IN SUPPORT OF THE FEDERAL TRADE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ..................................................................... 1

INTRODUCTION ............................................................................................. 1

ARGUMENT .................................................................................................... 2

I.    THE STATUTE'S PLAIN TEXT PROHIBITS ANYONE—INCLUDING PLATFORMS—
      FROM KNOWINGLY ENABLING TICKET SCALPERS. ................................... 3

      A.    TICKETMASTER "SELLS OR OFFERS TO SELL" TICKETS............................... 4

      B.    SCALPERS VIOLATE SUBPARAGRAPH (A) WHEN THEY COLLUDE
            WITH PLATFORMS LIKE TICKETMASTER. ....................................... 8

            1.    Scalpers "circumvent" Ticketmaster's technological controls by using
                  multiple accounts to evade ticket limits. ............................... 9

            2.    Platform–scalper collusion does not foreclose circumvention........................ 10

II.   CONGRESS ENACTED THE BOTS ACT TO PROTECT CONSUMERS, NOT
      TICKETING PLATFORMS. ...................................................................... 11

III.  TICKETMASTER'S CONSTRICTIVE READING OF THE LAW WOULD ALLOW
      TICKET PLATFORMS TO COLLUDE WITH TICKET SCALPERS AND HARM
      ORDINARY CONSUMERS. ...................................................................... 15

CONCLUSION ............................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albrecht v. United States*,
  273 U.S. 1 (1927) .......................................................................................................... 6

*Brauer v. ExamOne World Wide Inc.*,
  683 F. Supp. 3d 1054 (C.D. Cal. 2023) ........................................................................ 6

*Est. of Graham v. Sotheby's, Inc.*,
  178 F. Supp. 3d 974 (C.D. Cal. 2016) .......................................................................... 7

*Fabozzi v. StubHub, Inc.,*
  No. C-11-4385, 2012 WL 506330, (N.D. Cal. Feb. 15, 2012) ..................................... 7

*Federal Trade Commission v. Key Investment Group, LLC*,
  No. 1:25-cv-02716-GLR (D. Md. Nov. 24, 2025) ...................................................... 10

*Hill v. StubHub, Inc.*,
  727 S.E.2d 550 (N.C. Ct. App. 2012) ........................................................................... 7

*Ind. Farm Bureau Ins. v. Shenzhen Anet Tech. Co.*,
  No. 19-cv-00168, 2020 WL 7711346 (S.D. Ind. Dec. 29, 2020) ................................. 7

*Pinter v. Dahl*,
  486 U.S. 622 (1988) .................................................................................................. 6, 7

*Porras v. StubHub, Inc.*,
  No. C-12-1225, 2012 WL 3835073 (N.D. Cal. 2012) .................................................. 7

*Roberts v. Sea-Land Servs., Inc.*,
  566 U.S. 93 (2012) ....................................................................................................... 5

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
  390 F. Supp. 3d 964 (W.D. Wis. 2019) ....................................................................... 7

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
  835 F. App'x 213 (9th Cir. 2020) ................................................................................. 7

*United States v. eBay Inc.*,
  751 F. Supp. 3d 232 (E.D.N.Y. 2024) .......................................................................... 7

**Statutes and Rules**

7 U.S.C. § 136j(a)(1) ........................................................................................................ 8

15 U.S.C. § 45c(a)(1)(A) ............................................................................................. 3, 9

15 U.S.C. § 45c(a)(1)(B)(i) ................................................................ 8

15 U.S.C. § 80a-12 ............................................................................. 7

49 U.S.C. § 41712(c)(1) ..................................................................... 7

Pub. L. No. 114-274, pmbl., 130 Stat. 1401 (2016) .................... 11, 12

Pub. L. No. 114-274, § 3(3), 130 Stat. 1401 (2016) ......................... 6

Fed. R. Civ. P. 12(b)(6) ..................................................................... 6

**Other Authorities**

*Circumvent*, Black's Law Dictionary (12th ed. 2024) ...................... 9

*Circumvent*, Merriam-Webster Dictionary (11th ed. rev. 2025) ... 9, 11

Com., Sci., & Transp., *Moran Bill to Improve Consumer Access to Entertainment
Events Passes* (Dec. 1, 2016) ..................................................... 14

Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level Online
Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28, 2016) ......... 13

Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be
Secondary* (May 2025) ................................................................ 16

U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market
Characteristics and Consumer Protection Issues* (2018) ............... 17

*Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm.
on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci.,
& Transp.*, 114th Cong., S. Hrg. 114-614 (2016) ........................... 12

Exec. Order No. 14,254, 90 Fed. Reg. 14,699 (Apr. 3, 2025) ......... 17

Nat'l Indep. Ticket Operators Ass'n, NITO Ticket Resale Study (2024) ................ 17

*Oversight of the Federal Trade Commission: Hearing Before the S. Comm. on Com.,
Sci. & Transp.*, 114th Cong., S. Hrg. 114-631 (2016) .................... 13

Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale* (Nat'l Bureau of
Econ. Rsch., Working Paper No. 15476, 2009) ........................... 17

Press Release, Sen. Charles E. Schumer, *Schumer Introduces New Senate Bill That
Puts An End To Unfair Cyber Scalping* (Mar. 28, 2016) .............. 13

Press Release, Sen. Maria Cantwell, *Cantwell Backs Bill to Benefit Washington Music
and Sports Fans* (Sept. 21, 2016) .............................................. 13

iii

Press Release, Sen. Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on Unfair Ticket Bots* (Dec. 1, 2016)............................................................................ 14

