# EXHIBIT A

-13-

Case 2:25-cv-08884-MEMF-MAA    Document 123-1    Filed 04/30/26    Page 2 of 15    Page
Case 1:25-cv-02716-GLR    Document 54    Filed 04/29/26    Page 1 of 14
ID #:786

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-25-2716 |
| KEY INVESTMENT GROUP LLC., et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Front Rose Tix LLC, Key Investment Group LLC, Taylor Kurth, Elan N. Rozmaryn, Yair D. Rozmaryn, Totally Tix LLC, Totaltickets.com LLC, and WLK Investments LLC's Motion to Dismiss (ECF No. 33) and Senators Marsha Blackburn and Ben Ray Lujan's Motion for Leave to File Amicus Curiae Brief (ECF No. 35). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2025). For the reasons set forth below, the Court will deny the Motion to Dismiss and grant the Motion for Leave.

### I.    BACKGROUND[1]

#### A.    Factual Background

Beginning on or around October 2016, Defendants Front Rose Tix LLC, Key Investment Group LLC, Taylor Kurth, Elan N. Rozmaryn, Yair D. Rozmaryn, Totally Tix

---

[1] Unless otherwise noted, the Court takes the following facts from the Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Case 2:25-cv-08884-MEMF-MAA    Document 123-1    Filed 04/30/26    Page 3 of 15   Page
ID #:787
Case 1:25-cv-02716-GLR    Document 54    Filed 04/29/26    Page 2 of 14

LLC, Totaltickets.com LLC, and WLK Investments LLC (collectively "Defendants") bought tickets from Ticketmaster, a well-known ticket-issuer, and then sold those tickets to consumers on different websites at higher prices. (Compl. ¶ 2, ECF No. 1). Ticketmaster has certain security measures so that consumers can purchase tickets at a reasonable price. (See id. ¶¶ 24–27). Ticketmaster's security measures include, as one example, a "Purchase Policy" which imposes ticket limits and prohibits the purchase of tickets with accounts containing false or misleading information. (Id. ¶¶ 25–28). Plaintiff, the Federal Trade Commission ("FTC"), alleges that Defendants bypass these security measures by using a host of methods to buy more tickets at a faster pace than ordinary consumers. (Id. ¶¶ 28–29).

Specifically, the FTC alleges Defendants bypass Ticketmaster's security measures by using thousands of fictitious names, addresses, and phone numbers; thousands of credit card numbers (including some linked to accounts in the names of Key Investment Group employees, or friends and family of Key Investment Group officers or employees); IP proxy services to utilize multiple IP addresses; hundreds of SIM cards; and SIM banks, also known as SIM boxes. (Id. ¶ 28). In addition to opening their own allegedly fictitious Ticketmaster accounts and using the accounts of friends and family members, Defendants have purchased hundreds of Ticketmaster accounts from individuals unrelated to Defendants. (Id. ¶ 43). In total, the FTC alleges that Defendants created, purchased, or otherwise obtained from third parties more than 13,000 Ticketmaster accounts. (Id. ¶ 42).

With tickets in hand from Ticketmaster, Defendants then sell these tickets at higher prices to consumers on secondary websites who otherwise may have been able to purchase

Case 2:25-cv-08884-MEMF-MAA    Document 123-1    Filed 04/30/26    Page 4 of 15    Page
Case 1:25-cv-02716-GLR    Document 54    Filed 04/29/26    Page 3 of 14
ID #:788

these same exact tickets at the posted price had Defendants not bypassed Ticketmaster's security measures. (See id. ¶¶ 30–33). Specifically, beginning on November 1, 2022 and continuing through December 30, 2023, the FTC alleges that Defendants purchased more than 107,265 tickets online through Ticketmaster. (Id. ¶ 23). Around that same time, Defendants sold these tickets on secondary websites, netting approximately $5,661,787.49 in revenue. (Id. ¶30).

As stated, because Defendants allegedly circumvent Ticketmaster's security measures, Defendants can purchase tickets "more rapidly and in a greater volume" than an ordinary consumer purchasing a single ticket through Ticketmaster. (Id. ¶29). The FTC offers several real-world examples of this practice and its consequences. (Id. ¶¶ 31–33). For example, Defendants allegedly used 49 different accounts to purchase 273 tickets to Taylor Swift's March 25, 2023 concert at Allegiant Stadium, exceeding The Eras Tour's 2023 six-ticket limit; Defendants then resold these tickets, making $119,227.21 in revenue. (Id. ¶ 32). As another example, for a Bruce Springsteen show at MetLife Stadium on September 1, 2023, Defendants used 277 different accounts to purchase 1,530 tickets, exceeding Springsteen and the E Street Band's four-ticket limit; Defendants resold these tickets, making $20,900.84 in revenue. (Id. ¶ 33).