Press Release, White House, *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025)................................. 17

**INTERESTS OF AMICI CURIAE**

Amici Curiae are seven sitting members of the United States Senate:

Senator Marsha Blackburn (Tennessee)
Senator Richard Blumenthal (Connecticut)
Senator John Cornyn (Texas)
Senator Josh Hawley (Missouri)
Senator John Kennedy (Louisiana)
Senator Ben Ray Luján (New Mexico)
Senator Bernie Moreno (Ohio)

Most Amici, as members of the United States House of Representatives and Senate in 2016, voted to enact the Better Online Ticket Sales Act of 2016, which then-Representative Blackburn had drafted and co-sponsored. As legislators, all Amici have a special interest in the law's sound interpretation in federal court, and accordingly, they support the Federal Trade Commission (the "Commission") in opposing Defendants' motion to dismiss, which is grounded in an erroneous, unduly narrow interpretation of the law that they helped to enact.

**INTRODUCTION**

Amici and their fellow legislators actively support, drafted, or voted to pass the Better Online Ticket Sales Act of 2016 ("BOTS Act") to help protect ordinary American consumers from rapacious online ticket scalpers and their platform enablers like Ticketmaster. Ticket scalpers buy up tickets with no intention of using them. Then, with the help of their platform enablers, they list the tickets for sale on secondary markets with eye-popping markups. At each step in this process—when scalpers buy tickets in the primary market, when tickets are sold in the secondary market, and when real American consumers buy those tickets in the secondary market—ticket platforms like Ticketmaster collect fees. Scalpers' unearned profits and platforms' "triple dip" fees come out of the pockets of ordinary Americans who just want to attend performances by favorite artists or cheer on their teams. Amici expressly designed the BOTS Act to counteract this profiteering at American eventgoers' expense.

In March 2025, President Donald Trump made his desire known that the Commission rigorously enforce the law that Amici helped draft and pass. That law prohibits ticket-harvesting scalpers from "circumventing" ticket platforms' controls to exceed limits on the number of tickets that a customer may buy for a given event. The law also prohibits *anyone*—scalper, platform, or anyone else—from "selling or offering to sell" tickets when they "knew or should have known" that the tickets were procured through scalper circumvention. Defendants (collectively, "Ticketmaster") have violated this law. Ticket scalpers freely circumvent Ticketmaster's controls limiting the number of tickets that can be purchased for a given event, using internet protocol ("IP") proxy services, subscriber identity module ("SIM") card banks, and many thousands of fake Ticketmaster accounts with thousands of different credit cards to do so. Despite knowing that large-scale scalpers have easily circumvented these controls, Ticketmaster continues to sell their illicitly procured tickets on its resale platform—and reaps massive profits from doing so.

This Court should deny Ticketmaster's motion to dismiss. As the Commission has squarely alleged, Ticketmaster has violated the BOTS Act by selling or offering to sell what it clearly knew or should have known to be ill-gotten tickets on its secondary-market platform. The BOTS Act contains no implicit immunity for platforms: It protects *consumers*, not the platforms who harm them by colluding with scalpers to collect three layers of fees. If the Court holds for Ticketmaster, the law that Amici worked hard to enact with overwhelming bipartisan support would be defanged to the detriment of American eventgoers, who would be forced to keep paying exorbitant markups to scalpers and fees to Ticketmaster. This Court should not buy the arguments that Ticketmaster is selling.

### ARGUMENT

The BOTS Act is clear that online ticket scalping in violation of ticket issuers' posted rules is illegal. It is equally clear that enabling scalpers by knowingly selling their ill-gotten tickets is also illegal. Amici framed the BOTS Act broadly to prevent scalpers from buying up tickets before

consumers have a fair chance and to prevent platforms like Ticketmaster from facilitating their operations. This Court should not condone Ticketmaster's attempts to evade responsibility for platforming scalpers who harm American event-going consumers. The motion to dismiss should be denied.

I. **THE STATUTE'S PLAIN TEXT PROHIBITS ANYONE—INCLUDING PLATFORMS—FROM KNOWINGLY ENABLING TICKET SCALPERS.**

The plain text of the BOTS Act clearly prohibits two kinds of conduct. *First*, subparagraph (A) declares it

> unlawful for any person to circumvent a security measure, access control system, or other technological control or measure on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules.

15 U.S.C. § 45c(a)(1)(A). *Second*, subparagraph (B) declares it unlawful

> to sell or offer to sell any event ticket . . . obtained in violation of subparagraph (A) if the person selling or offering to sell the ticket either —
>
> (i)     participated directly in or had the ability to control the conduct in violation of subparagraph (A); or
>
> (ii)    knew or should have known that the event ticket was acquired in violation of subparagraph (A).

*Id.* § 45c(a)(1)(B).