For all these reasons, the FTC alleges that it has reason to believe that Defendants are violating and will continue to violate Section 2(a) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(a) and Section 5(a) FTC Act, 15 U.S.C. § 45(a) (Id. ¶¶1, 51). As further support, the FTC explains that in February 2018, Defendant Taylor Kurth entered a consent decree with the State of Washington regarding his use of software to circumvent, thwart,

3

Case 2:25-cv-08884-MEMF-MAA    Document 123-1    Filed 04/30/26    Page 5 of 15    Page
Case 1:25-cv-02716-GLR    Document 54    Filed 04/29/26    Page 4 of 14
ID #:789

or interfere with or evade a security measure, access control system, or other control or measure on Ticketmaster's websites in violation of Washington's Ticket Sellers Act, and yet Kurth and his co-Defendants, who allegedly know of the consent agreement, have continued to use business practices designed to circumvent Ticketmaster's posted ticket purchase policies. (Id. ¶ 51). As a result, the FTC seeks a permanent injunction to prevent future violations of the FTC Act and the Better Online Ticket Sales Act in accordance with the FTC Act, 15 U.S.C. § 53(b), and Section 2(b) of the Better Online Ticket Sales Act, 15 U.S.C. § 45c(b), along with civil penalties for each violation of the Better Online Ticket Sales Act in accordance with Section 2(b) of that Act, 15 U.S.C. § 45c(b), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A). (Id. at 17).[2]

## B.    Procedural History

On August 18, 2025, the FTC filed a Complaint against Front Rose Tix LLC, Key Investment Group LLC, Taylor Kurth, Elan N. Rozmaryn, Yair D. Rozmaryn, Totally Tix LLC, Totaltickets.com LLC, and WLK Investments LLC. (ECF No. 1). The one-count Complaint alleges violations of the Better Online Ticket Sales Act and the FTC Act (Compl. ¶¶ 52, 53). On November 24, 2025, Defendants filed a Motion to Dismiss. (ECF No. 33). The FTC filed an Opposition on December 24, 2025. (ECF No. 34). On January 16, 2026, Defendants filed a Reply. (ECF No. 51).

---

[2] Unless otherwise noted, citations to the page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

## II. DISCUSSION

### A. Motion for Leave to File Amicus Curiae Brief

Before reaching the merits of Defendants' Motion to Dismiss, the Court will first address the pending Motion for Leave to file Amicus Curiae Brief filed by United States Senators Marsha Blackburn and Ben Ray Lujan. (Mot. Leave File Amicus Curiae Br., ECF No. 35). Amici Senators move for leave to file an amicus brief seeking to provide guidance as to the interpretation and purpose of the Better Online Ticket Sales Act of 2016, 15 U.S.C. § 45c. (Mot. Leave File Amicus Curiae Br. at 6, ECF No. 35-1).

There is no Federal Rule of Civil Procedure applicable to motions for leave to appear as amicus curiae in a federal district court. Am. Humanist Ass'n v. Md.-Nat'l Cap. Park & Plan. Comm'n, 303 F.R.D. 266, 269 (D.Md. 2014). Accordingly, district courts have discretion to permit amicus briefs and often look to Rule 29 of the Federal Rules of Appellate Procedure for guidance, which applies to amicus briefs at the federal appeals level. Id. Rule 29 indicates that amici should state "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed.R.App.P. 29(b)(2). District courts have granted leave to file when amicus curie "provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance." Am. Humanist Ass'n, 303 F.R.D. at 269 (quotation omitted). On the other hand, if the Court does not find the "proffered information timely and useful," the motion "should not be granted." Id. (quotation omitted). Here, the Court finds that the proposed brief is relevant and helpful and will grant

Case 2:25-cv-08884-MEMF-MAA   Document 123-1   Filed 04/30/26   Page 7 of 15   Page
Case 1:25-cv-02716-GLR   Document 54   Filed 04/29/26   Page 6 of 14
ID #:791

the Motion (ECF No. 35). The Court considers the Amicus Curiae Brief in its analysis of the Motion to Dismiss.