Subparagraph (B) prohibits platforms from knowingly enabling commercial ticket scalpers. Ticketmaster violated that provision by selling tickets that it knew to have been obtained in violation of subparagraph (A). The Commission's complaint details how scalpers violate subparagraph (A): Using thousands of (often fake) Ticketmaster accounts and sophisticated technology like IP proxy services and SIM banks, scalpers exceed posted ticket limits across myriad small transactions. ECF No. 1 ("Compl.") ¶¶ 74, 76, 82. Then, using Ticketmaster's TradeDesk platform, scalpers aggregate their ill-gotten tickets in plain view. *See id.* ¶¶ 84–87. Ticketmaster sells those tickets even though it knows they were illicitly procured. *See id.* ¶ 48 (for secondary-market transactions, Ticketmaster

3

"voids the first ticket" and "reissues a new ticket, with unique identifying information, to the second purchaser"); *id.* ¶ 33 ("Ticketmaster is the merchant of record for all . . . resale tickets sold on its platform."); *id.* ¶ 39 (Ticketmaster can "unilaterally increase" the price of resale tickets); *id.* ¶¶ 15, 71, 75, 90, 103–04 (detailing Ticketmaster's tolerance of scalpers and blind-eye policy towards scalped tickets). That is a BOTS Act violation, plain and simple.

Against all this, Ticketmaster offers two main arguments. *See* ECF No. 55 ("Defs. Mem."), at 17–23. *First*, Ticketmaster claims that a resale platform cannot be susceptible to subparagraph (B) liability because it "does not itself sell or offer to sell tickets listed by third parties." *Id.* at 18 (capitalization altered). *Second*, it suggests that there cannot be a predicate subparagraph (A) violation where (1) scalpers evade ticket issuers' ticket limits by using multiple accounts, *see id.* at 24–25, or (2) the platform "allow[s]" them "to exceed ticket limits," *id.* at 23. These arguments lack merit.

## A.    TICKETMASTER "SELLS OR OFFERS TO SELL" TICKETS.

Ticketmaster argues that platforms cannot be subject to BOTS Act liability because they do not "sell or offer to sell" tickets on the secondary markets that they enable. This argument—premised upon the dubious, atextual premise that one "must own or possess an item to sell it," *id.* at 19—is wrong at least three times over. *First*, it depends upon a stunted, artificially narrow understanding of the word "sell," obviously at odds with the ordinary usage. *Second*, Ticketmaster's argument ignores myriad authorities—from the Supreme Court and Congress alike—that support the common, broad understanding of the word "sell." And *third*, Ticketmaster's narrow reading of the word "sell" disrupts the BOTS Act's carefully reticulated structure.

***Ordinary Meaning.*** Ticketmaster agrees that because "the word 'sell' is undefined," it "thus takes its 'ordinary meaning' in the 'context' in which it appears." *Id.* at 18 (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100–01 (2012)). And in context, the ordinary meaning of the word "sell" is indeed "to convey an interest for consideration." *Id.* But that ordinary meaning does *not*

require the seller to "own or possess" the thing sold. *Id.* at 19. In "everyday usage," *id.*, we often speak of people "selling" things that they do not possess or own. Consider:

- A salesman employed at a brick-and-mortar store can "sell" a product that is only in-stock online. He neither owns it (it belongs to the retail company), nor possesses it (it is not in the physical store for him to possess as a custodian). But in ordinary usage, we have no trouble saying, "He *sells* that product."

- A stock trader "sells" a security short. He does not own the stock, and although he nominally "borrows" it, it never enters his possession—rather, a broker takes shares from someone else's account and transfers them to the buyer on the seller's account. Again, in ordinary usage, we would still say that the trader engaged in "selling."

- A thief heists jewels and asks a black-market dealer to fence them. The thief hides the jewels for safekeeping, and the fence attempts to "sell" them. But the fence obviously does not own the jewels, and neither does he possess them. Here again, we have no trouble speaking of the fence as "offering to sell" something he neither owns nor possesses.

- A real estate agent is said to "sell" a house, even though he neither owns nor possesses the house in question. Again, no English speaker would bat an eye if someone said, "A realtor sold my house."

- An auctioneer "sells" an all-inclusive vacation. He does not (and cannot) own or possess the experience that he is said to have "sold."

- A drop-shipper "sells" a product owned by a third-party supplier and shipped directly from that supplier to the buyer. Again, it is perfectly normal English to say that the drop-shipper "sold" the product, despite never owning or possessing it.

In each of the examples above, the verb "sell" is immediately recognizable according to its ordinary English meaning—to convey (or undertake to convey) something of value for consideration—notwithstanding the obvious fact that in each situation, the seller neither owns not possesses the item in question. So too, Ticketmaster—as an online ticket resale platform—quite obviously "sells" (and "offers to sell") event tickets, even if we assume, for argument's sake, that it never owns nor possesses the event tickets in question.[1]

***Judicial and Congressional Authority.*** Case law bolsters this commonsense usage. "In common parlance, a person may offer or sell property without necessarily being the person who transfers title to, or other interest in, that property." *Pinter v. Dahl*, 486 U.S. 622, 642–43 (1988); *cf. Albrecht v. United States*, 273 U.S. 1, 11 (1927) ("One may obviously . . . sell and cause to be delivered a thing of which he has never had possession[.]"). So, for example, the Supreme Court held that someone who merely a *brokered* a deal could be held liable under § 12(1) of the Securities Act of 1933, which prohibits "[a]ny person" from "offer[ing] or sell[ing] a security" in violation of registration requirements. *Pinter*, 486 U.S. at 641–43; *see id.* at 642–43 ("ordinary understanding" of the terms "offer or sell" is not limited to one who owns or possesses a property interest); *see also, e.g.*, *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 390 F. Supp. 3d 964, 973 (W.D. Wis. 2019) ("Amazon did not own the product that [a third-party] sold to [the plaintiff's insured,] [b]ut . . . that