**B.** <u>**Motion to Dismiss**</u>

    **1.**     **Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. <u>Goss v. Bank of Am., N.A.</u>, 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting <u>Walters v. McMahen</u>, 684 F.3d 435, 439 (4th Cir. 2012)), <u>aff'd</u>, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

Case 2:25-cv-08884-MEMF-MAA    Document 123-1    Filed 04/30/26    Page 8 of 15    Page
Case 1:25-cv-02716-GLR    Document 54    Filed 04/29/26    Page 7 of 14
ID #:792

allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### 2.    Analysis

Defendants assert the FTC fails to allege a cognizable violation of the Better Online Ticket Sales Act of 2016 ["BOTS Act" or "Act"], 15 U.S.C. § 45C. (Defs.' Mem. L. Supp. Mot. Dismiss ["Mot."] at 1, ECF No. 33-1). Specifically, Defendants argue that the BOTS Act is inapplicable here because Defendants do not use bots. (Id. at 1). Further, Defendants argue that Ticketmaster does not enforce or maintain security measures; to the contrary, Defendants insist that Ticketmaster encourages Defendants' behavior as it relates to ticket purchases. (Id.). Defendants also raise a host of constitutional issues, including that the BOTS Act is unconstitutionally vague as to non-bot users and violates the major questions doctrine. (Id. at 32–34). The FTC counters that the BOTS Act is neither unconstitutionally vague nor does it violate the major questions doctrine. (Pl.'s Mem. L. Opp'n Defs.' Mot. Dismiss ["Opp'n"] at 28–30, ECF No. 34). Additionally, the FTC argues that "[a]cronym aside, the words 'bot' or 'bots' do not appear in the Act" and urges the Court to "decline Defendants' invitation to read an unwritten substantive pleading requirement into the Act's text, based simply on an acronym for the Act's title." (Id. at 21). The Court will review each argument in turn.

7

Case 2:25-cv-08884-MEMF-MAA    Document 123-1    Filed 04/30/26    Page 9 of 15    Page
Case 1:25-cv-02716-GLR    Document 54    Filed 04/29/26    Page 8 of 14
ID #:793

### a.    Whether the BOTS Act Applies to "Non-Bot Users"

The Court will first address Defendants' argument that the BOTS Act is inapplicable here because Defendants do not use bots. (Mot. at 8–19). The BOTS Act makes it unlawful for "any person . . . to circumvent a security measure, access control system, or other technological control or measure on an Internet website . . . used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules[.]" 15 U.S.C. § 45c(a)(1)(A). Defendants rely on the statute's acronym to show the Act applies exclusively to bots or bot-users. (Mot. at 7 n.1, 4–19). Defendants then insist that "whether the BOTS Act applies to non-bot users is ambiguous at best. As such, courts are directed to look to legislative history for guidance." (Id. at 15). Defendants then turn to the Act's legislative history and conclude that Congress did not intend for the BOTS act to apply to "non-bot users" and maintains that the FTC "cannot now turn a blind eye to Congress's intent." (Id.).

The Court finds Defendants' approach to statutory interpretation unpersuasive. Matters of statutory interpretation are within the sound province of the judiciary. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 385 (2024) (citing Marbury v. Madison, 5 U.S. 137, 177 (1803)). "[T]he starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" Redeemed Christian Church of God v. Prince George's Cnty., 17 F.4th 497, 508 (4th Cir. 2021) (quoting D.B. v. Cardall, 826 F.3d 721, 734 (4th Cir. 2016)). And "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." West Virginia v. Env't Prot. Agency, 597 U.S. 697, 721 (2022) (quotation

8

Case 2:25-cv-08884-MEMF-MAA    Document 123-1    Filed 04/30/26    Page 10 of 15
Case 1:25-cv-02716-GLR    Document 54-3    Filed 04/29/26    Page 9 of 14
Page ID #.794

omitted). "Principles of statutory construction require 'a court to construe all parts to have meaning' and, accordingly, avoid constructions that would reduce some terms to mere surplus[ ]age." In re Total Realty Mgmt., LLC, 706 F.3d 245, 251 (4th Cir. 2013) (quoting PSINet, Inc. v. Chapman, 362 F.3d 227, 232 (4th Cir. 2004)); Child Trends, Inc. v. United States Dep't of Educ., 795 F.Supp.3d 700, 723 (D. Md. 2025).

Here, 15 U.S.C. § 45c does not define nor include the word "bots." Rather, the statute makes it unlawful for "any person" to "circumvent a security measure . . . on an Internet website or online service that is used by the ticket issuer to enforce posted event ticket purchasing limits or to maintain the integrity of posted online ticket purchasing order rules." 15 U.S.C. § 45c(a)(1)(A). The statute unambiguously applies to "any person" and not just to "bots." See id. Additionally, the harms at issue, exorbitant ticket prices because of bad actors manipulating and re-selling tickets and circumventing posted security measures, could be caused either by "bots," or humans who write the code behind the "bots," or individuals who work in concert to recreate what bots otherwise accomplish. Put simply, the Court is not persuaded by Defendants' narrow reading of the statute. Further, courts have rejected relying on a statute's name or acronym as evidence of the law's plain meaning because "it is the statutory language, and not the statutory provision's title or popular name, that controls." United States v. Terrazas Siles, 397 F.Supp.3d 812, 825 (E.D.Va. 2019), aff'd sub nom., United States v. Terrazas-Silas, 811 F.App'x 845 (4th Cir. 2020); see Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528–29 (1947) (discussing the "wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text"). The Court's inquiry, however, does not end there.