---

[1] In any event, the facts pleaded in the complaint give rise to the reasonable inference that Ticketmaster does, in fact, "possess" the event tickets that it sells on its resale platform. *See Brauer v. ExamOne World Wide Inc.*, 683 F. Supp. 3d 1054, 1058 (C.D. Cal. 2023) (Frimpong, J.) ("When evaluating a complaint under Rule 12(b)(6), the court must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." (quotation omitted)). For example, the Commission alleges that "[w]hen Ticketmaster *delivers* resale tickets to a secondary-market purchaser, it voids the first ticket that it sold on the primary market and *reissues a new ticket*, with unique identifying information, to the secondary purchaser." Compl. ¶ 48 (emphases added); *see also id.* ¶ 33 ("Ticketmaster is the merchant of record for all primary and resale tickets sold on its platform."). The reasonable inference to be drawn from these allegations is that Ticketmaster possesses each "event ticket"—defined by the BOTS Act as "any physical, electronic, or other form of . . . *evidence* indicating that the [buyer]" has the right of admittance, *see* Pub. L. No. 114-274, § 3(3), 130 Stat. 1401, 1403 (2016) (emphasis added)—before conveying it to the secondary-market buyer. Simply put, if Ticketmaster "reissues a new ticket"—the "evidence" of the buyer's right to enter—for every secondary market transaction on its platform, it is reasonable to infer that Ticketmaster necessarily possesses, and thus, "sells" it.

is a mere technicality . . . [because] Amazon otherwise serves all the traditional functions of both retail seller and wholesale distributor.").[2]

Courts are not the only expositors of English usage. Legislators like Amici have used the word "sell" in many other laws, and these uses are also instructive as to the word's ordinary meaning. Quite often, Congress uses the word "sell" in statutes that clearly apply to actors who do *not* necessarily own or possess the thing that they are selling. *See, e.g.*, 49 U.S.C. § 41712(c)(1) ("It shall be an unfair or deceptive practice . . . for any ticket agent . . . offering to *sell* tickets . . . to fail to disclose . . . the name of the air carrier." (emphasis added)); *id.* § 40102(a)(45) (defining "ticket agent" as one who "as a principal *or agent sells, offers for sale*, negotiates for, or holds itself out as selling, providing, or arranging for, air transportation" (emphasis added)); 15 U.S.C. § 80a-12 (Investment Company Act) ("unlawful for any . . . principal underwriter [of a registered open-end investment company], *or any broker or dealer* . . . to *sell* or otherwise dispose of any security issued by the [company]" under certain conditions); 7 U.S.C. § 136j(a)(1) ("unlawful . . . to distribute or sell" an unregistered pesticide); *id.* § 136(gg) (defining "distribute or sell" to mean to "distribute, sell, offer for sale, . . . [or] release for shipment"). These broad congressional uses of the term "sell"

---

[2] Ticketmaster cites several nonbinding cases having nothing to do with the BOTS Act to support its contention that it is not a ticket "seller." *See* Defs. Mem. at 20. These mostly unpublished and state-court cases are inapposite in any event. For instance, Ticketmaster first cites a footnote from *Fabozzi v. StubHub, Inc.*, which, in dictum, merely clarified a party's conflicting factual allegations. No. C-11-4385, 2012 WL 506330, at *1 n.1 (N.D. Cal. Feb. 15, 2012). Ticketmaster's other cases are no better. In each, the particular statutory context of the term "seller" made clear that it took a narrower meaning than its ordinary usage, reflecting legislatures' allocation of legal responsibility to those who own or possess the item sold. *See Hill v. StubHub, Inc.*, 727 S.E.2d 550, 555, 561, 563–64 (N.C. Ct. App. 2012) (state law limiting fees that may be added to ticket's face value applied only to the tickets' "owner" who "set the price of the tickets," and not to StubHub, which—at that time—merely "provided an independent brokerage function"); *Porras v. StubHub, Inc.*, No. C-12-1225, 2012 WL 3835073, at *2 (N.D. Cal. 2012) (law prohibited ticket resellers and brokers—who actually buy and deliver tickets—from misrepresenting their ability to deliver tickets); *Ind. Farm Bureau Ins. v. Shenzhen Anet Tech. Co.,* No. 19-cv-00168, 2020 WL 7711346, at *2–6 (S.D. Ind. Dec. 29, 2020) (strict liability for product defects allocated to third-party vendors responsible for those defects); *State Farm Fire & Cas. Co. v. Amazon.com, Inc.,* 835 F. App'x 213, 216 (9th Cir. 2020) (similar); *Est. of Graham v. Sotheby's, Inc.,* 178 F. Supp. 3d 974, 998 (C.D. Cal. 2016) (similar); *United States v. eBay Inc.,* 751 F. Supp. 3d 232, 239–40 (E.D.N.Y. 2024) (similar). Here, Amici and their colleagues drafted and passed the BOTS Act with a "broader view[ ] about what it means to 'sell' something." *eBay*, 751 F. Supp. 3d at 239.

suggest that the term commonly denotes more than just "hand[ing] over [a] good" that a party already "own[s] or possess[es]" "in exchange for payment."  *See* Defs. Mem. at 19.

*Statutory Structure.*  Ticketmaster claims that "subparagraphs (A) and (B) work together to target both aspects of scalpers' operations," with subparagraph (A) targeting their buying, and subparagraph (B) targeting their selling.  *Id.*  "Extending subparagraph (B) to . . . ticket issuers," Ticketmaster complains, "would disrupt that careful structure."  *Id.* (cleaned up).  But how exactly? Ticketmaster does not say.