Case 2:25-cv-08884-MEME-MAA    Document 123-1    Filed 04/30/26    Page 11 of 15
Case 1:25-cv-02716-GLR    Document 54-3    Filed 04/29/26    Page 10 of 14
Page ID #:795

As the United States Court of Appeals for the Fourth Circuit recently explained when interpreting a provision of the Internal Revenue Code, even where "[t]he statute's text is clear, [and] we needn't reach its legislative history," in any event, a look at the statute's legislative history "lends no support to the [Defendants'] position." Bank of Am. Corp. v. United States, 148 F.4th 171, 179–80 (4th Cir. 2025). Here too. The Court need not reach the text's legislative history to determine whether it exclusively applies to "bots," but even so, Defendants' position still does not warrant dismissal. As Amici Senators explain, "the operative text of the BOTS Act does not limit its application to scalpers who use bots. In fact, the law's key provision does not reference bots at all." (Amicus Br. at 7, ECF No. 35-1). Further, and most critically, "contrary to Defendants' representations, Amici—as drafter (Senator Blackburn) and supporter (Senator Luján) of the law—did not believe the BOTS Act was confined solely to use of bot technology." (Id.). Rather, "the problem troubling Amici and their fellow lawmakers was not just scalpers using bots to gain an unfair advantage—though, to be sure, that was a significant concern." (Id. at 15). Instead, "[t]he root problem was that ticket scalpers did not play by the rules; they cheated and enriched themselves at the expense of the ordinary American consumer." (Id.). The legislative history of the BOTS Act does not support a narrow reading as Defendants suggest. As a result, the Court will deny Defendants' Motion to Dismiss on this basis.

**b.      Whether Defendants Circumvented Security Measures**

Defendants next advance a series of other arguments in support of dismissal, including, for example, that the FTC fails to allege that Defendants circumvented a security measure in violation of the BOTS Act because Ticketmaster condones its behavior. (Mot.

Case 2:25-cv-08884-MEME-MAA    Document 123-1    Filed 04/30/26    Page 12 of 15
Case 1:25-cv-02716-GLR    Document 54-1    Filed 04/29/26    Page 11 of 14
Page ID #:796

at 19–21). The statute's applicability, however, does not depend on how vigorously a ticket issuer enforces its policies.

Indeed, whether Ticketmaster condoned or encouraged Defendants' behavior seems, at best, issues of fact best suited for summary judgment briefing and discovery. The same goes for Defendants' arguments around their use of SIM Cards, SIM Boxes, and multiple IP Address and accounts. (Mot. at 10–18). At this very early stage, the question is whether the FTC adequately alleges that Defendants circumvented Ticketmaster's security measures. It does. (See e.g., Compl. ¶ 28 ("When purchasing tickets from Ticketmaster, Defendants have regularly circumvented security measures, access control systems, and other technological controls or measures on Ticketmaster's websites by, among other things, using: computer software and technologies designed to do so; thousands of fictitious names, addresses, and phone numbers; thousands of credit card numbers (including some linked to accounts in the names of Key Investment Group employees, or friends and family of Key Investment Group officers or employees); IP proxy services to utilize multiple IP addresses; hundreds of SIM cards; and SIM banks, also known as SIM boxes.")). Defendants may be correct that, ultimately, the FTC will fail to "establish" liability (see Mot. at 16), but that is not the inquiry at this stage of the litigation and the Court will decline to dismiss on this basis.

### c.      Whether the BOTS Act is Void for Vagueness

Defendants next argue that the BOTS Act is unconstitutionally vague as applied to "non-bot users." (Mot. at 32–34). A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what

Case 2:25-cv-08884-MEME-MAA    Document 123-1    Filed 04/30/26    Page 13 of 15
Case 1:25-cv-02716-GLR    Document 54-7    Filed 04/29/26    Page 12 of 14
Page ID #:797

conduct it prohibits;" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." United States v. Whorley, 550 F.3d 326, 333 (4th Cir. 2008) (citation omitted). To satisfy constitutional muster, statutory prohibitions must simply "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." Id. (citation omitted). A statute need not spell out every possible factual scenario with "celestial precision" to avoid being struck down on vagueness grounds. Id. (citation omitted).