It is, in fact, *Ticketmaster's* contorted reading that "disrupt[s]" the law's "careful structure." *Id.*  The BOTS Act's prohibitions in subparagraphs (A) and (B) are asymmetric: While subparagraph (A) does indeed target scalpers and their bulk-buying operations, *see id.*, subparagraph (B)—by design—casts a wider net.  To be sure, the subparagraph (B) prohibition on "sell[ing] or offer[ing] to sell" captures scalpers who "participated directly in or had the ability to control the conduct" of illicitly procuring tickets. 15 U.S.C. § 45c(a)(1)(B)(i).  But it *also* captures their platform enablers, like Ticketmaster, and others who "knew or should have known that [an] event ticket" was illicitly procured.  *Id.* § 45c(a)(1)(B)(ii).  Ticketmaster's atextual attempt to cast subparagraphs (A) and (B) as symmetrical prohibitions on the buying and selling operations of *scalpers alone* unduly cabins this carefully structured statutory scheme, and the court should reject it.

## B. SCALPERS VIOLATE SUBPARAGRAPH (A) WHEN THEY COLLUDE WITH PLATFORMS LIKE TICKETMASTER.

As a fallback, Ticketmaster argues that even if it "sells" scalpers' tickets on the secondary market, the Commission's claim is still doomed because there are no predicate subparagraph (A) violations in any event.  But the Commission *has* amply alleged predicate violations: The complaint details how ticket scalpers abuse Ticketmaster's platform to snatch up tickets, using thousands of often-fake accounts and various technologies to end-run Ticketmaster's means of implementing ticket-purchase limits.  This conduct constitutes "circumvent[ion]" of "technological controls"

within the plain meaning of the BOTS Act, regardless of Ticketmaster's blind-eye permission to exceed ticket limits.

### 1. Scalpers "circumvent" Ticketmaster's technological controls by using multiple accounts to evade ticket limits.

By its plain terms, the BOTS Act prohibits "circumvent[ion]" of ticket platforms' "technological control[s]" for enforcing "posted event ticket purchasing limits" and "purchasing order rules." *Id.* § 45c(a)(1)(A). As Ticketmaster apparently agrees, the operative verb "circumvent" has a plain—and broad—meaning: "To avoid (a restrictive problem, rule, etc.), esp. by clever and sometimes dishonest means." *Circumvent*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025) ("to manage to get around especially by ingenuity or stratagem"); Defs. Mem. at 23 (quoting BLACK'S LAW DICTIONARY).[3]

Scalpers' alleged predicate conduct falls squarely within this plain meaning. The Commission alleges that ticket scalpers "bypass" Ticketmaster's ticket-purchase controls "by using multiple accounts" and, among other things, "software that allows one person to log into multiple accounts at once on the same computer without being detected by [Ticketmaster's] automatic controls." Compl. ¶ 76. Those controls include features on Ticketmaster's "website and app" that "automatically prevent" accountholders from exceeding "posted limit in a single transaction," *id.* ¶ 70, the use of texted "account verification codes," *id.* ¶ 76, and a "security measure[ ]" called the "TicketCounter system," which "automatically blocks multiple purchase attempts from the same IP address and analyzes patterns to identify multiple accounts acting in concert to evade purchase limits," *id.* ¶ 71. *See* Defs. Mem. at 21 (conceding that "[t]he Complaint . . . identifies technological controls like automatic IP address blocking and account-verification codes"). Scalpers obviously use multiple

---

[3] These dictionary definitions can be reduced to a single word: Bypass. To circumvent something is to bypass it. The terms are perfectly synonymous.

accounts, multi-account-enabling software, and SIM banks to "avoid" or "get around" these technological controls. *See* BLACK'S LAW DICTIONARY and MERRIAM-WEBSTER DICTIONARY, *supra*. Ticketmaster's conclusory claim that the Commission "conflate[s] technological controls and ticket limits" and "assume[s] [that] a violation of ticket limits reflects a circumvention of some unidentified technological control," Defs. Mem. at 22, simply blinks the complaint's actual allegations.

### 2. Platform–scalper collusion does not foreclose circumvention.

Against all this Ticketmaster offers one more argument: It claims that lax enforcement by ticket platforms—or, what is worse, platform *complicity* in ticket scalpers' schemes—negates the "circumvent[ion]" element of subparagraph (A). *See* Defs. Mem. at 23. If, as the Commission alleged, Ticketmaster "allowed brokers to exceed ticket limits," that "forecloses a BOTS Act claim" because "then the brokers necessarily did not 'circumvent' technological controls to do so." *Id.* As one of Ticketmaster's largest scalping clients recently put it, scalpers "cannot 'circumvent' when Ticketmaster approves."[4]

The ordinary meaning of the statutory term "circumvent" forecloses this argument. Circumvention does not turn on Ticketmaster's authorization or permission. A user who "manage[s] to get around" a ticket platform's controls "circumvents" those controls, permission or acquiescence notwithstanding. *Circumvent*, MERRIAM-WEBSTER DICTIONARY (11th ed. rev. 2025). And that is unlawful.