Here, the Court finds that the BOTS Act is not unconstitutionally vague as applied to non-bot users. As this Court has explained, the law applies to "any person" who engages in circumventing ticket-issuers' security measures. See 15 U.S.C. § 45c(a)(1)(A). The Court takes the law to mean what it says. The Act provides enough context and does not fail to provide "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." Whorley, 550 F.3d at 333 (citation omitted). The law aims to stop exorbitant ticket prices on secondary websites, and the FTC's enforcement of the BOTS Act, at least at this stage of the litigation, does not appear arbitrary or discriminatory. As a result, the Court rejects Defendants' invitation to find the law unconstitutionally vague as applied to non-bot users.

For these same reasons, the Court also rejects Defendants' argument that "civil penalties cannot be assessed as a matter of law" because Defendants did not know they violated the BOTS Act. (Mot. at 26). Specifically, Defendants argue that the FTC Act "only allows for civil penalties if an entity violated the BOTS Act 'with actual knowledge or knowledge fairly implied on the basis of objective circumstances.'" (Id. (quoting 15

12

Case 2:25-cv-08884-MEME-MAA    Document 123-1    Filed 04/30/26    Page 14 of 15
Case 1:25-cv-02716-GLR    Document 54-3    Filed 04/29/26    Page 13 of 14
Page ID #:798

U.S.C. § 45(m)(1)(A)). Because Defendants assert that they do not use bots, Defendants argue "it would have been literally impossible for [Defendants] to have had knowledge 'on the basis of objective circumstances' that it violated the BOTS Act." (Id. at 27). The FTC counters that Defendants had knowledge of the Act, received warnings from vendors about compliance with the act, and monitored the Act and FTC enforcement actions. (Compl. ¶ 51; Opp'n at 12). The Court declines to find that civil penalties cannot be assessed as a matter of law because the plain text of the BOTS Act does not limit its enforcement only to "bots" but rather applies to "any person." 15 U.S.C. § 45c(a)(1)(A). Accordingly, Defendants' arguments around its lack of knowledge about the potential violations are unpersuasive. As a result, the Court declines to dismiss on this basis.

### d.    Whether the BOTS Act Violates the Major Questions Doctrine

Defendants also argue that the BOTS Act violates the major-questions doctrine (Mot. at 34–36). This rule requires clear congressional authorization for agency action in "extraordinary cases" when the "history and breadth" and "economic and political significance" of the action at issue gives us "'reason to hesitate before concluding that Congress' meant to confer such authority" to act on the agency. West Virginia, 597 U.S. at 721 (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159–60 (2000)). "As its name suggests, the major-questions doctrine applies only when the question at issue—i.e., the authority the agency is claimed to have—is a major one. That is, the question must have significant political and economic consequences." North Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC, 76 F.4th 291, 296 (4th Cir. 2023).

13

Case 2:25-cv-08884-MEME-MAA     Document 123-1     Filed 04/30/26     Page 15 of 15
Case 1:25-cv-02716-GLR     Document 54-23     Filed 04/29/26     Page 14 of 14
Page ID #:799

Here, the BOTS Act seeks to curtail a specific problem of exorbitant ticket prices that harm consumers buying tickets on secondary websites. See 15 U.S.C. § 45c. Further, in contrast to Biden v. Nebraska, 600 U.S. 477, 500–07 (2023), where the Court found the major questions doctrine applicable because it involved the Secretary of Education's decision to free 43 million borrowers from their obligations to repay $430 billion in student loans, here, the BOTS Act is much more narrow and simply aims to "prohibit the circumvention of control measures used by Internet ticket sellers to ensure equitable consumer access to tickets for any given event," 15 U.S.C. § 45c(a)(1)(A). It does not seek to regulate large swaths of the economy nor is it particularly politically significant or controversial. (See Amicus Br. at 15 (noting that Congress passed the BOTS Act unanimously)). In sum, the Court agrees with the FTC that this case "involves neither ambiguous statutory text" nor "extravagant statutory power over the national economy." (Opp'n at 29 (quoting West Virginia, 597 U.S. at 724)). As a result, the Court declines to dismiss on this basis.

### III.     CONCLUSION

For the foregoing reasons, the Court will deny the Motion to Dismiss (ECF No. 33) and grant the Motion for Leave to file Amicus Curiae Brief (ECF No. 35). A separate Order follows.

Entered this 28th day of April, 2026.

/s/
_____

George L. Russell, III
Chief United States District Judge