An analogy to trespass is instructive. If a property owner turns a blind eye to trespass, that does not mean the trespasser has not climbed over the fence. He *has* climbed over the fence—but

---

[4] *See* Defs. Mem. of Law in Support of Mot. to Dismiss, ECF No. 33-1 at 16, *Federal Trade Commission v. Key Investment Group, LLC*, No. 1:25-cv-02716-GLR (D. Md. Nov. 24, 2025) (making the same argument); *see* Compl. ¶ 83 fig. 8 (Key Investment Group listed in internal Ticketmaster presentation among "brokers violating fictitious account rules on large scale").

with tacit permission. In trespass, of course, permission is a defense. But the BOTS Act includes no such exception. That is because violating the BOTS Act harms *event-going consumers*—not ticket platforms like Ticketmaster, who, far from being harmed, even *benefit* from fees on scalped tickets' secondary-market sales. *See* Compl. ¶ 77 (explaining that when Ticketmaster "sell[s] a secondary market ticket that was purchased on their primary market, [it] collect[s] three sets of fees on the same ticket[.]"); *id.* ¶ 16 (highlighting Ticketmaster's incentive to allow commercial scalping so that it "can 'triple dip' on fees").

For this reason, Ticketmaster's lack of enforcement or blind-eye treatment cannot negate scalpers' subparagraph (A) culpability. Holding otherwise would create an atextual exemption for collusive conduct between scalpers and ticket platforms that would harm the very people that the BOTS Act was plainly intended to protect—ordinary Americans who want to see their favorite performers or sports teams at reasonable prices. *See* Pub. L. No. 114-274, pmbl., 130 Stat. 1401, 1401 (2016) (indicating Act's focus on "ensur[ing] equitable *consumer* access to tickets" (emphasis added)).

## II. CONGRESS ENACTED THE BOTS ACT TO PROTECT CONSUMERS, NOT TICKETING PLATFORMS.

Ticketmaster claims that, in enacting the BOTS Act, Congress was worried about platforms like Ticketmaster. *See* Defs. Mem. at 15 ("Congress enacted the bots act to protect *platforms* from bad actors . . . ." (emphasis added) (capitalization altered)). Wrong. Amici and their fellow legislators were concerned with everyday *Americans*—Americans who want to be able to purchase tickets to see their favorite teams and artists live at reasonable prices. *See* BOTS Act of 2016, Pub. L. No. 114-274, pmbl., 130 Stat. 1401, 1401 (2016) ("An Act To prohibit the circumvention of control measures used by Internet ticket sellers *to ensure equitable* **consumer** *access* to tickets for any given event." (emphases added)); S. Rep. No. 114-391, at 1 (2016) ("The purpose of [the bill] is . . . to ensure equitable *consumer* access to tickets for any given event.") (emphasis added).

Ticketmaster's fanciful account of Congress's intent in enacting the BOTS Act flies in the face of the Act's legislative history.

From the beginning, the BOTS Act has been about *consumer* protection, not *platform* protection. When Amicus Senator Blackburn, the bill's House co-sponsor, introduced the BOTS Act and Congress unanimously passed it into law in 2016, legislators drew attention to the problem of online ticket scalpers and the harms they imposed on American consumers. The primary problem troubling Amici and their fellow lawmakers was that ticket scalpers cheated and enriched themselves and their platform enablers at the expense of the ordinary American consumer. By circumventing platforms' technological controls enforcing ticket-purchase limits to snatch up and accumulate hoards of tickets, online scalpers forced many Americans onto secondary markets, like Ticketmaster's platform, where they buy scalped tickets at exorbitant markups and with even more fees heaped on top. In short, unscrupulous scalpers and profiteering platforms gained at American eventgoers' expense.

The legislative record is replete with statements evincing legislators' focus on protecting consumers, not platforms. Senator Amy Klobuchar, for example, explained that she was a co-sponsor of the Act expressly "because it protects *consumers*." *Examining the Better Online Ticket Sales Act of 2016: Hearing Before the Subcomm. on Consumer Prot., Prod. Safety, Ins., & Data Sec. of the S. Comm. on Com., Sci., & Transp.* ("S. Subcomm. Hearing"), 114th Cong., S. Hrg. 114-614, at 52 (2016) (question submitted by Hon. Amy Klobuchar to Jeremy Liegl) (emphasis added). Senator Blumenthal likewise emphasized his track record in "fighting to protect *consumers* from ticket scalpers." *Id.* at 3 (Statement of Hon. Richard Blumenthal) (emphasis added). The list goes on. *See, e.g.*, *id.* at 24 (Statement of Hon. Claire McCaskill) (expressing concern that scalpers "are stealing money from legitimate customers"); *Oversight of the Federal Trade Commission: Hearing Before the S. Comm. on Com., Sci. & Transp.*, 114th Cong., S. Hrg. 114-631, at 44 (2016) (Statement of Hon. Maria Cantwell) ("[The BOTS Act] is about empowering *consumers*." (emphasis added)); Press Release,

Sen. Maria Cantwell, *Cantwell Backs Bill to Benefit Washington Music and Sports Fans* (Sept. 21, 2016) (available at tinyurl.com/CantwlPR) ("This legislation gives *consumers* a fair shake when making [a ticket] purchase." (emphasis added)); Press Release, Sen. Charles E. Schumer, *Schumer Introduces New Senate Bill That Puts An End To Unfair Cyber Scalping* (Mar. 28, 2016) (available at tinyurl.com/SchumBOTS) ("[T]his legislation would help ensure *consumers* are given equitable access to tickets." (emphasis added)).[5]

When the BOTS Act passed, Amicus Senator Blackburn explained that the Act was designed "to end [scalpers'] anti-consumer tactics and level the online ticket playing field for fans of live entertainment." Press Release, Office of Congressman Paul Tonko, *Tonko, Blackburn Lead Bipartisan Effort to Level Online Ticket Sales Playing Field for Fans of Live Entertainment* (Apr. 28, 2016) (available at tinyurl.com/Tonko-Bbn). Other legislators made similar remarks, underscoring the consumer focus of the new law. *See, e.g.*, *id.* (Rep. Tonko: "This legislation . . . empower[s] *consumers* to fight back against price manipulators in the ticket industry." (emphasis added)); Press Release, S. Comm. on Com., Sci., & Transp., *Moran Bill to Improve Consumer Access to Entertainment Events Passes* (Dec. 1, 2016) (available at tinyurl.com/SCommPR) (Senator Jerry Moran: "This bill helps level the playing field for *consumers* and takes aim at artificially inflated prices." (emphasis added)); Press Release, Sen. Richard Blumenthal, *Senate Approves Blumenthal Bill to Crack Down on Unfair Ticket Bots* (Dec. 1, 2016) (available at tinyurl.com/BlumPR2) ("*Consumers* deserve access to tickets at affordable prices and a fair chance to buy them before scalpers buy them in bulk." (emphasis added)).

---

[5] Private citizens advocating for the BOTS Act at the Senate Subcommittee hearing that considered the bill also emphasized the bill's consumer-protection focus. *See, e.g.*, S. Subcomm. Hearing, *supra*, at 12 (prepared statement of Jeffrey Seller, Producer, "Hamilton") ("[W]e are here together to ask for your help in passing the BOTS Act to punish abusers of a system designed for *consumers and fans*, not just for those looking to 'game the system' and make a quick buck." (emphasis added)); *id.* at 9 (prepared statement of Bob Bowlsby, Commissioner, Big 12 Conference) ("[W]e should denounce . . . forced competition on Internet ticket sites between ardent *fans* and faceless scalpers who seek to profit from those *fans'* passion for college athletics." (emphases added)).

Conspicuously missing from this legislative record is any real concern for the impact of ticket-scalper practices on ticket platforms.  In fact, contrary to Ticketmaster's suggestion that Congress was really looking out for platforms' interests, the record shows that legislators were leery of platforms' motivations.  For instance, at a hearing before the Consumer Protection, Product Safety, Insurance, & Data Security Subcommittee of the Senate Committee on Commerce, Science, and Transportation, then-Chairman John Thune observed:

> As leading companies in the live events industry [*i.e.*, Ticketmaster and Stubhub] representing primary and secondary ticket sellers respectively, it would seem that [scalpers' use of] ticket bots might actually help your bottom lines.  For primary ticket issues, for instance, bots move tickets quickly, and in the secondary market, they help create inventory.  And, of course, in both cases, they do so at the expense of the ticket buying public, which, again, as we pointed out earlier, makes the consumer experience both more frustrating and expensive.

S. Subcomm. Hearing, *supra*, at 38 (Statement of Hon. John Thune).  Similarly, Senator Claire McCaskill had the following colloquy with the then–General Counsel of Stubhub, Tod Cohen:

> Senator MCCASKILL.  . . . [L]et's talk about the ticket services that are making money coming and going.  Let's see if I have this right.  Live Nation owns Ticketmaster, correct?
>
> Mr. COHEN.  Yes.
>
> Senator MCCASKILL.  And they also own TicketNow, correct?
>
> Mr. COHEN.  They do.
>
> Senator MCCASKILL.  So someone can . . . buy a large inventory of tickets to a concert, and then they can turn around and place those tickets for sale on TicketNow, correct?
>
> Mr. COHEN.  Yes, and . . . they could place them for sale on our platform as well as other competitors. . . .
>
> Senator MCCASKILL.  So Live Nation is making money coming and going, correct?  They're making money—they're making the fees on the first sale, and then they're turning around and making a fee on the second sale also.
>
> Mr. COHEN.  That is true.

14

*Id.* at 25.  Clearly, Amici and their colleagues were concerned with consumer welfare, not corporate welfare for ticket platforms who *benefit* from scalpers' secondary-market transactions.[6]

Ticketmaster musters no contrary evidence of Congress's supposed desire to "[p]rotect [p]latforms."  *See* Defs. Mem. at 15–16 (citing no concrete evidence in the legislative record).  This Court should reject Ticketmaster's baseless assertion and apply the BOTS Act in accord with its plain text and obvious purpose of protecting American consumers.

## III.   TICKETMASTER'S CONSTRICTIVE READING OF THE LAW WOULD ALLOW TICKET PLATFORMS TO COLLUDE WITH TICKET SCALPERS AND HARM ORDINARY CONSUMERS.

Ticketmaster's strained interpretation of the BOTS Act should be rejected because it would condone—and indeed, incentivize—collusive conduct between platforms and scalpers.

As the complaint explains, ticket platforms like Ticketmaster collect fees on both primary and secondary-market transactions.  *See* Compl. ¶¶ 16, 77; *see also, e.g.*, Clare Y. Cho, Cong. Rsch. Serv., R48179, Tickets for Live Entertainment Events 3 (2025) ("Ticketers in the primary and secondary markets obtain revenue from fees that are paid by consumers.").  Thus, a *single* ticket generates *three* layers of Ticketmaster fees when it is scalped:  First, the scalper pays a fee on the initial primary-market purchase; then, when the scalped ticket is sold (with a markup), Ticketmaster collects two more fees: one fee from the scalper listing the ticket, and another from the buying consumer.  Compl. ¶ 77.  Because of these cumulative fees, platforms have a strong financial incentive to allow scalpers to operate at scale:  The more primary-market tickets that scalpers can buy, the more tickets will be sold on the secondary market, and the more fees Ticketmaster will be able to collect—to the tune of hundreds of millions, or even *billions*, of dollars.  *See id.* ¶¶ 16, 37, 39, 78; *cf. id.* ¶ 103; S. Subcomm. Hearing, *supra*, at 38 (Statement of Hon. John Thune).

---

[6] *See also* S. Subcomm. Hearing, *supra*, at 26 (Sen. Blumenthal suggesting "that there may be elements of the [ticketing] industry that are complicit in these kinds of unfair markups and denial of access").

These incentives motivate platform–scalper collusion.  At artists' requests, platforms make paper promises about ticket limits, but—to continue collecting "triple dip" fees—they are all too willing to turn a blind eye to their policies' violations in practice.  *See* Compl. ¶¶ 11, 14–16, 66–67, 82, 90–93.  Adopting Ticketmaster's incorrect construction of the BOTS Act would let scalpers and their platform enablers entirely off the hook precisely when they most need to be held to account. If, as Ticketmaster urges, it negates the Act's "circumvent[ion]" element when Ticketmaster colludes with scalpers to "allow" them to maneuver around its technological controls, *see* Defs. Mem. at 23, then the BOTS Act becomes a paper tiger:  Ticketmaster's permission absolves scalpers of subparagraph (A) liability, and without a subparagraph (A) predicate, Ticketmaster itself is absolved of subparagraph (B) liability.  Fortunately, that is not the law, and Ticketmaster cannot issue itself a golden ticket.

Ticketmaster's erroneous interpretation of the Act would impose serious and substantial real-world costs on hardworking Americans who save up to enjoy attending live performances and sporting events.  Almost 40% of Americans report buying event tickets on the secondary market. *See* Digital Citizens Alliance, *When It Comes to Digital Markets, Trust Can't Be Secondary* (May 2025), tinyurl.com/DigCitAllce.  "Seventy-five percent of Americans who purchased reseller tickets said online secondary markets lead to speculators hoarding products." *Id.*  Their intuitions are amply justified:  It is well-documented that unregulated ticket-resale markets incentivize "costly rent-seeking behavior," which "reduce[s] overall social welfare."  Phillip Leslie & Alan Sorensen, *The Welfare Effects of Ticket Resale*, at 1 (Nat'l Bureau of Econ. Rsch., Working Paper No. 15476, 2009).

When ticket scalpers buy up tickets in primary markets, they force ordinary consumers into secondary markets, where "[t]icket resale prices can be significantly higher than primary market prices." U.S. Gov't Accountability Off., GAO-18-347, *Event Ticket Sales: Market Characteristics and Consumer Protection Issues*, at 12 (2018), tinyurl.com/GAO-tix.  One study, for instance, found

16

that ticket buyers on average paid 203% of face value for their tickets in the secondary market. *See* Nat'l Indep. Ticket Operators Ass'n, NITO TICKET RESALE STUDY 1–2 (2024), perma.cc/UE6A-WBF6. These markups represent massive wealth transfers from American consumers to unscrupulous online ticket speculators and their fee-collecting platform enablers—precisely what the BOTS Act sought to stop.

For too long, the Commission failed to enforce the BOTS Act with vigor. *See* Press Release, Office of Senator Marsha Blackburn, *The FTC Has Failed To Enforce The BOTS Act* (Dec. 2, 2022), tinyurl.com/FTC-BOTS. In March 2025, President Trump made his desire known that the Commission "[r]igorously enforce" the BOTS Act "to protect fans from exploitative ticket scalping." Press Release, White House, *Fact Sheet: President Donald J. Trump Will End Price-Gouging by Middlemen in the Entertainment Industry* (Mar. 31, 2025), tinyurl.com/WHFctsht; *see* Exec. Order No. 14,254 § 2(b), (d), 90 Fed. Reg. 14,699, 14,699 (Apr. 3, 2025). This Court should not hinder that overdue enforcement by allowing Ticketmaster to continue platforming commercial ticket scalpers.

**CONCLUSION**

Because the Commission's complaint adequately alleges BOTS Act violations, Amici respectfully submit that the Court should deny Defendants' motion to dismiss.


Dated: January 30, 2026

|  | Respectfully submitted, |
|---|---|
|  | */s/ James M. Donovan* |
| Michael A. Fragoso* | James M. Donovan (SBN 64756) |
| T. Zachary Horton* | Michael J. Glenn (SBN 89654) |
| Peter Lee Hamilton* | **LAW OFFICES OF JAMES M.** |
| **TORRIDON LAW PLLC** | **DONOVAN** |
| 801 Seventeenth Street NW, Suite 1100 | 915 Wilshire Boulevard, Suite 1610 |
| Washington, DC 20006 | Los Angeles, CA 90017 |
| Telephone: (202) 249-6900 | Telephone: (213) 629-4861 |
| mfragoso@torridonlaw.com | *jmdonovan@thedonovanoffices.com* |
| tzhorton@torridonlaw.com | *mglenn@thedonovanoffices.com* |
| phamilton@torridonlaw.com |  |
|  |  |
| *\*Pro hac vice forthcoming* |  |

**Attorneys for Amici Curiae**